UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

A.S. GOLDMEN, INC., ANTHONY MARCHIANO      :
& SALVATORE MARCHIANO,
                                           :
                    Petitioners,
                                           :

        -against-
                                           :

WARDEN WILLIAM PHILLIPS, Green Haven                 05 Civ. 4385 (PKC) (AJP)
Correctional Facility & SUPERINTENDENT     :
WILLIAM CONNOLLY, Edgecombe
Correctional Facility,                     :

                    Respondents.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHARLES TRENTO,                            :

                    Petitioner,            :
                                                     05 Civ. 5496 (PKC) (AJP)
        -against-                          :

                                           :

CHAIRMAN ROBERT DENNISON, New York         **REPORT AND RECOMMENDATION**
State Division of Parole,                  :

                    Respondent.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable P. KEVIN CASTEL, United States District Judge:**


            Petitioners seek a writ of habeas corpus from their November 2001 convictions in

Supreme Court, New York County, of enterprise corruption and multiple counts of securities fraud

pursuant to New York General Business Law § 352-c(5) ("The Martin Act").[1]  In addition, petitioner A.S. Goldmen, Inc. ("ASG") was convicted of six counts of first degree criminal possession of stolen property; petitioner Anthony Marchiano was convicted of six counts of first degree criminal possession of stolen property, five counts of first degree falsifying business records, two counts of third degree grand larceny, one count of fourth degree grand larceny and twenty-eight counts of securities fraud pursuant to § 352-c(6) of the Martin Act; petitioner Salvatore Marchiano was convicted of two counts of first degree criminal possession of stolen property; and petitioner Charles Trento was convicted of twenty counts of first degree falsifying business records and eleven counts of securities fraud pursuant to § 352-c(6) of the Martin Act.  See People v. A.S. Goldmen, Inc., 9 A.D.3d 283, 283-84, 779 N.Y.S.2d 489, 490-91 (1st Dep't 2004).   ASG was sentenced to a conditional discharge; Anthony Marchiano was sentenced to an aggregate of 10 to 30 years imprisonment and directed to pay $8,000,000 in restitution; Salvatore Marchiano was sentenced to an aggregate of 5 to 15 years imprisonment and directed to pay $3,968,000 in restitution; and Trento was sentenced to an aggregate of 4 to 12 years imprisonment and directed to pay $1,354,000 in restitution.  Id., 9 A.D.3d at 284, 779 N.Y.S.2d at 491.  The Marchianos remain in prison; Trento has been released on parole.  (See State Br. at 3.)

---

[1]     Petitioners Anthony Marchiano, Salvatore Marchiano and A.S. Goldmen, Inc. submitted a joint petition and brief (05 Civ. 4385, Dkt. No. 1: Pet. & Br.), while petitioner Charles Trento submitted a separate petition (05 Civ. 5496, Dkt. No. 1: Trento Pet.).  Hereinafter, citations to docket numbers are from 05 Civ. 4385 unless otherwise indicated.

Petitioners seek habeas relief on several grounds: First, all petitioners allege that the First Department unreasonably applied clearly established federal law by holding that the admission of seven plea allocutions at trial in violation of petitioners' Confrontation Clause rights was harmless error. (Marchiano Pet. ¶ 2; 05 Civ. 5496, Dkt. No. 1: Trento Pet. ¶ 12(B).) Second, all petitioners allege that they were denied their constitutional rights due to the misconduct of the trial judge, Justice Leslie Crocker Snyder. (Marchiano Pet. ¶ 1; Trento Pet. ¶ 12(C).) The Marchiano petitioners allege that "the trial court's conduct in unfairly limiting cross-examination, participating in the trial process, as an ancillary prosecutor, and by demonstrating obvious partiality both in and out of the presence of the jury." (Marchiano Pet. ¶ 1.) Trento alleges that he was denied a fair trial because the trial "court should have recused itself after another co-defendant was charged with hiring someone to murder [the] trial judge [and the] trial court exhibited bias and gave interviews and wrote a book while the case was pending." (Trento Pet. ¶ 12(C).) Additonally, Trento alleges that: (1) the evidence against him at trial was insufficient to support his conviction (Trento Pet. ¶ 12(A)), and (2) he was denied an impartial jury because the trial court denied his request to excuse three jurors who reported the misconduct of a fourth juror who was replaced by an alternate (Trento Pet. ¶ 12(D)).

For the reasons discussed below, petitioners' habeas petition should be DENIED, but a certificate of appealability should issue, limited to the <u>Crawford</u> Confrontation Clause harmless error claim.

**FACTS**

**The Prosecution Case at Trial**[2/]

    **The Petitioners and Other Senior ASG Personnel**

Petitioner ASG, founded in 1988 by petitioner Anthony Marchiano, was a licensed securities broker-dealer and an investment banking underwriter. (Marchiano Br. at 2-3; Dkt. No. 6: State Br. at 7.) The "A.S." in A.S. Goldmen stood for Anthony and Sal Marchiano. (E.g., Imbrenda: Tr. 2758.) ASG began operations at two Manhattan locations (Kaplan: Trial Transcript ("Tr.") 705-06) but by 1996 these offices had closed and the New Jersey office, which had opened in 1993, became the principal office, with additional offices in Florida (opened in April 1997) and California (closed in 1995). (Kaplan: Tr. 725-26; Caracciolo: Tr. 3554, 3646-47; Meyers: Tr. 5449-51, 5924; Whitman: Tr. 6392-93, 6395; see Marchiano Br. at 2.)

Petitioner Anthony Marchiano was president and sole shareholder of ASG, and a licensed securities broker. (Kaplan: Tr. 712; Meyers: Tr. 5396; Whitman: Tr. 6416, 7076; Panza: Tr. 7256; Pipia: Tr. 8470; see Marchiano Br. at 3.) He was involved in every major decision of the firm, including setting the prices for the stocks that ASG bought and sold (Meyers: Tr. 5438, 5936, 6183; Whitman: Tr. 7076-77). Once the Florida office opened, Anthony Marchiano moved there and ran that office, acting as manager – a hands-on position in which he dictated which stocks to buy

---

[2/]    Except in the subsection discussing the plea allocutions (see "Plea Allocutions and the Trial Judge's Limiting Instructions" at pages 30-40 below), the description of the trial testimony herein will not refer to or cite to the plea allocutions. Evidentiary citations are representative, not exhaustive.

and sell and in what quantities. (Meyers: Tr. 5443, 5448, 5457; Whitman: Tr. 6399, 6414.) He remained in close contact with the New Jersey office, where trading occurred. (Whitman: Tr. 6400, 6413.) In fact, his contact with the trading department increased once he took on the managerial role in Florida. (Meyers: Tr. 5447-48.)

Petitioner Salvatore Marchiano, Anthony's twin brother,[3/] was a licensed securities broker and ASG's head trader in the New York office and sales manager. (Meyers: Tr. 5396-97, 5409; Cilmi: Tr. 8740-41; see Marchiano Br. at 3; State Br. at 8-9.) At the end of 1992, Sal left ASG ostensibly to start his own brokerage firm, but returned to ASG as a senior manager in the New Jersey office where he was in charge of the brokers. (Kaplan: Tr. 730-31, 763, 767-68, 907-09, 948; Meyers: Tr. 5426-27; Whitman: Tr. 6390-91.) Sal Marchiano helped decide which stocks to buy (Meyers: Tr. 5409-10; Imbrenda: Tr. 2841-43), conducted the sales meetings (Whitman: Tr. 6391), processed sales (Kaplan: Tr. 880-83) and controlled the pay of many of the brokers (Kaplan: Tr. 947-48). In May 1997, at the behest of ASG's Chief Financial Officer Stuart Winkler, Sal left the firm because he had had someone else take his licensing exam for him. (Whitman: Tr. 6404-05.)[4/] When Sal left, Stacy Meyers took over as head trader. (Meyers: Tr. 5425-26.)

Charles Trento was a senior broker at ASG. (See Marchiano Br. at 3; State Br. at 9.)

---

[3/]  The Court will sometimes refer to the Marchiano brothers by their first names, Anthony and Sal, for convenience since they obviously have the same last name. No disrespect is intended.

[4/]  When Sal left ASG, ASG filed the required form with the National Association of Securities Dealers, but indicated that he left for medical reasons. (Whitman: Tr. 6405-07.)

Stuart Winkler was ASG's executive vice president, Chief Financial Officer and head of compliance. (Kaplan: Tr. 870-75; Rosenblatt: Tr. 4402; Meyers: Tr. 5397; Whitman: Tr. 6416-17; Pipia: Tr. 7908, 8391; Cilmi: Tr. 8740-41, 9170-71; see Marchiano Br. at 4.) Winkler played a pivotal role in ASG such that several former ASG employees who testified at trial understood Winkler to be a partner or co-owner of ASG. (Kaplan: Tr. 714-15, 738-40; Imbrenda: Tr. 2748, 2758; Carraciolo: Tr. 3555.) Once Anthony Marchiano moved to the Florida office, Winkler managed the New Jersey office (Whitman: Tr. 6414) and the two maintained close contact via daily, or sometimes more frequent, phone calls (Whitman: Tr. 6417-20; see Pipia: Tr. 7908-09).

As part of their scheme, Winkler and Anthony Marchiano prearranged for Winkler to be ASG's "fall guy," that is, Winkler agreed to take whatever punishment might be imposed by regulatory bodies or the courts for ASG's improper and illegal conduct in return for compensation to be paid him by Anthony. (E.g., Cilmi: Tr. 8930, 9172-73; see Marchiano Br. at 21; State Br. at 8.)

Erika Whitman was the assistant director of compliance until 1997 when she became director of compliance. (Whitman: Tr. 6396, 6420.) Whitman "took care of all the state inquiries[,] . . . there [were] a lot of investigations going on and customer complaints that had to be dealt with." (Whitman: Tr. 6420-21.)

Stacy Meyers was head of trading. (Whitman: Tr. 6392; Meyers: Tr. 5425-26.) Meyers had less discretion than Sal had had in that position: she had to get permission from Anthony or Winkler if she wanted to buy or sell a large amount of inventory stock. (Meyers: Tr. 5429-31,

5434-36, 5441.) The trading department reported to Winkler and Anthony Marchiano. (Rosenblatt: Tr. 4402.)

Meyers and Whitman were among ten former ASG employees who testified against the petitioners at trial as part of cooperation agreements entered into with the prosecution. (See Marchiano Br. at 5.) Additionally, the prosecution presented the testimony of ASG's former customers and experts from the regulatory field. The prosecution also introduced documentary evidence and tapes of telephone conversations between ASG personnel and customers, as well as the guilty plea allocutions of Stuart Winkler and six other ASG employees.

**ASG's Business**

ASG engaged in three general business areas. First, ASG served as underwriter for initial public offerings ("IPOs") of small companies. (See Marchiano Br. at 6; State Br. at 9.) An IPO is a "process by which a private company becomes public through the issuance of additional stock." (Marchiano Br. at 3.) Second, it served as "market maker" for those companies' securities.[5]

---

[5] A "market maker" is a firm that uses its own capital to build up an inventory account of a specific company's securities and then trades those securities at publicly quoted prices from its own account and at its own risk. (Rosenblatt: Tr. 4353-56; Hazen: Tr. 10914-18; see Marchiano Br. at 6.) For further definitions of "market maker" see, e.g., In re Xcelera.com Sec. Litig., 430 F.3d 503, 515 (1st Cir. 2005) ("A market-maker is '[o]ne who helps establish a market for securities by reporting bid-and-asked quotations' (the price a buyer will pay for a security and the price a seller will sell a security), and who 'stand[s] ready to buy or sell at these publicly quoted prices,'") (citations omitted); Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(38) ("The term 'market maker' means any specialist permitted to act as a dealer, any dealer acting in the capacity of block positioner, and any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis.").

(See Marchiano Br. at 6; State Br. at 10.)  Market makers are regulated by the National Association of Securities Dealers ("NASD") and the Securities & Exchange Commission ("SEC").  (Rosenblatt: Tr. 4300-01; see Marchiano Br. at 6; State Br. at 11.)  Third, ASG was a retail brokerage firm, but it predominantly sold to its customers its "house stocks," that is, the securities of the companies it had brought public and for which it served as market maker.  (E.g., Kaplan: Tr. 812, 817-18, 903-04, 908-13; see Marchiano Br. at 6; State Br. at 10.)

**The IPOs**

As the underwriter for the IPOs of small start-up companies, ASG raised the money from a group of investors, called "bridge lenders," who loaned the company preparing to go public money in return for stock and/or warrants,[6] and the repayment of the loan once the IPO occurred. (Kaplan: Tr. 870-74; see Marchiano Br. at 6-8; State Br. at 11-12.)  Additionally, ASG raised money through "private placements," whereby customers of ASG loaned money to the company preparing to go public in return for stock and/or warrants which could be sold after the company went public. (Panza: Tr. 7367-68; Pipia: Tr. 8134; see Marchiano Br. at 8.)[7]

---

[6]     A warrant is a security which allows the holder to purchase common stock of that company at a future date at a specified price.  (Rosenblatt: Tr. 4338.)

[7]     For additional information about the general IPO process and the manipulative practices that commonly occur therein, see 2 Thomas Lee Hazen, Treatise on the Law of Securities Regulation Chpt. 6 ("IPO Practices: Manipulation, Stabilization and Hot Issues") (5th ed. 2002).

Between May 1994 and August 1998 – the period covered by the indictment – ASG executed, or attempted to execute, IPOs for 10 companies.[8/]

SEC and NASD regulations require a company planning to go public to file and issue a prospectus and a registration statement. (Rosenblatt: Tr. 4299-300, 4302, 4348; Kaplan: Tr. 835.) The prospectus described the company's prospects and included the number of shares, the price, the distribution plan, the risk and the company's financial condition. (Rosenblatt: Tr. 4305-07.) It was used to promote interest among potential lenders and customers who had given "indications of interest" to purchase the IPO stock. (Rosenblatt: Tr. 4304; Pipia: Tr. 8097-98; Kaplan: Tr. 835, 850-52.)

Once the IPO securities were distributed to investors, usually within the first few hours after the IPO became effective, public trading began on the NASDAQ. (Rosenblatt: Tr. 4304.)

ASG's goal was to gain control of a large percentage of a company before the IPO and also use lenders and initial investors it controlled so that ASG could control the market once public trading began. (E.g., Meyers: Tr. 5478-80, 5634-35, 5640, 5643-44, 5665-68; Whitman: Tr. 6577.) These controlled investors were the bridge and private placement lenders, ASG employees holding nominee accounts and customers who had "problem accounts." (Panza: Tr. 7265-68, 7270-71;

---

[8/]     The 10 firms: Innovative Technology Systems, Inc. ("ITSY"), Cinema Ride, Inc., Nickelodeon Theater Co., Veritas Music Entertainment, Winfield Capital Corp., Wanderlust Interactive, Inc., Imatec, Ltd., Independence Brewing Company ("IBCO"), Millennium Sports Management (formerly Skylands Park) and the Stadium Capital private placement. (Panza: Tr. 7270; Serrano: Tr. 11400-32; see Marchiano 1st Dep't Br. Jt. Appx. Vol. I at A. 12-342: Indictment; Marchiano Br. at 3, 10, 13-20; State Br. at 12-13.)

Smith: Tr. 7678, 7682; Lamarti: Tr. 9443-47, 9453-54.)  A nominee account is an account that an ASG principal or employee set up in another person's name, usually a relative or friend, to hide the fact that the true owner of the account was the ASG principal/employee. (Rosenblatt: Tr. 4508; Meyers: Tr. 5475-77; Panza: Tr. 7265.)  Nominee accounts were against NASD regulations; ASG personnel were not allowed to claim ownership in a company they were bringing public.  (Pipia: Tr. 8122-23; Meyers: Tr. 5475-77; Rosenblatt: Tr. 4508; see Marchiano Br. at 9 & n.4.)  The general practice at ASG, however, was to allot certain IPO shares to ASG personnel who, by placing the shares in the nominee account, had a hidden financial interest in the IPO company.  (Panza: Tr. 7265-68, 7270-71; Smith: Tr. 7678; Lamarti: Tr. 9443-47, 9453-54.)  The name on the nominee account, however, did not appear on its face to be related to anyone at ASG, thereby deceiving the public as to who actually controlled the account.  (Pipia: Tr. 8123; Meyers: Tr. 5475-77.)  ASG did not disclose to its customers that it was participating in the IPO through nominee accounts.  (E.g., Panza: Tr. 7270.)

"Problem accounts" were accounts of customers who had complained about ASG's handling of their account and who were willing to resolve the complaint with ASG (through receipt of IPO stock), instead of through the regulatory agencies. (Meyers: Tr. 5634-35; Whitman: Tr. 6574-96, 6617-32; Lamarti: Tr. 9454-68; see Marchiano Br. at 10.)  Anthony Marchiano and Stuart Winkler supervised the allocations of IPO stock to "problem accounts." (Smith: Tr. 7680-81, 7693-94; Whitman: Tr. 6587, 6591-92, 6621, 6637-46, 6676-77; Lamarti: Tr. 9458-68.)  Trento, as a senior broker, often spoke to the complaining clients and would arrange for them to receive IPO

allocations to placate them. (Smith: Tr. 7680-82, 7693-94.) Whitman, as director of compliance, maintained lists of clients with problem accounts and wrote the buy and sell tickets for the warrants allocated to those accounts; Winkler directed Whitman to write out the sell tickets at the same time she wrote out the buy tickets, before the IPO, since the warrants were going to be automatically sold out by ASG after the IPO. (Whitman: Tr. 6615-17, 6623-24, 6659.)

Thus, the "owners" of the nominee and problem accounts did not actually control their accounts. (E.g, Pipia: Tr. 8201-02; Meyers: Tr. 5488.) Rather, it was understood, and prearranged by ASG, that ASG could pull those securities into the firm's inventory in the IPO aftermarket at a date and price determined by ASG, not the seller of the security. (E.g., Meyers: Tr. 5478-79, 5488-89, 5634-35, 5640, 5643-44, 5665-68; Whitman: Tr. 6576-77; Pipia: Tr. 8201-02.)

### ASG As Market Maker

In the IPO's aftermarket, once shares in the company could be traded publicly, ASG would buy back the shares from its lenders, nominees and problem accounts. (Meyers: Tr. 5638-40.) Winkler and Anthony Marchiano would "take out" (that is, ASG would buy the shares at the prearranged price) the nominee and problem accounts within a day or two after the IPO. (Meyers: Tr. 5478-79, 5634-35, 5640, 5643-46, 5665-68; Whitman: Tr. 6576-77.) While ASG would make sure the original investors made some money from the deal, the price at which the original investors sold the securities to ASG, set by Anthony or Winkler, typically was well below market prices. (Meyers: Tr. 5479-82, 5643-46; Panza: Tr. 7280-87; Smith: Tr. 7696-97; Lamarti: Tr. 9464-66.) Anthony dictated the price and volume of the stocks sold in the aftermarket and, for example, when

another brokerage firm called to bid on the stock, Anthony would decide whether to sell them the shares. (E.g., Meyers: Tr. 5647-48.)

For example, after the Independence Brewing Company ("IBCO") IPO, Anthony had one of the "problem account" customers who had been given 20,000 warrants in IBCO taken out for one dollar per warrant at a time when the warrants were selling for between $1.53 and $1.81. (Lamarti: Tr. 9464-68.) After speaking with the customer, Lamarti relayed to Anthony that the customer was upset he could not keep any of his warrants, to which Anthony replied, the customer was "lucky to get what he was getting." (Lamarti: Tr. 9467.) Shortly thereafter, the customer closed his ASG account, with a $100,000 loss. (Lamarti: Tr. 9467-68.)

With respect to the IPOs that ASG underwrote before 1994, Anthony was usually in and out of the trading room or would be on the phone on the day of the IPO. (Meyers: Tr. 5444-45.) After 1994, on the day of an IPO, Anthony was stationed in the trading department and would dictate how much of the stock to buy and sell and to whom and in what quantity to offer warrants. (Meyers: Tr. 5443-44, 5932, 6179-80; Whitman: Tr. 7077.) On days other than "IPO days," Anthony maintained an office with a computer that showed him market prices. (Meyers: Tr. 5933.) Erika Whitman testified about how closely Anthony and Winkler kept in touch:

> Anthony would call the office and ask to speak to Stuart [Winkler] and we'd have to find Stuart wherever he was. If he was in the bathroom we would tell him he was in the bathroom. I never went as far as to knock on the bathroom door, but I know Denise had. We used to get him in the car. If Stuart was in the car I'd connect [Anthony] through to the car and vice versa. Stuart would call the office and want to be connected to [Anthony] in the office, if he was away from the office, in the car or on a cell phone. . . . In 1994 they had the bat phone, which was a single line phone that was brought in to – Stuart had one hooked up in his office, and I understand

> Anthony had one in his office, as well. . . . It was just a single line phone that was –
> I believe it was like a red telephone that was just – it would just ring . . . [i]n Stuart
> Winkler's office, and Anthony was the only one I know of who ever called on it.

(Whitman: Tr. 6417-19.)

Pursuant to the governing laws and regulations, the market maker is supposed to be a neutral player, with its bid and ask prices reflecting the market. (Hazen: Tr. 10946.) The NASD allows a market maker, which takes on a high level of risk, to charge a mark-up on the stocks it sells of up to 5%, with anything over 10% being a per se fraudulent sale. (Rosenblatt: Tr. 4536-37; Hazen: Tr. 10943-44.) ASG generally would mark up its price above the 5% limit. (Meyers: Tr. 5552-53.)

ASG then acted as retailer and sold these IPO stocks that it had bought cheaply to its customers at market price. (Meyers: Tr. 5644-46.) ASG made significant profits on its sales to customers. (Rosenblatt: Tr. 4606.) Anthony and Winkler set ASG's bid and ask prices. (Meyers: Tr. 5435-36, 5552-53.) Sal Marchiano also had been involved in that practice until Stacy Meyers took over as head trader. (Meyers: Tr. 5435-36.) As head of sales in the New Jersey office, Sal told the brokers how much of a stock the firm wanted sold on a particular day. (Caracciolo: Tr. 3709-10.)

### Examples of ASG's IPO Process

#### The Imatec IPO

An example of ASG's IPO process was its handling of Imatec Corporation's IPO. Charles Pipia, an ASG broker who testified as a cooperating witness for the prosecution, brought

Imatec, a closely-held corporation, to the attention of ASG managers Paul and Michael Cilmi.[9] (Pipia: Tr. 8106-12, 8868; Cilmi: Tr. 8867; <u>see</u> Marchiano Br. at 15.)  Imatec's principal, Hanoch Shalit, had developed a process for improving images from medical scanners and had been searching for financing to no avail.  (Pipia: Tr. 8106-07; Cilmi: Tr. 8867-69; <u>see</u> State Br. at 13.)  At Winkler's direction, Paul and Michael Cilmi and Pipia met with Shalit to see if Shalit would "play ball." (Pipia: Tr. 8112; Cilmi: Tr. 8869; <u>see</u> State Br. at 13.)  The ASG employees told Shalit at the end of the meeting that Winkler would be contacting him.  (Pipia: Tr. 8117.)  At a second meeting, Winkler explained to Shalit what "playing ball" meant: ASG would do the private placement but only if Shalit gave up 50% of his company to ASG.  (Pipia: Tr. 8119-22; Cilmi: Tr. 8869-70, 8873-81; <u>see</u> Marchiano Br. at 15; State Br. at 13.)  ASG would split its ownership shares between the nominee accounts of Anthony, Winkler, Pipia, and the Cilmi brothers.  (Pipia: Tr. 8120; Cilmi: Tr. 8880-86; <u>see</u> Marchiano Br. at 15.)  The nominees, which meant the ASG employees, received these shares for free.  (Pipia: Tr. 8140; Cilmi: Tr. 8897; <u>see</u> Marchiano Br. at 15.)  Anthony and Winkler shared a nominee for the Imatec IPO because, as Winkler put it at the time, Anthony "'had run out of people to use for his stock these days.'"  (Cilmi: Tr. 8886; <u>see</u> State Br. at 14.)  The Imatec prospectus did not reflect the ownership interest of any ASG personnel.  (Cilmi: Tr. 8898; <u>see</u> Marchiano Br. at 15.)  Anthony checked in with Michael Cilmi a couple of times in the initial stages to make sure the deal was progressing.  (Cilmi: Tr. 8902-03.)

---

[9]    Paul Cilmi was a defendant at trial, but is deceased and not a petitioner here.  (<u>See</u> Marchiano Br. at 3-4; State Br. at 5 n.4.)  Michael Cilmi testified at trial as a cooperating witness for the prosecution.

The next phase of the deal was the private placement. (Cilmi: Tr. 8893.) Michael Cilmi enlisted his brokers to solicit placement from their customers and the brokers themselves were allowed to invest in the private placement through their nominee accounts. (Pipia: Tr. 8135-36; Cilmi: Tr. 8893-94; 8898.) Each participant in the private placement invested $50,000 and stood to gain their money back plus 10% and securities in the company once it went public. (Pipia: Tr. 8134; Cilmi: Tr. 8894; see Marchiano Br. at 16.) The investors did not know that Cilmi, Pipia, Winkler and Anthony Marchiano owned half the company. (Cilmi: Tr. 8894.) ASG brokers, including Trento, invested in the Imatec private placement using nominee accounts so that their personal stake in Imatec could not be discovered. (Pipia: Tr. 8139; see State Br. at 14-15.) If it was disclosed to the public that the brokers were among the investors in the company, the stock would not be allowed to be traded publicly. (Pipia: Tr. 8138-39.)

The general practice for distributing warrants to the problem accounts was for Winkler to determine the allocations; for Imatec, both Anthony and Winkler decided that placement. (Whitman: Tr. 7015.)

Initially, the NASD prevented the Imatec IPO from going through because of the way the private placement was set up: the private placement holders could "get out immediately" after the deal went public, which was against regulations. (Pipia: Tr. 8183, 8186-91.) Once ASG changed the conditions – private placement holders who opted to continue to participate could not sell their stock for 18 months and the warrants for 24 months – the NASD let the IPO go through. (Pipia: Tr. 8186; Meyers: Tr. 5681-82; see Marchiano Br. at 16; State Br. at 15 n.6.) Given the choice to stay

in the IPO or get out and lose half of the money they/their nominees had invested, both Trento and Pipia opted to stay in after assurance from Winkler that they would make money. (Pipia: Tr. 8192-93.) Right before the deal went public, Trento, Pipia and other brokers received additional warrant allocations from Sal Marchiano, which Trento and Pipia put into their nominee accounts and also handed out to junior brokers and cold callers who worked for them. (Pipia: Tr. 8194-99.) In giving out the warrants to the junior employees, Trento and Pipia explained the rationale behind nominee accounts – to set up an account in the name of someone else and put the warrants in it so that they could "get the money out of there" when they wanted. (Smith: Tr. 7667-70; Pipia: Tr. 8200.)[10]

The Imatec IPO occurred on October 29, 1996. In the IPO aftermarket, it had been prearranged that the nominee shares were to be sold to ASG at below-market prices within the first week after the IPO. (Pipia: Tr. 8201-02.) However, due to concerns about NASD scrutiny and Winkler's desire to keep the stock price low, even though the brokers wanted a higher price to maximize their own profits, those sales were postponed. (Pipia: Tr. 8210-14; see Marchiano Br. at 16.)

In order to push the stock price up, ASG brokers pushed Imatec common stock on their clients even though it was not a good investment for them. (Pipia: Tr. 8206, 8211-16.) The only reason to promote Imatec was so that the brokers could make a profit–the more people that bought the stock, the higher the price and therefore the higher the price at which the ASG brokers

---

[10] Trento had a nominee account in his jeweler's name, the proceeds of which he used to buy a Rolex watch and his wife's engagement ring. (Smith: Tr. 7650-52.)

would be able to sell their shares from their nominee accounts. (Pipia: Tr. 8216.) The brokers promoted Imatec through misrepresentations and false assurances. (Pipia: Tr. 8216-17.)

On November 1, 1996, a company that ASG had brought public, Winfield Capital, bought one million Imatec warrants, out of the four million warrants put on the market, at the IPO price of $0.25. (Pipia: Tr. 8208, 8224-25; Meyers: Tr. 5619-21, 5631; see Marchiano Br. at 16; State Br. at 17.) That same day, as part of a prearranged plan, Winkler told head trader Stacy Meyers that he and Anthony wanted her to buy 500,000 (half) of Winfield Capital's warrants at $0.375 but that she should report to NASDAQ that ASG had bought the shares for $1.375. (Meyers: Tr. 5612-18; Pipia: Tr. 8208, 8224-25; see Marchiano Br. at 16-17; State Br. at 17.) Initially, NASDAQ did not let the sale go through at $1.375 because even that price was so below the market price that it was out of the range NASDAQ would allow. (Meyers: Tr. 5615-16.) But Meyers called NASDAQ and got special approval to put the sale through at $1.375. (Meyers: Tr. 5616-18.) ASG turned around and sold these warrants to its customers at market price, which was over $2.00. (Meyers: Tr. 5619, 5632; see State Br. at 17.)

Winfield Capital sold the second half of its warrants to ASG six days later at the same price, $0.375, using the same scheme. (Meyers: Tr. 5621-22.) These warrants were made into a "special," which meant the ASG brokers would get extra commissions if they sold them to customers.[11] (Pipia: Tr. 8208-09.) Trento was one of the brokers recommending Imatec to his

---

[11] Anthony or Sal Marchiano usually announced the specials. (Panza: Tr. 7305-07; Pipia: Tr. 7990-96.)

clients in the special. (Pipia: Tr. 8209.) Again, the brokers recommended the Imatec warrants to their customers not because it was a good investment– it was not – but because the brokers could make money from the sale. (Pipia: Tr. 8209-10.) Under NASD regulations, brokers are required to disclose the fact of a special when recommending a stock to a customer. (Hazen: Tr. 10949.)

## The ITSY IPO

A second example of ASG's scheme was the Innovative Tech Systems ("ITSY") IPO. The ITSY IPO took place on July 26, 1994. (Rosenblatt: Tr. 4470; see Marchiano Br. at 13; State Br. at 18.) As part of the ITSY IPO, 1.3 million shares of common stock at $5 a share and 1.8 million warrants at $0.25 each were to be issued. (Rosenblatt: Tr. 4341-43; see Marchiano Br. at 13; Sate Br. at 18.) An additional 1.3 million warrants were assigned to insiders who had provided bridge loans to ITSY. (Rosenblatt: Tr. 4345-46; see Marchiano Br. at 13.) The prospectus showed that the bridge lenders (also known as "security selling holders") were to get their money back plus interest and warrants. (Rosenblatt: Tr. 4345-46.) ASG fully sold the IPO which enabled it to exercise an option allowing it to distribute 275,000 warrants over and above the original offering (called an "over-allotment"). (Rosenblatt: Tr. 4344-46; see Marchiano Br. at 13.) Thus, a total of 3,375,000 warrants were placed. (Rosenblatt: Tr. 4461-65.) As had been the case in the Imatec IPO, ASG employees participated in the private placement through their nominees. (See, e.g., Panza: Tr. 7281-84, 7286-87.)

Within two hours of the IPO, ASG had purchased over 1 million warrants for its inventory. (Rosenblatt: Tr. 4504-09; see State Br. at 18.) Within the first 24 hours of trading, all

of the 1.3 million warrants that had been issued to the bridge lenders had been bought back by ASG at well below market-price. (Rosenblatt: Tr. 4502-03, 4510, 4560, 4563-64, 4572-73, 4582; see State Br. at 18.) ASG also bought ITSY warrants from other brokerage firms, which served to drive the market price up further. (Rosenblatt: Tr. 4564-65, 4570-71; see Marchiano Br. at 14; State Br. at 19.)

According to Rosenblatt, who investigated the ITSY IPO for the NASD, the NASD determined that by July 29, four days after the IPO, ASG and its customers held 99.64% of ITSY warrants, which meant ASG "dominated and controlled" the market. (Rosenblatt: Tr. 5531-34; see Marchiano Br. at 14.) While there is nothing improper about dominating and controlling the market, it does impose certain restrictions on the size of the mark-up a firm can charge its customers. (Rosenblatt: Tr. 4534.) ASG charged a mark-up of 22.33% to its customers, even though the NASD only allowed a 5% mark-up, with anything over 10% being a per se fraudulent sale. (Rosenblatt: Tr. 4536-37; Hazen: Tr. 10943-44.) Moreover, a conscious attempt to control, or corner, the market in a stock is not permissible. (Hazen: Tr. 11011.)

According to Rosenblatt, ASG manipulated the market for ITSY by buying almost all of the company's securities for the sole purpose of driving up the market price. (Rosenblatt: Tr. 4557-58, 4565; see Hazen: Tr. 11014; Marchiano Br. at 14.) Additionally, Rosenblatt opined that since ASG had prearranged to buy all those warrants in a short amount of time, that rendered the representation in the prospectus that the warrants would be sold "from time to time" misleading. (Rosenblatt: Tr. 4582-89; see State Br. at 30.) A member of the investing public would find it

material to have known that the warrants would be sold so quickly because of the downward pressure such swift movement would have on the value of the warrants.  (Rosenblatt: Tr. 4582-89.)

Thus, where ASG had held almost 100% of the ITSY warrants at the time of the IPO, just three days later, ASG held 256,753 ITSY warrants in its inventory, having made almost $1.5 million in those three days.  (Rosenblatt: Tr. 4498; see State Br. at 30.)[12]

**ASG Sales Practices**

**Sales Meetings**

ASG held frequent, almost daily, sales meetings during which the managers told the brokers which stocks from ASG's inventory to sell to customers and how many shares.  (Imbrenda: Tr. 2919-20; Kaplan: Tr. 908; see Marchiano Br. at 11.)  When Sal conducted these sales meetings, he would yell, threaten and encourage the brokers to manipulate the prices and sell a particular stock "or else."  (Kaplan: Tr. 907-14; Smith: Tr. 7593-94, 7597; Cilmi: Tr. 8756; Lamarti: Tr. 9432-35.)  At these meetings, Sal Marchiano also would announce specials.  (Pipia: Tr. 7990-91.)

On occasion, Anthony Marchiano attended these sales meetings.  (Pipia: Tr. 8473-74.)  On one such occasion, at a meeting with the entire New York office, Anthony spoke about the Winfield Capital special.  (Pipia: Tr. 8474-75.)  In the Florida office, Anthony applied pressure to

---

[12]    Even though the Imatc and ITSY IPOs are the only examples described here, the prosecution at trial also focused on the Skylands Park/Millennium Sports Management, Inc. IPO to illustrate the way in which ASG operated.  (See, e.g., Marchiano Br. at 17-20; Pets. Jt. 1st Dep't Br. at 13 ("The prosecution placed particular emphasis on certain securities by focusing in greater detail on the structure and execution of transactions relating to those securities.").) Documentary evidence of the Cinema Ride, Nickelodeon, Veritas, Wanderlust and International Brewing Company IPOs was also admitted.  (See State 1st Dep't Br. at 45.)

his brokers, through a "pretty loud" voice, to sell certain amounts of a particular stock and if that broker failed, he would charge the broker for the unsold amount. (Lamarti: Tr. 9435-38; <u>see</u> Imbrenda: Tr. 2919-20.)

## Sales Tactics

The brokers, interested in generating commissions, told clients whatever they had to in order to get the customer to purchase securities, and to prevent customers from selling securities. (<u>E.g.</u>, Smith: Tr. 7618, 7624-28: Pipia: Tr. 7937-39; Lamarti: Tr. 9608-16, 9630-33; <u>see</u> State Br. at 35.) When the brokers pressured clients to buy stock, they did so with no regard to whether the security was suitable for the needs of the particular investor. (Pipia: Tr. 7943-44.) Most of ASG's customers had indicated that they did not want to make speculative investments but ASG nonetheless pushed their highly speculative house stocks; at Winkler's direction, ASG manipulated the account opening paperwork to make it seem to the regulators who reviewed the forms that their customers wanted to invest in high risk stock. (Whitman: Tr. 6520-27; Smith: Tr. 7672-74, 7714; <u>see</u> Marchiano Br. at 7.) ASG would not open a customer account if the paperwork did not indicate "high risk." (Smith: Tr. 7672-74, 7714.)

For example, ASG brokers aggressively promoted Skylands Park/Millennium Sports Management,[13] a company intending to build a "golf stadium" in Naples, Florida. At Anthony's direction, using scripts Anthony had prepared, the brokers in the Naples office lured customers by

---

[13] The company's name changed from Skylands Park to Millennium Sports Management in October 1997. (Meyers: Tr. 5727.)

saying that the land had been bought for the stadium, construction was underway, and various golf organizations and major golf figures like Arnold Palmer, Jack Nicklaus or Tiger Woods, or prominent figures like former President George H.W. Bush, had committed to tournaments in the new stadium. (E.g., Lamarti: Tr. 9574-76, 9606-16, 9630-33, 9655-56; Britt: Tr. 9372; Cross: Tr. 11260; see Marchiano Br. at 19; State Br. at 24-25, 38-40.) None of this was true. (Lamarti: Tr. 9574-76, 9606-16, 9655-56; see Marchiano Br. at 19; State Br. at 24-25, 38-40.) ASG's brokers also told customers that the company was making money and the stock would triple or quadruple in value within the next few months. (Monaghan: Tr. 1807; Ramsdell: Tr. 2104-07, 2122-23, 2182-84; Severson: Tr. 8671-73; Britt: Tr. 9376; Lamarti: Tr. 9610-11; Hirsch: Tr. 10304, 10309; Cross: Tr. 11262-63, 11516; see Marchiano Br. at 19; State Br. at 38-40.) The brokers did not tell customers that the company had in fact been in bankruptcy in 1994 and that one of the joint venturers on the stadium had previously tried a stadium project that had failed. (Trueblood: Tr. 546-47; Ramsdell: Tr. 2122-23, 2182; Severson: Tr. 8671-73; Britt: Tr. 9376; Hirsch: Tr. 10305-06; see Marchiano Br. at 19.) ASG sent some customers a news article – given to the brokers by Anthony – with drawings of "the project" that in fact was an article referencing the previously failed project. (Fisher: Tr. 360-61, 367; Severson: Tr. 8660-61; Lamarti: Tr. 9564-65, 9567, 9606; see Marchiano Br. at 19.)[14]

_____

[14]    From April 1997 to March 1998, ASG purchased class A warrants from Skylands Park for $0.10 each and converted the warrants for an additional $0.50 cents per share to common stock – for a total price of $0.60 – and then sold the shares as common stock to its customers at the prevailing market price which ranged from just over $1.00 to over $5.00. (Meyers: Tr. 5732-56; see Marchiano Br. at 19-20; State Br. at 21.) Anthony Marchiano directed Meyers to record the price ASG paid, not as $0.60, but as an amount he specified which was
(continued...)

Sal Marchiano would sometimes create demand for a stock, not by manipulating customers, but by manipulating the computer: one ASG cold caller who became a broker, Shawn Smith, testified that he was once in Sal's office with Trento and other brokers, while Sal explained how "easy it was to make money" by simply "taking out other offers and moving his own offer up" so that you could see the stock rise "from five to seven in an hour." (Smith: Tr. 7599-600; <u>see generally</u> Meyers: Tr. 5934-35; Pipia: Tr. 8015-21.) This enabled Sal and his friends to make profits in their nominee accounts. (Pipia: Tr. 8015-21.)

On another occasion, Sal came into Trento's office to announce that they should accumulate as much ITSY stock as possible because they planned to "run the stock" higher that day. (Smith: Tr. 7607.) Smith called one of the less valuable customers to convince him to sell his ITSY stock; when Smith was unable to persuade him to sell, Trento took over and "twisted his arm" until he agreed. (Smith: Tr. 7608-12.) Trento put the stock in one of his own nominee accounts. (Smith: Tr. 7611-12.) Once the price of the stock "ran up," that customer called to complain that Trento and

---

[14]/     (...continued)
high enough that it did not look improper as the market price rose. (Meyers: Tr. 5737-42, 5744-56.) ASG kept half the profit and gave the broker who got the sale the other half. (Meyers: Tr. 5739-5744.) The customers were only informed that they had been charged a typical mark-up fee. (Meyers: Tr. 5549-52; <u>see</u> Britt: Tr. 9379.)

The regulatory expert who testified about this transaction at trial testified that by failing to tell its customers that the stock was available for $0.60, ASG had put its trading interests in front of its customers' and thus acted improperly as a market maker. (Hazen: Tr. 11011-13.) ASG should have disclosed to its customers that the same shares were available for $0.60 price. (Hazen: Tr. 11011-13.) ASG's conduct also was a failure to disclose material informaton. (Hazen: Tr. 11015-11020.)

Smith had cheated him. (Smith: Tr. 7612-13.) This sort of thing was "an everyday event." (Smith: Tr. 7610.)

### Cold Callers

ASG employed "cold callers" who were not licensed brokers but were supposed to locate potential customers and, if the person expressed interest, turn that person over to a licensed broker who would try to persuade the person to open a new account. (Imbrenda: Tr. 2741; Smith: Tr. 7583, 7586-91.) According to the ASG compliance manual shown to regulators, unlicensed employees such as cold callers were not allowed to open new accounts. (Smith: Tr. 7710-12.) At ASG, however, in practice the cold callers would identify themselves as the broker for whom they worked to entice the potential customers to get in on the "hot" IPO they were selling. (Smith: Tr. 7618-19; Imbrenda: Tr. 2755-58, 2767-68; see Marchiano Br. at 7.) For example, Shawn Smith, a cold caller, would identify himself as Senior Vice President Trento when asking customers to open an account with ASG. (Smith: Tr. 7618-19.) Trento, in who's office Smith was stationed, gave Smith the "pitches" he should use when making such calls, and would critique his calls. (Smith: Tr. 7585-91.)

### ASG Sales Policies

ASG operated under a "net buy" but "no net sales" policy. (E.g., Meyers: Tr. 5489-92; Lamarti: Tr. 9448-49; see Marchiano Br. at 11; State Br. at 25.) Under this policy, when a customer called ASG wanting to sell their stock, the broker would do all he could to change that client's mind–this usually consisted of bald lies such as the broker claiming to have just met with the

company's CEO and had learned inside news that the stock would go up. (Smith: Tr. 7623-25; Pipia: Tr. 7937-39; Cilmi: Tr. 8746-8748; <u>see</u> Marchiano Br. at 11; State Br. at 25, 35.) If that did not work, the broker could not accept a sale order until he found a corresponding buy order to off-set the sale. (Meyers: Tr. 5489-92; Smith: Tr. 7625-26; Pipia: Tr. 7964-65; Cilmi: Tr. 8747; <u>see</u> Marchiano Br. at 11; State Br. at 25.) The corresponding buy usually came from another customer who the broker convinced to buy that particular amount of stock. (Cilmi: Tr. 8747-48; Pipia: Tr. 7964-65.) If a client insisted on selling the stock and the broker could not find a corresponding buyer right away, the broker would place the stock "on the desk" – <u>i.e.</u>, sold into ASG's inventory – until the broker could obtain a corresponding sell order. (Meyers: Tr. 5490-92; Panza: Tr. 7292-97, 7371-75; Smith: Tr. 7626; Pipia: Tr. 8014-15; Cilmi: Tr. 8747; Lamarti: Tr. 9447-50; <u>see</u> State Br. at 28.) Meyers kept track of stock "on the desk" to make sure the broker re-booked the sale. (Meyers: Tr. 5492.) If the broker could not secure a sell order while the market price remained the same, he would be charged for any loss ASG incurred. (<u>E.g.</u>, Meyers: Tr. 5492-93; Panza: Tr. 7292-95.) Brokers who were able to find buy and sell orders generated commissions on both ends for themselves. (Smith: Tr. 7627; <u>see</u> State Br. at 36.)

When the trading department was located in the New York office, Anthony had daily contact with Meyers to monitor ASG's inventory. (Meyers: Tr. 5446.) If Anthony thought a stock had been "on the desk" for too long, he instructed Meyers to make sure the broker sold it. (Meyers: Tr. 5447.) Anthony was one of the few people in the firm who could authorize an exception to the "no net sales" policy. (Meyers: Tr. 5489-92.) Anthony became even more involved once he moved

to the Florida office, because his daily monitoring of ASG's trade records increased to trade by trade supervision. (Meyers: Tr. 5447-48; Lamarti: Tr. 9661-63.)

When Sal Marchiano was head of sales, the brokers had to give him their buy and sell tickets. (E.g., Imbrenda: Tr. 2919-20; Cilmi: Tr. 8755; Lamarti: Tr. 9448, 9450.) Sal enforced the "no net sales" policy by refusing to process trades where brokers turned in only sales tickets–he would tell brokers who came in to his office with only sales tickets to go find a buyer before the transaction would be recorded. (Imbrenda: Tr. 2919; Pipia: Tr. 8014-15; Cilmi: Tr. 8747-48; Lamarti: Tr. 9449-50; see State Br. at 25-26.) Brokers risked fines or reprimand if they failed to fulfill the volume of trades they were told to generate. (Imbrenda: Tr. 2920; Cilmi: Tr. 8754; see Marchiano Br. at 12.) Anthony or Winkler gave permission whether to put stocks "on the desk." (Meyers: Tr. 5490-91.)

Another sales tactic used to further the "no net sales" policy was the unauthorized trading of stocks. When a broker could not find a corresponding buyer, he would "park" the unwanted stock in another client's account, without that client knowing it, until a buyer could be found. (Panza: Tr. 7297-98; Smith: Tr. 7632-33; Pipia: Tr. 8025-27; Cilmi: Tr. 8749; see Marchiano Br. at 11-12; State Br. at 26, 36.) Trento engaged in such practices when dissatisfied with customers who refused to buy stocks that he pushed on them. (Imbrenda: Tr. 2906-17.) This practice enabled the broker to get the commission for the sell side of the trade and give himself time to find a buyer. (Cilmi: Tr. 8749.) Shawn Smith testified that if a customer called to complain about a parked stock,

Smith would tell them that there had been a misprint in the account statement, which was not true. (Smith: Tr. 7679-80; <u>see also</u>, <u>e.g.</u>, Cilmi: Tr. 8749-50.)

ASG also engaged in "cross trades," which was where one broker would have a customer buy a second broker's block of stock in company A in exchange for the second broker having his customer buy a corresponding amount of stock in company B from the first broker–essentially a swap–in order to generate commissions. (Cilmi: Tr. 8757-61; <u>see</u> Marchiano Br. at 12; State Br. at 27.) In order to get their clients to unwittingly participate in the cross trade, the broker would persuade the client first to sell their stock and then would make up a reason why it would be beneficial for the client to immediately use that money to purchase new stock. (Cilmi: Tr. 8760.) The brokers had to get clearance from Stacy Meyers who had to get clearance from Anthony as to whether cross trades were allowed at a particular time. (Cilmi: Tr. 8760-61.)

Trento was known to joke that working at ASG was "easier than robbing people. You don't have to have the gun" and "[i]t's like printing money." (Smith: Tr. 7683, 7683-84; Pipia: Tr. 7982; <u>see</u> State Br. at 37.) Trento rationalized that it "was okay to rob from rich people." (Smith: Tr. 7684; <u>see</u> State Br. at 37.)[15]

Trento and Smith shared a holding cell after their arrests. Trento warned Smith to keep his mouth shut or else Trento would "kick [his] f---ckin teeth in." (Smith: Tr. 7569; <u>see</u> State Br. at 38.)

---

[15]    In fact, the ASG customers were not necessarily rich; some were retirees with limited savings. (O'Neil: Tr. 10376-78, 10408.) One such investor took out a loan in order to pay for the increased stock she was convinced to buy. (O'Neil: Tr. 10385-92.)

**ASG Dealings With Regulators**

Winkler, as head of compliance, and Erika Whitman, his assistant, were in charge of making sure the ASG employees complied with NASD and SEC regulations. (Whitman: Tr. 6373-74.) However, Winkler was the one who made sure the trade records, account forms, trade tickets such as those showing the Winfield Capital purchase of Imatec stock, and any documents which could reveal ASG's practices, were destroyed or hidden from regulators. (Meyers: Tr. 5625-26; Whitman: Tr. 6467-72, 6500-20, 6535-41, 6629-36.) Whitman testified that in late 1995/early 1996, during one of the SEC investigations of ASG, at Winkler's direction she took home certain computer disks reflecting fraudulent trades in order to hide them from the SEC. (Whitman: Tr. 6535-38.) Moreover, brokers, including Trento, actively trained their subordinates in the ways to violate securities rules. (Smith: Tr. 7585, 7609, 7667-69, 7710-12; Pipia: Tr. 7941-42.)

Stacy Meyers did not turn over her personal blotters – the records of ASG's trades – to the regulators because they, unlike the "firm blotters," listed stock put on the desk, which would reveal both the real status of those sales and that ASG was not allowing its clients to sell their stocks freely. (Meyers: Tr. 5813-19.)

Before Meyers' testimony to the SEC, Winkler told her to "keep Anthony out of it" and counseled her to lie about various trading practices, including the "no net sales" policy. (Meyers: Tr. 5819, 5822-30; see Marchiano Br. a 21.) Once Meyers had testified, and lied, to the SEC, she told Winkler about it and she told Anthony that she had "protected him like he was family." (Meyers: Tr. 5830-31.) Winkler told Meyers to "blame everything on him" when she testified

before the NASD.  (Meyers: Tr. 5838; see Marchiano Br. at 21.)  Winkler also told Meyers to "'keep

the moron out of it,'" which Meyers understood to mean Sal Marchiano.  (Meyers: Tr. 5839, 5871;

see Marchiano Br. at 21.)  Meyers followed Winkler's instructions and lied when she testified before

the NASD and the New Jersey Bureau of Securities.  (Meyers: Tr. 5838; see Marchiano Br. at 21.)[16]

      Former ASG broker Joseph Imbrenda was fired by Winkler when Winkler learned

that Imbrenda wanted to correct the false testimony he had given to the New Jersey Bureau of

Securities. (Imbrenda: Tr. 2927-29; see Marchiano Br. at 21.)[17]

---

[16]    In January 1998, the NASD suspended Meyers, Winkler and Anthony Marchiano from the securities industry.  (Meyers: Tr. 5872.) ASG continued to operate until October 4, 1998.  (Meyers: Tr. 5872.)  In May 1999, Meyers' and Anthony's suspensions terminated, while Winkler's suspension continued. (Meyers: Tr. 5872-73.)

[17]    Imbrenda also explained at trial instances when he witnessed or was the subject of threats used by ASG principals to discourage former brokers from testifying truthfully to regulators: After Imbrenda had been called to testify in front of the New Jersey Bureau of Securities he was in Trento's office when Sal Marchiano came in and explained to Imbrenda that they "had to take care of" another broker who had testified in front of the regulators after he had left ASG.  (Imbrenda: Tr. 2933-34, 2989.)  According to Imbrenda, Sal Marchiano used the words "'take him out'" which Imbrenda took to mean "it wasn't taking him out to lunch or nothing like that, it was pretty much to hurt him."  (Imbrenda: Tr. 2934.)  Trento turned to a man who was also in the office during this encounter and told him that they "had a job for him to do, basically which was to hurt" that former broker because, as Imbrenda testified Trento explained it: "he possibly could be giving some information about [ASG]."  (Imbrenda: Tr. 2934.)

The second instance occurred after Imbrenda had been fired from ASG and shortly after Imbrenda's father had died.  (Imbrenda: Tr. 2930.)  Imbrenda received a phone call from someone affiliated with ASG who told him, in sum and substance, that "if [Imbrenda] knew what was good for [him] he wouldn't have to go down to testify and if [he] happen[ed] to make that decision to [testify] [the man on the phone] would bury [Imbrenda] on top of [his] father."  (Imbrenda: Tr. 2931-32.)

Several other ASG brokers falsely testified before various regulatory agencies about ASG's fraudulent trade practices including its use of nominee accounts, the practice of lying to customers and the "no net sales"policy. (Kaplan: Tr. 1137-38, 1149-50; Cilmi: Tr. 8924-31; Panza: Tr. 7331-36.) When Cilmi returned from falsely testifying in front of the SEC he spoke to Winkler about it, and Anthony told him he heard he "did a good job." (Cilmi: Tr. 8932.)

### Plea Allocutions and the Trial Judge's Limiting Instructions

In addition to the testimony of the 10 cooperating former ASG employees, customers, and expert witnesses, Justice Snyder admitted the plea allocutions of seven ASG employees who had pled guilty.[18] Before admitting the allocutions, Justice Snyder instructed the jury on the limited purpose for which the allocutions were admitted:

> These statements are being admitted into evidence for a very limited purpose which I need first explain to you. . . .
>
> You may not use the statements you're going to hear as identification of any of the defendants on trial. You may use these statements only as evidence of the participation and such acts by the persons who made statements.
>
> These statements are being admitted to show only the following:
>
> (A) Whether or not a criminal enterprise or conspiracy existed.
>
> (B) The scope of any criminal enterprise or conspiracy.
>
> And (C) Whether certain criminal acts were committed as part of a pattern of criminal activity that in quotes was carried out by a criminal enterprise.

---

[18] The trial occurred before the Supreme Court's ruling in Crawford.

(Tr. 11970-71.) Justice Snyder told the jury that she would define the terms she had just used and further explain the law in her final jury charge. (Tr. 11971.) Justice Snyder told the jurors she would remind them of "the limited purpose for which [the statements were] being received into evidence" after the jury heard the statements. (Tr. 11971-72.)

The prosecution entered the seven allocutions into evidence by reading or summarizing each one into the record. (Tr. 11974-12010, 12012-17.) The allocutions entered were for: Charles Principato (Tr. 11974-80; 1st Dep't Jt. Appx. Vol. III: People's Ex. ("PX") 407 at A. 1371-74), Vito Randazzo (Tr. 11980-83; PX 408 at A. 1375-76), John Dias-Abeygundawardena, also known as John Abey (Tr. 11983-89; PX 409 at A. 1377-83), Vincent Lia (Tr. 11990-95; PX 410 at A. 1384-89), Christopher Delcioppo (Tr. 12012-14; PX 443 at A. 1390-91), John Delcioppo[19] (Tr. 12014-17; PX 443 at A. 1392-94) and Stuart Winkler (Tr. 11996-12010; PX 450 at A. 1398-408).

Charles Principato allocuted that he acted "in conjunction with members" of ASG as part of a criminal enterprise to help defraud "customers and potential customers" of ASG by inducing them (Tr. 1195):

> I and other persons induced members of the investing public, including investors in the County of New York to purchase securities in [Wanderlust Interactive, Inc. ("LUST")] by: misrepresenting the nature and value of LUST

---

[19] The Delcioppos began the trial as defendants but pled guilty in the middle of trial. (See Marchiano Br. at 4.) In order to explain the Delcioppos' absence, Justice Snyder instructed the jury "not [to] speculate why those defendants are no longer here. Draw no inference favorable or unfavorable as to their absence to the remaining defendants." (Tr. 3257.) Justice Snyder then polled the jury to make sure each juror could "remain fair" and "keep an open mind" as to the remaining defendants. (Tr. 3257-58.) Consequently, the Delcioppos' allocutions were described as "statements," not guilty plea allocutions. (See Tr. 11787-88.)

securities; misrepresenting and failing to disclose the extent to which securities distributed in an initial public offering had been placed into nominee and controlled accounts; misrepresenting and failing to disclose the extent to which other persons and other members of the Goldmen Criminal Enterprise were scheming to control and were controlling the market for those securities; misrepresenting and failing to disclose the prices of LUST securities were dependent on the continuation of that scheme; misrepresenting and failing to disclose the extent to which A.S. Goldmen brokers were being compensated for selling those securities; misrepresenting and failing to disclose the extent to which customers had been, were being and would be discouraged and restrained from selling those securities.

(Tr. 11976-77.) Principato admitted to the same criminal conduct, using identical language, in connection with the securities of Cinema Ride, Inc. ("MOVE") (Tr. 11977-78) and Veritas Music Entertainment (Tr. 11978-79). Additionally Principato admitted:

> I and other persons associated with [ASG] also undertook unlawful activities as part of the above described schemes and for other purposes, including but not limited to, operation of unlawful nominee accounts, including such accounts in [ITSY] securities and in the names of such persons as [omitted names], operation of controlled problem accounts by which [ASG] suppressed complaints while manipulating the supply and price of securities; refusals to execute customer sell orders at times when we were required to do so, manipulation of securities prices and the execution of unauthorized transactions in customer accounts. I and other persons also failed to disclose that such practices were policy at [ASG].

(Tr. 11979-80.)

Vito Randazzo admitted to helping defraud customers regarding Millennium Sports Management ("MSPT"):

> I and others induced members of the investing public . . . to open brokerage accounts at [ASG] and to purchase securities in MSPT by:

> Misrepresenting and failing to disclose material facts concerning the nature and value of MSPT securities by:

Misrepresenting and failing to disclose the extent to which I and other members of [ASG] were scheming to control and were controlling MSPT.

Misrepresenting and failing to disclose [ASG]'s role in distributing MSPT's class D warrants . . . and underlying shares of common stock contrary to the publicly filed disclosure documents of MSPT.

Misrepresenting and failing to disclose purchases and sales of MSPT securities based on material non-public information by myself and other members of [ASG].

Misrepresenting and failing to disclose that [ASG] was purchasing and exercising securities [of] MSPT for it's own account at a price of 60 cents, while selling such securities to the public at several times that price.

Misrepresenting and failing to disclose the extent to which [ASG] brokers were being compensated for selling these securities.

Misrepresenting and failing to disclose [to] purchasers of MSPT's Class A Warrants that MSPT Class D Warrants were available on materially better terms.

Misrepresenting and failing to disclose the extent to which MSPT's financial future was dependent on the continued existence of the above described scheme.

Misrepresenting and failing to disclose material facts concerning the nature of MSPT's investment in a project to build a so-called golf stadium.

Misrepresenting and failing to disclose [ASG]'s control of the golf stadium project.

(Tr. 11981-83.)

John Abey allocuted to substantially similar criminal conduct involving MSPT. (Tr. 11983-85.) Additionally, he admitted defrauding investors in order to induce them to "purchase securities in Stadium Capital Inc. by misrepresenting and failing to disclose the nature and value of Stadium Capital Inc. Securities." (Tr. 11986.) He also admitted to "[m]isrepresenting and failing to disclose who had contributed the vast majority of capital to Stadium Capital Inc. was the primary

creditor of Stadium Capital Inc. [a]nd would be repaid from the proceeds of a private placement of Stadium Capital Inc. debt and securities." (Tr. 11986.) Abey admitted to defrauding customers and potential customers concerning the sale and purchase of Independence Brewery Co. as well as LUST securities. (Tr. 11987.) Abey allocuted to acting with "[o]ther persons . . . with the intent to deceive and defraud, made material false representations and statements while engaged in the sale, negotiations and purchase within and from New York of a security and thereby wrongfully obtained property with a value in excess of 250 dollars from" five separate customers in five separate incidents. (Tr. 11988-89.)

Vincent Lia allocuted to participating in and advancing the criminal enterprise of ASG by engaging in intentional defrauding of "customers and potential customers" through "fraudulent pretenses representations and promises. . . . obtained property from one or more such persons engaged in sale, negotiation and purchase of securities of" MSPT by inducing investors "to open brokerage accounts at [ASG] and to purchase securities in MSPT." (Tr. 11990-91.) Lia also admitted to participating in the fraudulent schemes surrounding Stadium Capital Inc. and Imatec. (Tr. 11991-93.) Additionally, Lia's allocution included his admission to "wrongfully obtain[ing] property with a value in excess of 250 dollars" from seven specific ASG customers. (Tr. 11993-95.)

The prosecution read Stuart Winkler's allocution, which was substantially longer and more detailed than the others, into the record. Winkler's allocution described the way in which ASG carried out its criminal enterprise:

The [ASG] Criminal Enterprise committed crimes through the underwriting and offering of securities to the public through [ASG].

Among the techniques used for manipulation of securities prices, control of stock through nominee accounts and other controlled accounts, unauthorized trading in customer accounts, falsification of records, requiring brokers to offset customers sell orders with fraudulently induced purchase orders, charging undisclosed and excessive markups and commissions, sales of securities by unlicensed persons and violations of blue sky registration laws, high pressure sales tactics and making misleading and false statements to investors.

Each of the following initial IPO's were fraudulently prearranged and manipulated: [listing the IPOs named in the indictment].

In each such offering [ASG] acting through me and others, would identify companies whose management would give [ASG] control over the structure of the public offering of the company. [ASG] acting through me and others would then cause such company to issue securities under the guise of bridge loans and private placements for the purpose of manipulating securities, particularly common stock purchase warrants under the names of persons . . . controlled [or] controllable by [ASG].

(Tr. 11996-97.) Winkler's allocution outlined ASG's operations – explaining that ASG would prearrange for the "controlled" persons to sell their "positions back to [ASG] at prices dictated by [ASG] acting through [Winkler] and others." (Tr. 11998.) Further, ASG would prearrange the resale of the securities to customers at a price "many times [ASG]'s actual cost without disclosing such prearrangements with customers or regulators" or to the "NASDAQ market system." (Tr. 11998.) "In addition, large quantities of securities were sold into controlled accounts at the initial public offering prices of each IPO, also for the purpose of being available for re-sale on demand to [ASG]." (Tr. 11998.)

Winkler's allocution explained that there were three types of controlled accounts: the nominee accounts, the problem accounts and accounts controlled by ASG for ASG's own interest with the understanding that the owner of the account would share in the profits. (Tr. 11998-99.)

As to the prospectuses, Winkler admitted that he "and others put language in the prospectus that would imply [ASG was] complying with the law in disclosing how the selling securities holders accounts were to be traded, whereas in truth such language was false at the time the prospectus was issued because such prospectuses failed to disclose the prearranged transactions that existed and the other unlawful agreements and arrangements between the selling securities holders who had been placed in the transactions by [ASG]." (Tr. 11999.)

"Simultaneously with such prearranged transactions, members of [ASG] would induce unsuspecting retail customers to purchase securities at prices that were manipulated through the posting of price quotations on the NASDAQ system." (Tr. 11999-2000.)

Winkler's allocution explained the breadth of the criminal schemes:

> It was necessary for me and other persons, brokers, participating in these IPO flips to coordinate our actions across the entire firm. . . .

> The schemes I participated in would not have been successful if [ASG] did not control substantially all of the securities because such control over the float of the securities ensured [ASG] could control the prices of such security without significant interference from persons who owned uncontrolled blocks of stock.

> In the Imatec IPO, which I participated in prearranging, such controlled transactions were planned, but did not originally take place as intended due to a lock up period imposed by the NASD after the controlled accounts had received their stock.

Accordingly, I along with other persons arranged for Winfield Captal Corp. to hold warrants to be sold back to [ASG] as prearranged.

In each of the IPO transactions I carried out the prearranged transactions in concert with other persons associated with [ASG].

I am aware of the identity of many such controlled accounts because I shared responsibility for the timing of controlled sales of such securities back to [ASG] trading accounts.

. . . .

In the course of the criminal enterprise other persons and I falsely and fraudulently pretended, represented and promised that the defendant [ASG] was acting lawfully as a broker/dealer.

I and other persons also systematically endeavored to evade the scrutiny of the government and private regulators with the power to stop [ASG] operations.

(Tr. 12000-02). Winkler explained the different ways the ASG employees defrauded the regulatory bodies, including destroying documents, lying to regulators, "[r]eferring complaints to a compliance department which often assisted in the concealment of fraudulent activity," and creating documents to "mislead regulators by falsely creating an impression" that ASG was acting properly and legally. (Tr. 12002-03.)

Winkler's allocution described his role in the MSPT/Skylands Park scheme (Tr. 12004-06) and in Imatec, including his role with "other persons" in attempting "to avoid the detection of this scheme and continue trading [Imatec] Securities by hiding and destroying documents sought by regulators, including tickets for transactions by Winfield Capital. In particular [Winkler] caused the hiding and destruction of tickets reflecting transactions by Winfield Capital

Corp. which held one million Imatec IPO warrants which [he] had caused to be held by Winfield

Capital Corp. as a controlled account for the benefit of [ASG]. [Winkler] caused the sale of those

one million warrants to be falsely reported to NASDAQ." (Tr. 12006-07.) Winkler also allocuted

to his role in the ITSY scheme (Tr. 12007-09.)

       Finally, Winkler admitted that he falsified business records and violated New York

securities laws by "executing such transactions and creating misleading records of such transactions

to the extent such records failed to reveal [his] interest in certain [nominee] accounts." (Tr. 12009-

10.)[20]

---

[20]   Immediately following the reading of Winkler's allocution, Justice Snyder read a stipulation
into the record which explained that while Winkler had been incarcerated pending trial on
these charges, he conspired to murder Justice Snyder. (Tr. 12010-12; 1st Dep't Jt. Appx.
Vol. III: PX 449 at A. 1395-97.) The stipulation stated, in full:

> One. While incarcered on securities fraud charges, Mr. Winkler engaged in
> conversations with another inmate who, unknown to Mr. Winkler, was acting as a
> confidential informant for the office of the District Attorney.
>
> Two. During these conversations, Mr. Winkler discussed with the confidential
> informant a plan to murder the Judge presiding over his case.
>
> Three. Mr. Winkler was subsequently charged with and convicted after trial
> of conspiracy to commit murder. He was sentenced to a term of imprisonment for
> 8 and a third to 25 years.
>
> Four. During tape-recorded conversations with the inmate informant, Mr.
> Winkler stated the following with reference to the securities fraud charges against
> him.
> A. I didn't steal any money;
> B. I should not have been charged. I should have never been indicted even;
>
>           (continued...)

Once the allocutions were admitted into evidence, Justice Snyder reiterated her limiting instructions:

> Members of the jury, let me remind you, and please pay attention because this is important. Again, as I said to you earlier, before these statements and allocutions were read to you, these were made by persons who are not defendants before you at this trial. This is obvious, and they were admitted into evidence for very limited purposes only. You may not use these statements or allocutions to any of the defendants on trial. You may use the statements or allocutions only as participation of the subject acts by the persons who made the statements.
>
> The statements are admitted only for the following purposes: To show whether or not a crime of enterprise or conspiracy existed. And the scope of any criminal enterprise or conspiracy and whether certain criminal acts were committed as part of a pattern of criminal activity carried on by criminal enterprise as I shall define all those terms for you.

_____

[20]/     (...continued)

> C. I shouldn't have never even been indicted. I built a legitimate business out of businesses.

> Five. During his trial for conspiracy to commit murder, Mr. Winkler testified on his own behalf. During his testimony, Mr. Winkler stated under oath:
> A. This is an intricate, intricate, intricate case in my mind and I can prove I had the computer runs, prospectuses, these rooms full of due diligence that I'm right and they're wrong.
> B. I know I can defend myself on the securities trial, cause – cause – cause the written record will actually prove that I'm right.

(Tr. 12010-12; 1st Dep't Jt. Appx. Vol. III: PX 449 at A. 1395-97.)

In September 2000, when Winkler's conspiracy to murder Justice Snyder had first come to light, Justice Snyder granted Winkler's motion to recuse herself and severed Winkler's case from petitioners'. (See State Br. at 65-66.) Justice Snyder, however, denied petitioners' motion to recuse herself from their trial. (Id.)

Please remember these limiting instruction[s] as they are extremely important.

(Tr. 12017-18.)

In her final charge to the jury, Justice Snyder re-addressed the plea allocutions:

Now, you have heard a series of statements, and you were read a series of statements which have been introduced into evidence and what we kept referring to as plea allocutions . . . .

You have heard some stipulations indicating the circumstances under which those statements or plea allocutions were made, which you may consider in determining whether to accept or reject those statements or plea allocutions.

While these statements are admissible by law, they were admitted into evidence for certain limited purposes.

I cautioned you both before and then after their admission at the time what those limited purposes were for their admission, and I want to do it again now.

You may not use the statements that were admitted or the plea allocutions as identification of any of the defendants on trial in this case.

You may use those statements or allocutions only as evidence of the participation in such acts by the person or persons who made those statements.

Those statements were admitted to show, one, whether or not a criminal enterprise or conspiracy existed.

Two, the scope of any criminal enterprise or conspiracy.

And, three, whether certain criminal acts were committed as part of a pattern of criminal activity carried out by a criminal enterprise, all of which concepts in terms of a criminal enterprise, patterns, etcetera, we'll be dealing with in a little while.

(Jury Charge: Tr. 12834-36.)

**Defense's Cross-Examination**

As part of the defense strategy, on cross-examination, defense counsel elicited testimony from the cooperating witnesses to show the lack of Anthony Marchiano's involvement in ASG's day-to-day operation and his absence from instances of wrongdoing.

For example, on cross, Imbrenda testified that Anthony never told him to call potential customers and use a phony name, never told him to lie to the New Jersey Bureau of Securities nor did Imbrenda tell Anthony that he had in fact lied to that regulative body, never told him to lie to the NASD, never told him to pay someone to take his test, that Anthony did not have an office in the area where Imbrenda worked, never was present at any of the late-night sales meetings Imbrenda testified about and that Imbrenda only saw him in the ASG offices a handful of times. (Imbrenda: Tr. 3106-10, 3114-16.) Imbrenda also testified on cross that Trento threatened to report him to the authorities for having had someone else take his licensing exam for him (Imbrenda: Tr. 3088-90) and that Anthony was not present for that or for when Imbrenda was fired. (Imbrenda: Tr. 3089-90).

Vincent Caracciolo, another cooperating former ASG employee, testified on cross examination that he had never discussed the fact that he had nominee accounts with Anthony Marchiano. (Caracciolo: Tr. 4048.) When Anthony interviewed him for the job, Anthony did not suggest that the job would entail doing unlawful or deceitful acts. (Caracciolo: Tr. 4049-50.)

Stacy Meyers testified on cross that Anthony's office was not situated among the brokers in the New York and New Jersey offices; it was situated out of ear-shot of the brokers' area.

(Meyers: Tr. 5927-30.)   Meyers also testified that she did not actually tell Anthony that she maintained nominee accounts.  (Meyers: Tr. 5947.)

Erika Whitman testified on cross-examination that Anthony Marchiano never told her to lie to regulators about ASG's practice of settling their customers' complaints by giving them warrants.  (Whitman: Tr. 7078.)  She also testified that while she lied at Winkler's direction to the attorneys ASG had hired, Anthony never told her to do so.  (Whitman: Tr. 7084-85.)  Additionally, Anthony was not present whenever Winkler told Whitman to rewrite or destroy trade tickets or alter or backdate documents and she never discussed those activities with Anthony.  (Whitman: Tr. 7085-87, 7099, 7233.)  Anthony was not present when Winkler told Whitman to remove certain computer records from the office to hide them from the SEC.  (Whitman: Tr. 7087-89.)  Winkler, not Anthony, told Whitman to lie to the NASD regarding certain forms ASG kept, and Anthony did not tell Whitman not to turn over documents to the NASD.  (Whitman: Tr. 7089, 7107.)

Through Whitman, the defense read a letter that Anthony sent to the NASD, apparently in response to client complaints.  (Whitman: Tr. 7235-37.)  In the letter, Anthony explained that, in response to his client's anxiety over the fact that the stock he had bought was down $10,000, Anthony had cancelled the purchase order and had told the client ASG would absorb any loss on the stock.  (Whitman: Tr. 7235.)  This, according to Anthony's letter, "pleased" the client and Anthony assured the NASD that no unauthorized transactions had ever been discussed.  (Whitman: Tr. 7235-36.)

Christopher Panza testified that he never told Anthony Marchiano that he had nominee accounts. (Panza: Tr. 7364-65.) Panza never told Anthony about particular instances when he conducted cross trades. (Panza: Tr. 7379-81.) Panza never discussed with Anthony that when regulators requested Panza turn over certain documents he sometimes threw them out or brought them home to avoid turning them over. (Panza: Tr. 7390.) Additionally, Panza never told Anthony that he lied under oath when testifying in front of the different regulatory bodies nor did he tell Anthony that he failed to execute certain trades or failed to disclose commissions or that he made unwarranted price predictions or made unauthorized trades. (Panza: Tr. 7392-95.)

Shawn Smith testified on cross that he never "sat down and spoke with Anthony Marchiano" about "all of the wrong doings" that he had testified to having done. (Smith: Tr. 7852.)

Michael Lamarti, who had worked in the Florida office, testitfied on cross-examination that he maintained a nominee account and never told Anthony Marchiano about it. (Lamarti: Tr. 9728.) Anthony had told Lamarti to tape telephone conversations with customers as a training tool but Anthony learned that is was against Florida law to do that and told Lamarti to stop making the tapes. (Lamarti: Tr. 9742-43.) Anthony told Lamarti that when talking to customers, if he started his sentence with the words "I believe" and "I feel" that he could say almost anything, but Anthony also told Lamarti that he should not say anything to a potential customer that he would not want a regulator to hear. (Lamarti: Tr. 9753-54.) Anthony fired a cold caller, and the broker whose name the cold caller had used, because that cold caller had been using the broker's name instead of his own when on the phone with a potential customer. (Lamarti: Tr. 9754-57.) Regarding

the Skylands Park stock, while Lamarti did not tell the customers he spoke to that Skylands Park had been in bankruptcy four to five years earlier, Anthony did not tell Lamarti to conceal this information nor did Lamarti know of any rule requiring him to disclose that information to potential customers. (Lamarti: Tr. 9775-76.)  When Lamarti was selling the private placement for Skylands Park, the lie he told potential lenders – that the company had already raised a "few million dollars" – was his own creation and was not said at Anthony's direction.  (Lamarti: Tr. 9777.)  Lamarti also witnessed Anthony yell at another broker, Christopher Delcioppo, because Delcioppo had told a customer that Rasmussen–one of the principals in the Skylands Park deal–was getting one million shares when actually he held options.  (Lamarti: Tr. 9831-32.)  When Lamarti would, on occasion make up a buy-ticket without having actually spoken to a customer about it, he would give it to Anthony as was the protocol but never told him that it was a fake ticket.  (Lamarti: Tr. 9857-58.)

Stephen Kaplan, another cooperating witness, testified on cross examination that Anthony Marchiano never told him to ignore or not comply with the rules and regulations governing securities.  (Kaplan: Tr. 1476.)  Kaplan testified about a time when he sold a large amount of a specific customer's stock and Winkler had Kaplan attribute the sale to a different broker so that Anthony would not find out about the transaction.  (Kaplan: Tr. 1549-50.)  Kaplan never discussed his nominee accounts with Anthony because he did not want him to know about them. (Kaplan: Tr. 2062-63.)

Michael Cilmi testified on cross examination that he received an allocation of warrants for a particular company–Managed Healthcare–that ASG helped take public.  (Cilmi: Tr.

9130-31.) As Cilmi understood it, Anthony Marchiano had given the warrants to the managers so that the brokers would distribute them to customers. (Cilmi: Tr. 9131-32.) Instead of giving that allocation to his customers, Cilmi kept them for himself in a nominee account and never told Anthony what he had done. (Cilmi: Tr. 9131-32.) In 1995, in order to decrease the practice of improper cross trading and unauthorized trading, Anthony designated a few people to call the clients from ASG's buy tickets to verify whether those clients recognized the trade. (Cilmi: Tr. 9141.) Winkler had told Cilmi to lie to the SEC when Cilmi was called to testify, but Anthony did not tell him to lie, he merely told him when Cilmi returned from giving his testimony to the SEC that he had "'heard [he] did a good job.'" (Cilmi: Tr. 9175-76.) Cilmi testified that Anthony was "very vague" when sharing information with Cilmi about how to handle "these different things" and "always told [him] to deal with [Winkler], [Winkler] knows how to handle all these different things." (Cilmi: Tr. 9177.) It was Cilmi's understanding that Winkler was hired as head of compliance because he had previously worked as a regulator at the NASD. (Cilmi: Tr. 9177.)

Charles Pipia testified on cross that while he lied to customers on a daily basis he never told Anthony Marchiano about it. (Pipia: Tr. 8454-56.)

## The Defense Case

Gary Mosher testified on behalf of Anthony Marchiano. (See Tr. 12025.) Mosher had been an investigator and chief examiner in the Compliance Department for the Chicago Board of Options Exchange and at the time of trial was the compliance director and chief financial officer of a New York brokerage firm. (Mosher: Tr. 12025-34; see Marchiano Br. at 22-23; State Br. at 40.)

Mosher testified as an expert, explaining the operation and regulation of securities firms in the NASD. (Mosher: Tr. 12043-69, 12079-116.)

According to Mosher, since market makers put their capital at risk, the profit that is permissible to generate from the sale of a stock that comes out of their inventory does not require disclosure to the customer. (Mosher: Tr. 12051-56, 12063-66, 12079-87, 12133-34.) It is also permissible for the market maker to give part of its profit from selling its house stock to the brokers. (Mosher: Tr. 12091-100.)

The defense also showed through its expert that the SEC does not require disclosure to the customer of an extra commission to a broker via a "special," even though that potential extra commission puts the broker's and customer's interest at odds. (Mosher: Tr. 12132-36, 12202-07; see Marchiano Br. at 23.) However, the broker's recommendation to its customer must be based on the investment being suitable to that customer's needs. (Mosher: Tr. 12132-36, 12199, 12202-07.)

Further, the SEC permits market makers to make "stabilizing bids" if the price of one of its house stocks falls below the offering bid, even though that effectively manipulates the market. (Mosher: Tr. 12094-96; see Marchiano Br. at 23.) Mosher admitted, however, testify that market makers are not permitted to manipulate the price of a stock. (Mosher: Tr. 12094-96.) To prevent the price of a stock from falling due to a customer selling a large block of stock, there is no rule prohibiting a broker from finding a customer to purchase those shares, but a firm cannot delay execution of a sale order in order to find a matching buy order. (Mosher: Tr. 12096-101, 12130-31;

see State Br. at 41.)  A firm is also allowed to negotiate the selling price with the customer looking to sell that large block of stock, since such a sale will move the market.  (Mosher: Tr. 12115-16.)

Mosher testified that it is proper to allow a customer to participate in an IPO as a quid pro quo for settlement of his claims against the firm.  (Mosher: Tr. 12182-86; see Marchiano Br. at 24.)  It is also proper for employees of the underwriting brokerage house to buy stock in an IPO if it is not a "hot" stock.  (Mosher: Tr. 12090-91; see State Br. at 41.)  Brokers could also buy stock for their own accounts in the aftermarket of an IPO.  (Mosher: Tr. 12091-92; see State Br. at 41.)  However, nominee accounts are not permissible.  (Mosher: Tr. 12187; see State Br. at 41.)

**The Dismissal of a Juror**

On July 2, 2001, after the prosecution's presentation of its case through live witnesses had ended (see Tr. 11621), and after the jurors had left for the day, the court clerk reported to Justice Snyder that he had been approached by three jurors.  (Tr. 11833.)  Justice Snyder made a sealed record of her conversation with the clerk[21] and addressed the issue with counsel when court reconvened the following Monday, July 9, 2001.  (See Tr. 11833.)

**The Jurors' Testimony**

The three jurors, along with the other members of the jury, were questioned on the record about what they had heard and seen.  The first of the three jurors, Terry Davis, explained that

---

[21]     The sealed record was not provided to this Court, but Justice Snyder referenced it in her on-the-record discussion with counsel on July 9, 2001.  (Tr. 11833-34.)

he had noticed juror Franklin Zapata making "eye contact with the defendants and what not" (Tr.

11844, 11847), and the week prior he and Mr. Zapata had a conversation:

> We were talking about the defendants and he was saying how much he admired them, and I said look Franklin [Zapata], as far as I'm concerned, whether they are guilty or not, that is something for us to decide later on, but these are not nice guys as far as I'm concerned.
>
> This is my own personal view, but if that is the way you feel, fine, that is something I shared.
>
> Then he said my mind is made up. I said your mind is made up, no, you have no idea what nor I have no idea what the law is, how can your mind be possibly made up.
>
> Then he goes on and says well you know, I had a conversation with one of the Marchiano's. I said you did what. I said look Frankie, my mouth is no prayer book. . . . [but] one thing I know, we have no conversation with the defendants . . . I think he said this happened back in May . . . he said it was downstairs in the cafeteria here in the courthouse, and one of the defendants walked up to him, I think one of the Marchiano brothers and he said hello to each other, and he went on and he asked him what kind of work he did.
>
> THE COURT: Who asked whom.
>
> [MR. DAVIS]: I believe one of the Marchiano's asked Franklin [Zapata] what kind of work he did, then it continued on and he said you know I won't mind working for you, so . . . I said look Frank . . . you are not supposed to have any contact with these people. . . .

(Tr. 11844-46.) Concerned about what Mr. Zapata had told him, Mr. Davis discussed it with jurors

Gina Carlotti and Susan Rothzeid. (Tr. 11846-47.) Mr. Davis and Ms. Carlotti planned to "think

about it over the weekend" before deciding to take the matter to the clerk. (Tr. 11847, 11866.) The

following Monday, after discussing it with Ms. Rothzeid, they decided to take the matter to the clerk. (Tr. 11847, 11853-54, 11866, 11875.)

After further questioning by Justice Snyder, Mr. Davis said he thought it was "Salvatore" that had spoken to Mr. Zapata but that he could not "be certain." (Tr. 11848.) Mr. Davis said he learned that Mr. Zapata told Sal Marchiano that he "would have liked" to have worked for him, and that Mr. Zapata did not say Sal Marchiano had any response to that comment. (Tr. 11849-50.) Justice Snyder asked Mr. Davis to reiterate what Mr. Zapata had told him the conversation with one of the Marchianos had been. (Tr. 11849.) Mr. Davis explained the encounter as Mr. Zapata had related it, and explained what he had said to Mr. Zapata:

> [MR. DAVIS]: [Zapata] said yeah, I wouldn't minded working for you guys earlier when he was employed, and I said you know, like I said why didn't you walk away, he was wrong, you were wrong, you should have turned around and walked away.
>
> THE COURT: What did Mr. Zapata say?
>
> [MR. DAVIS]: He just didn't get it at that point, that is when I got angry and I backed off and I explained why I was angry, he assumed – I said Frank, I like you, but what you did was dead wrong, do you realize if this got back to the Judge this could lead to a mistrial, after all the work we put into this nobody wants this.

(Tr. 11849-50.)[22]

---

[22] In response to defense counsel's question, Mr. Davis explained that one alternate juror was close enough that she could have overheard Mr. Zapata's conversation with Mr. Davis. (Tr. 11855-56.) Mr. Davis also mentioned the conversation to a third juror, Mr. Pearce. (Tr. 11851.) When Mr. Pearce was questioned by Justice Snyder, he said he "just blew [Mr. Davis' discussion about Zapata] off." (Tr. 11857.) Justice Snyder asked Mr. Pearce if he could "put that out of your mind and be fair and impartial to both sides?" (Tr. 11857-58.) Mr. Pearce replied that "[i]t was out of my mind as soon as I heard it." (Tr. 11858.)

Justice Snyder inquired whether Mr. Davis could remain impartial:

> THE COURT:  . . . My concern is now that everyone on the jury could remain fair and impartial to every defendant and the prosecution.
>
> Do you feel you could give both sides that assurance?
>
> [MR. DAVIS]:  Absolutely.
>
> THE COURT:  You have no hesitancy whatsoever?
>
> [MR. DAVIS]:  No, because I told – frankly I expressed to [Ms. Carlotti], my mind is not made up either way, but what ticked me off in [Mr. Zapata's] case is his mind is made up, I said that is not being fair.

(Tr. 11854-55.)

Later, Justice Snyder re-called Mr. Davis to further inquire into what he meant when

he referred to the defendants as "not nice guys":

> [MR. DAVIS]:  I told [Mr. Zapata] in my opinion, these are bad guys in the way they did something. That based on the evidence whether I can find them guilty or not guilty that is something I can determine.
>
> THE COURT:  Can you assure all of us as to the names that came up, which I believe, because I'm now getting a little confused, were Sal Marchiano and possibly Anthony Marchiano that you can maintain the presumption of innocence?
>
> [MR. DAIVS]:  Yes.
>
> THE COURT:  As well as to the other defendants, of course?
>
> [MR. DAVIS]:  Yes.
>
> THE COURT:  And you can hold the People to the high standard of proof which I referred to and I will discuss with you at length in my final charge, proof beyond a reasonable doubt?
>
> [MR. DAVIS]:  Yes.

THE COURT: Would you have any trouble evaluating the evidence fairly as to Sal and Anthony Marchiano because you don't think they are nice guys?

[MR. DAVIS]: No.

THE COURT: What about the other defendants, any problem?

[MR. DAVIS]: No.

THE COURT: Can you separate the issue of whether you like someone, and whether you can be fair and impartial?

[MR. DAVIS]: Whether I think these guys are personally nice people, that has nothing to do with my being able to deliver a fair verdict.

THE COURT: Thank you.

(Tr. 11919-20.)

Juror Carlotti testified that her concerns about Mr. Zapata began a couple of months earlier:

> I have just noticed strange kinds of eye contact type things happening. One day I was leaving the building and saw Franklin [Zapata] just waving goodbye saying . . . [t]o Mr. Marchiano, the dad and I think two of the defendants or one. There were some other family members present, I don't exactly remember which ones kind of waved goodbye like they were chatting, you know friendly, kind of made me wonder.

(Tr. 11860.) She also had seen "a communication type eye contact thing" between Mr. Zapata and the defendants in the courtroom, "with Sal probably more than any other" (Tr. 11861), which had been going on consistently throughout the trial (Tr. 11863). In June, Ms. Carlotti spoke to Ms. Rothzeid, who also had seen the eye contact Mr. Zapata was making with the defendants in the courtroom. (Tr. 11862-64.) After a week or so, Ms. Carlotti spoke to Mr. Davis about it, who later recounted his conversation with Mr. Zapata to her. (Tr. 11864-66.)

In response to Justice Snyder's inquiry whether Ms. Carlotti could remain "fair and impartial" to both sides, Ms. Carlotti said "I believe so" and then, "yes." (Tr. 11867.)

Juror Rothzeid recounted the conversation she had with Mr. Davis concerning Mr. Zapata (Tr. 11869-70) and added that she once overheard Mr. Zapata tell two other jurors that he "wouldn't mind getting in good with [the defendants] to get paid," referring to the Ferraris and the millions of dollars and the defendants' general lifestyle (Tr. 11870). At that time, Ms. Rothzeid commented that she didn't "think we should talk about this." (Tr. 11871.) According to Ms. Rothzeid, in early June, Mr. Zapata returned from the cafeteria and told those who were in the jury room that one of the defendants – either "Anthony or Sal" – had offered to buy him lunch but that he had declined. (Tr. 11869-70, 11878.) Ms. Rothzeid also had observed moments during trial, while the lawyers were at sidebar, that Anthony Marchiano was

> turning around and saying, mouthing words back and forth, rolling his eyes and making communications with Mr. Zapata. And Ms. Carlotti, I said, something is going on here it is weird, I don't know what i[s] happening, and she said yeah I noticed it, and this kept happening many times.
>
> [Anthony Marchiano] would walk by when everyone's back was turned, he would turn around and say hey man, something, I don't know, just mouthing word[s]. . . . Anthony Marchiano would turn around and look at Mr. Zapata and they would connect and mouth words back and forth, that is when Ms. Carlotti and I were saying I noticed this for a while and Terry [Davis] was saying he's noticed it.
>
>  . . . [T]he mouthing of the words was with Anthony Marchiano but Sal always looked in the direction of Mr. Zapata and rolling his eyes and making facial expressions non-verbal communications.

(Tr. 11872-73.)

Ms. Rothzeid assured Justice Snyder that she was able to be "fair and impartial" and that she still could "[a]fford each defendant the presumption of innocence." (Tr. 11876-77.)

Juror Zapata was called into the courtroom next. Mr. Zapata denied that any defendant had offered to buy him lunch; rather he said the encounter was when he was behind Anthony Marchiano in line for lunch and it was "[j]ust like hello and that was it." (Tr. 11879, 11883.) Other than that "hello and goodbye," Mr. Zapata said he never had a conversation with either of the Marchianos. (Tr. 11879-80, 11883.) Mr. Zapata also denied any "gestures" made with the Marchianos in the courtroom and denied that he ever waved hello or goodbye to them. (Tr. 11880-81.) Mr. Zapata said he never told another juror that his mind was made up; in fact, he testified that he is "still undecided." (Tr. 11881-82.)

Alternate juror number two testified that a month before, she had heard someone say they had been "downstairs and had encountered one of the defendants just happened to be in the same line or area, [she thought] it was just a passing sort of a hi." (Tr. 11899-900.)

Alternate juror number three testified that Mr. Zapata had told her several times that he had spoken with one of the defendants and he told her that "he wished he could have worked for [Anthony Marchiano] at the time . . . he could have been making a lot of money, like that." (Tr. 11902-04.) Two weeks prior, Mr. Zapata told her he had "made up his mind" about the case, but he was laughing when he said it. (Tr. 11904.) Mr. Zapata also told her that he liked the defendants because "he would have done the same thing." (Tr. 11904-05, 11907.) The alternate juror said Mr. Zapata had made these comments in front of her and Mr. Davis and that Mr. Davis got "very

upset" but she "didn't want to get into their argument." (Tr. 11905.)  She recounted that Mr. Zapata then said he did not mean it, he was only joking, and that "he was going to go through the process." (Tr. 11905.)  The alternate juror assured Justice Snyder that she could remain "fair and impartial." (Tr. 11908.)

### Justice Snyder's Ruling

After all the jurors had been heard, Justice Snyder denied the defense's motion (Tr. 11910, 11913, 11914) to have any of the three jurors who had come forward removed from the jury finding them "candid, truthful and forthright."  (Tr. 11922.)  Justice Snyder found the jurors who came forward "to be credible and believable, to have no motive to tell anything but the truth, and to have reported the impropriety, perhaps tardily, from our perspective as lawyers, but in their view, to the best of their ability being uncertain what to do."  (Tr. 11922-23.)[23/]  Justice Snyder concluded that as a result of her inquiry of each juror, she was satisfied with their ability to serve as fair and impartial jurors.  (Tr. 11913-14, 11915, 11916, 11917.)

---

[23/]  Justice Snyder addressed the defense's argument that the three jurors had violated the court's instructions through delay in reporting the misconduct and had tainted each other by discussing the misconduct among themselves:

> I think in good conscience each made observations, did not know how to handle them, and perhaps they did not handle them as promptly as they should have.  That in no way affects their ability to be fair and impartial to both sides and I rest on that record.

(Tr. 11917.)

Justice Snyder found Mr. Zapata "absolutely incredible" and found that he lied in response to her questioning, but found that Mr. Zapata's statement that he had made up his mind about the defendants and that he would have liked to have worked for them and shared their lifestyle was credible. (Tr. 11923.) Justice Snyder was "absolutely convinced that Mr. Zapata [was] a grossly unqualified juror" in terms of the governing statute and case law, and she discharged him from the jury. (Tr. 11923-24, 11927.)

Justice Snyder denied the defense motion for a mistrial on the ground that the jury was "polluted." (Tr. 11926.)

**Verdict and Sentence**

On July 23, 2001 the jury found ASG, Anthony Marchiano, Salvatore Marchiano and Charles Trento guilty of enterprise corruption, violating the Martin Act and numerous individual crimes as well. (Verdict: Tr. 13396-463; see pages 1-2 above.)

Ppetitioners were sentenced on November 8, 2001. (1st Dep't Jt. Appx. Vol. III at A. 1497-559: 11/8/01 Sent. Tr.) ASG was sentenced to a conditional discharge, Anthony Marchiano was sentenced to an aggregate of 10-30 years imprisonment and directed to pay $8 Million in restitution (id. at A. 1552: Sent. Tr. at 56),[24] and Salvatore Marchiano was sentenced to an aggregate of 5-15 years imprisonment and directed to pay almost $4 Million in restitution (id. at A. 1555: Sent. Tr. at 59). Trento was sentenced to an aggregate of 4-12 years imprisonment and directed to pay

---

[24]  Anthony Marchiano was re-sentenced on November 30, 2001 with no change in the length of his recorded sentence. (Id. at A. 1560-62: 11/30/01 Re-Sent. Tr. at 1-3.)

$1.354 Million in restitution. (<u>Id</u>. at A. 1557: Sent. Tr. at 61.) Trento has been released on parole. (<u>See</u> State Br. at 3.)

**Petitioners' Direct Appeal**

Petitioners' joint direct appeal to the First Department raised the following issues: (1) the petitioners' due process right to a fair trial was denied by Justice Snyder's failure to recuse herself, unfairly limited cross-examination, improperly inserted herself during the trial and demonstrated partiality (Pets. Jt. 1st Dep't Br. at 24-82); (2) Justice Snyder violated petitioners' Confrontation Clause rights by erroneously admitting the plea allocutions of seven former co-defendants as declarations against penal interest (<u>id</u>. at 82-106) and the error was not harmless (Marchiano 1st Dep't Reply Br. at 2-22); (3) "the admission of expert testimony over defense objection regarding legal standards and assessments of the [petitioners'] culpability was prejudicial error" (Pets. Jt. 1st Dep't Br. at 107-14); (4) Justice Snyder violated petitioners' constitutional right to an impartial jury by failing to discharge "three jurors as grossly unqualified and for substantial misconduct" (<u>id</u>. at 115-33);[25/] (5) "the court's jury charge regarding accomplice corroboration for conduct underlying both pattern acts and substantive counts was erroneous and confusing" (<u>id</u>. at 134-39); (6) "the court below erred in refusing to suppress evidence seized pursuant to a warrant for the search of [petitioner] Anthony Marchiano's home" (<u>id</u>. at 140-49); (7) Salvatore Marchiano's sentence was "excessive and unduly harsh" (<u>id</u>. at 149-56); and (8) Anthony Marchiano's sentence was "excessive as a matter of law and unduly harsh" (<u>id</u>. at 157-62).

---

[25/] Petitioners did not appeal the dismissal of juror number 10, Mr. Zapata. (<u>Id</u>. at 115.)

Trento filed a separate brief on appeal, represented by attorney Perry S. Reich. (05

Civ. 5496, Dkt. No. 10: Ginsberg Aff. Ex. A: Trento 1st Dep't Br.) Trento's First Department brief

joined in the Marchianos' brief (Trento 1st Dep't Br. at 1), and raised the additional argument that

the verdict was "against the weight of the credible evidence." (Id.; see also id. at 5-12.) He also

argued that the evidence against him was insufficient. (Ginsberg Aff. Ex. B: Trento 1st Dep't Reply

Br. at 1-19.)

On July 8, 2004, the First Department affirmed petitioners' convictions. People v.

A.S. Goldmen, Inc., 9 A.D.3d 283, 779 N.Y.S.2d 489 (1st Dep't 2004). The First Department found

the trial court's admission of the plea allocutions harmless error:

> Although the [trial] court improperly admitted the plea allocutions of various
> participants in defendants' fraudulent enterprise, we find the error to be harmless.
> Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 1372, 158 L. Ed. 2d 177
> includes plea allocutions within the category of "testimonial" hearsay statements
> covered by the Confrontation Clause. Since defendants specifically objected under
> the Confrontation Clause, we apply the standard for constitutional error and find the
> error to be harmless beyond a reasonable doubt. Despite the number of allocutions
> admitted at trial, none of them directly linked any of defendants to any specific crime,
> and none was critical proof of any crime against any defendant. Moreover, the
> allocutions represented a minuscule portion of the overwhelming evidence against
> these defendants, which included testimony from 10 other codefendants, numerous
> defrauded customers, voluminous documentation and expert testimony.

People v. A.S. Goldmen, Inc., 9 A.D.3d at 284, 779 N.Y.S.2d at 491 (citations omitted).

Regarding petitioners' claim that Justice Snyder acted improperly throughout the trial,

the First Department held:

> The [trial] court properly exercised its discretion in denying defendants'
> request that the court recuse itself after another codefendant was charged with hiring
> someone to murder the court. That codefendant's trial was severed, and there was no

indication that the court could not remain fair and impartial to the remaining defendants, none of whom were accused of having any connection to the murder plot.

> The [trial] court's rulings, its questioning of witnesses during direct and cross-examination, and its occasional admonitions to defense counsel, did not exhibit bias or deprive defendants of a fair trial. The various rulings challenged by defendants were neither erroneous nor evidence of judicial bias. The court did not "quash" the numerous subpoenas duces tecum directed at the brokerage firms which then held the accounts of the corporate defendant's victimized customers. On the contrary, the court correctly reserved decision on the particular subpoenas, pending an offer of proof by defendants regarding the relevance of the information sought as to each particular witness. The court's questioning was reasonably limited in scope, given the extraordinary length of the trial, and it constituted permissible efforts to clarify issues. Although some of the court's comments might have been better left unsaid, they do not warrant reversal.

Id. at 284-85, 779 N.Y.S.2d at 491-92 (citations omitted).

As to Justice Snyder's denial of petitioners' request to excuse three jurors, the First Department held:

> The [trial] court properly denied defendants' request to excuse three jurors who reported the misconduct of a fourth juror, who was promptly replaced by an alternate. Only one of the three jurors demonstrated any possibility of bias against defendants, and that juror gave unequivocal assurances that he would remain fair and impartial. Furthermore, these jurors did not violate the court's instructions when they briefly delayed their report of the misconduct of the fourth juror. The three jurors reported the misconduct as soon as there was something substantial to report.

Id. at 285, 779 N.Y.S.2d at 492 (citations omitted).

Finally, the First Department denied petitioner Trento's challenge to the sufficiency and weight of the evidence as "unavailing," furher holding that "[t]o the extent required, accomplice testimony was fully corroborated, especially by the testimony of the People's financial investigator."

Id. at 286, 779 N.Y.S.2d at 492.

On September 3, 2004, the New York Court of Appeals denied leave to appeal. People v. A.S. Goldmen, Inc., 3 N.Y.3d 703, 709, 712, 785 N.Y.S.2d 31, 37, 40 (2004).

**Petitioners' Habeas Petition**

All petitioners seek habeas relief on the ground that the First Department unreasonably applied clearly established federal law by holding the admission of seven plea allocutions, while a violation of petitioners' Confrontation Clause rights, was harmless error.  (Dkt. No. 1: Marchiano Pet. ¶ 2; 05 Civ. 5496, Dkt. No. 1: Trento Pet. ¶ 12(B).)  All petitioners also allege that they were denied their constitutional rights due to the misconduct of the trial judge.  (Marchiano Pet. ¶ 1; Trento Pet. ¶ 12(C).)  The Marchiano petitioners allege that "the trial court's conduct in unfairly limiting cross-examination, participating in the trial process, as an ancillary prosecutor, and by demonstrating obvious partiality both in and out of the presence of the jury" violated their due process rights.  (Marchiano Pet. ¶ 1.)  Trento alleges that he was denied a fair trial because the trial "court should have recused itself after another co-defendant was charged with hiring someone to murder [the] trial judge [and the] trial court exhibited bias and gave interviews and wrote a book while the case was pending."  (Trento Pet. ¶ 12(C).)  Additonally, Trento alleges that:  (1) the evidence against him at trial was insufficient to support his conviction (Trento Pet. ¶ 12(A)), and (2) he was denied an impartial jury because the trial court denied his request to excuse three jurors

who reported the misconduct of a fourth juror who was replaced by an alternate (Trento Pet. ¶ 12(D)).[26/]

---

[26/] Trento was represented by attorney Perry S. Reich when he filed the instant habeas petition. (05 Civ. 5496, Dkt. No. 1: Trento Pet.) His petition, even though counseled, was a bare-bones submission which listed his claims without any supporting facts, legal analysis or accompanying memorandum of law. (Id.) On March 27, 2006, attorney Reich, who also had represented Trento previously on his state appeal (but not at trial), was suspended from the practice of law in this District following his suspension by the State of New York. (See No. M-2-238, 3/27/06 Order.)

On May 12, 2006, Trento's newly retained counsel, Seth Ginsberg, requested that this Court issue a "stay and abeyance" of Trento's habeas petition to enable him to exhaust an ineffective assistance of appellate counsel claim in state court. (05 Civ. 5496, Dkt. No. 8: 5/12/06 Ginsberg Letter; Dkt. No. 9: Stay and Abeyance Br.; Dkt. No. 10: Ginsberg Aff.) The Court held a hearing on the matter during which it discussed the ramifications that a stay and abeyance could have on Trento's habeas petition in the future, particularly in light of the co-defendants' pending habeas petition. (See 5/24/06 Conf. Tr.) At the hearing, the Court nevertheless granted Trento a stay and abeyance but ordered counsel to review with Trento the potential consequences discussed at the hearing and to have Trento submit an affidavit to the Court confirming that he understood them. (See id.)

On June 2, 2006, Trento submitted an affidavit to withdraw his application for a stay and abeyance because he decided to proceed with his habeas petition as originally filed. (Dkt. No. 11: 5/31/06 Trento Aff.) The Court hereby explicitly approves Trento's withdrawal of his prior request for stay and abeyance, and analyzes his claims for federal habeas corpus relief in this Report and Recommendation.

## ANALYSIS

### I.    PETITIONER A.S. GOLDMEN, INC.'S CLAIM SHOULD BE DENIED

ASG has petitioned for a writ of habeas corpus.  (See Dkt. No. 1: Pet.)  However, because a corporation can never satisfy the "in custody" requirement of 28 U.S.C. § 2241(c)(3), this court lacks subject matter jurisdiction over ASG, and therefore ASG's habeas petition should be denied.  See Waste Mgmt. of Wis., Inc. v. Fokakis, 614 F.2d 138, 140 (7th Cir.) ("The parties concede that a corporate petitioner can never secure habeas corpus review under the present statute because a corporation's entity status precludes it from ever being incarcerated or otherwise held in custody."), cert. denied, 449 U.S. 1060, 101 S. Ct. 782 (1980).[27]

---

[27]    See also, e.g., United States v. Mett, 65 F.3d 1531, 1534 (9th Cir. 1995) (noting that a corporation not in custody "lack[s] access to § 2255 relief"), cert. denied, 519 U.S. 870, 117 S. Ct. 185 (1996); United States v. Pacific Ship Repair & Fabricators, Inc., No. 91-50649, 979 F.2d 856 (table), 1992 WL 337738 at *2 (9th Cir. Nov. 18, 1992) ("[T]he magistrate did not have jurisdiction to grant relief under 28 U.S.C. § 2255 because habeas corpus relief is unavailable to a corporation, which can never be held in custody."); United States v. Rad-O-Lite of Phila., Inc., 612 F.2d 740, 744 (3d Cir. 1979) ("Because a corporation cannot be held in custody, Rad-O-Lite cannot obtain relief under § 2255."); United States v. Tucor Int'l, Inc., 35 F. Supp. 2d 1172, 1177 (N.D. Cal. 1998) (While coram nobis can be used by a corporation to attack a federal conviction, federal courts "may not entertain a petition for the writ with respect to challenges to state convictions."), aff'd, 189 F.3d 834 (9th Cir. 1999).

## II. THE AEDPA REVIEW STANDARD[28/]

Before the Court can determine whether the remaining petitioners are entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

---

[28/] For additional decisions by this Judge discussing the AEDPA review standard in language substantially similar to that in this entire section of this Report & Recommendation, see, e.g., Rosario v. Walsh, 05 Civ. 2684, 2006 WL 1431410 at *12-15 (S.D.N.Y. May 25, 2006) (Peck, M.J.); Hardison v. Artus, 06 Civ. 0322, 2006 WL 1330064 at *6-8 (S.D.N.Y. May 16, 2006) (Peck, M.J.); Harris v. Woods, 05 Civ. 5582, 2006 WL 1140888 at *13-16 (S.D.N.Y. May 1, 2006) (Peck, M.J.); Nelson v. Sears, 05 Civ. 10341, 2006 WL 775123 at *5-8 (S.D.N.Y. Mar. 28, 2006) (Peck, M.J.); Hopkins v. Burge, 05 Civ. 8230, 2006 WL 519782 at *7-10 (S.D.N.Y. Mar. 3, 2006) (Peck, M.J.); Bryant v. Fischer, 05 Civ. 0437, 2005 WL 3418282 at *10-14 (S.D.N.Y. Dec. 14, 2005) (Peck, M.J.); Olivo v. Thorton, 05 Civ. 3237, 2005 WL 3292542 at *5-8 (S.D.N.Y. Dec. 6, 2005) (Peck, M.J.), report & rec. adopted, 2006 WL 1636742 (S.D.N.Y. June 12, 2006) (Castel, D.J.); Ellis v. Phillips, 04 Civ. 7988, 2005 WL 1637826 at *9-11 (S.D.N.Y. July 13, 2005) (Peck, M.J.); Murray v. Schultz, 05 Civ. 0472, 2005 WL 1523504 at *7-10 (S.D.N.Y. June 29, 2005) (Peck, M.J.); Roman v. Filion, 04 Civ. 8022, 2005 WL 1383167 at *14-17 (June 10, 2005 S.D.N.Y) (Peck, M.J.); Yapor v. Mazzuca, 04 Civ. 7966, 2005 WL 894918 at *9-11 (S.D.N.Y. Apr. 19, 2005) (Peck, M.J.), report & rec. adopted, 2005 WL 1845089 (S.D.N.Y. Aug. 3, 2005); James v. Artus, 03 Civ. 7612, 2005 WL 859245 at *5-8 (S.D.N.Y. Apr. 15, 2005) (Peck, M.J.); Boyd v. Smith, 03 Civ. 5401, 2004 WL 2915243 at *5-7 (S.D.N.Y. Dec. 17, 2004) (Peck, M.J.) (citing my earlier cases); Montalvo v. Annetts, 02 Civ. 1056, 2003 WL 22962504 at *12-14 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.) (citing my earlier cases); Larrea v. Bennett, 01 Civ. 5813, 2002 WL 1173564 at *14 (S.D.N.Y. May 31, 2002) (Peck, M.J.), report & rec. adopted, 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002) (Scheindlin, D.J.), aff'd, 368 F.3d 179 (2d Cir. 2004); Mendez v. Artuz, 98 Civ. 2652, 2000 WL 722613 at *22 (S.D.N.Y. June 6, 2000) (Peck, M.J.), report & rec. adopted, 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000) (McKenna, D.J.), aff'd, 303 F.3d 411, 417 (2d Cir. 2002), cert. denied, 537 U.S. 1245, 123 S. Ct. 1353 (2003); Fluellen v. Walker, 97 Civ. 3189, 2000 WL 684275 at *10 (S.D.N.Y. May 25, 2000) (Peck, M.J.), aff'd, 41 Fed. Appx. 497 (2d Cir. 2002), cert. denied, 538 U.S. 978, 123 S. Ct. 1787 (2003).

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[29]

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." Williams v. Taylor, 529 U.S. at 404-05, 120 S. Ct. at 1519.[30]  Both,

---

[29]    See also, e.g., Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 126 S. Ct. 1622 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'") (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019, 122 S. Ct. 1611 (2002)).

[30]    Accord, e.g., Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003); Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000); Lurie v. Wittner, 228 F.3d 113, 125 (2d Cir. 2000), cert. denied, 532 U.S. 943, 121 S. Ct. 1404 (2001); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000), cert. denied, 531 U.S. 1116, 121 S. Ct. 865 (2001).

however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence."

<u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 412, 120 S. Ct. at 1523.[31/] "That federal law, as defined by the Supreme Court, may either be a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d at 42. "A petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 110; <u>accord</u>, <u>e.g.</u>, <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200.

>As to the "contrary to" clause:
>
>A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . . A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

---

[31/]     Accord, <u>e.g.</u>, <u>Yarborough</u> v. <u>Alvarado</u>, 124 S. Ct. 2140, 2147 (U.S. 2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. 63, 72, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d 587, 591 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 1047, 124 S. Ct. 2171 (2004); <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d 1197, 1200 (2d Cir. 2002); <u>Yung</u> v. <u>Walker</u>, 341 F.3d 104, 109-110 (2d Cir. 2003); <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d 36, 42 (2d Cir.), <u>cert. denied</u>, 537 U.S. 909, 123 S. Ct. 251 (2002); <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d 178, 184 (2d Cir. 2001); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 309 (2d Cir. 2001).

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[32/]

        In Williams, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. at 413, 120 S. Ct. at 1523.[33/] However, "[t]he term 'unreasonable' is . . . difficult to define." Williams v. Taylor, 529 U.S. at 410, 120 S. Ct. at 1522. The Supreme Court made clear that "an unreasonable application of federal law is different from an incorrect application of federal law." Id.[34/] Rather, the issue is "whether the state court's

---

32/     Accord, e.g., Brown v. Payton, 544 U.S. 133, 125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); Lockyer v. Andrade, 123 S. Ct. at 1173-74; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 210, 219 (2d Cir.), cert. denied, 126 S. Ct. 215 (2005); Tueros v. Greiner, 343 F.3d at 591; DelValle v. Armstrong, 306 F.3d at 1200; Yung v. Walker, 341 F.3d at 109; Kennaugh v. Miller, 289 F.3d at 42; Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 127-28.

33/     Accord, e.g., Brown v. Payton, 125 S. Ct. at 1439; Wiggins v. Smith, 123 S. Ct. at 2534-35; Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006); Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d at 181.

34/     See also, e.g., Yarborough v. Alvarado, 124 S. Ct. at 2150; Wiggins v. Smith, 123 S. Ct. at 2535; Price v. Vincent, 123 S. Ct. at 1853 ("As we have explained, 'a federal habeas court may not issue the writ simply because that court concludes that the state-court decision applied [a Supreme Court case] incorrectly.'") (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002)); Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 124-25; DelValle v. Armstrong, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not (continued...)

application of clearly established federal law was objectively unreasonable."  Williams v. Taylor,

529 U.S. at 409, 120 S. Ct. at 1521.[35/]  "Objectively unreasonable" is different from "clear error."

Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness.").  However,

the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is

required . . . the increment need not be great; otherwise, habeas relief would be limited to state court

decisions so far off the mark as to suggest judicial incompetence.'" Jones v. Stinson, 229 F.3d at 119

(quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).[36/]  "[T]he range of reasonable

judgment can depend in part on the nature of the relevant rule." Yarborough v. Alvarado, 124 S. Ct.

at 2149.[37/]

---

[34/]    (...continued)
grant habeas relief even if in our judgment its application was erroneous.").

[35/]    Accord, e.g., Yarborough v. Alvarado, 124 S. Ct. at 2150; Wiggins v. Smith, 123 S. Ct. at 2535; Price v. Vincent, 123 S. Ct. at 1853; Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1174-75; Woodford v. Visciotti, 537 U.S. at 25-27, 123 S. Ct. at 360-61; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002); Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 128-29.

[36/]    Accord, e.g., Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197, 200-01; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d at 245; Yung v. Walker, 341 F.3d at 110; Loliscio v. Goord, 263 F.3d at 184.

[37/]    The Supreme Court explained:

[T]he range of reasonable judgment can depend in part on the nature of the relevant
(continued...)

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." Kennaugh v. Miller, 289 F.3d at 45.[38/]

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

---

[37/] (...continued)
rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

Yarborough v. Alvarado, 124 S. Ct. at 2149.

[38/] Accord, e.g., Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; see Yarborough v. Alvarado, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision.  There is force to this argument.  Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.  At the same time, the difference between applying a rule and extending it is not always clear.  Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

Sellan v. Kuhlman, 261 F.3d at 312; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853 ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); Lynn v. Bliden, 443 F.3d at 246; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 220; Wade v. Herbert, 391 F.3d 135, 140 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'" "Such a summary determination, even absent citation of federal case law, is a 'determination on the merits' and as such requires the deference specified by § 2254." Moreover, "[I]f any reasonable ground was available [for the state court's decision], we must assume that the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise Appellate Division disposition – the word 'denied' – triggered AEDPA deference.")[39]

---

[39]     Accord, e.g., Cox v. Donnelly, 387 F.3d at 197 ("Neither the Appellate Division nor the New
(continued...)

"By its terms, § 2254(d) requires such deference only with respect to a state-court 'adjudication on the merits,' not to a disposition 'on a procedural, or other, ground.' Where it is 'impossible to discern the Appellate Division's conclusion on [the relevant] issue,' a federal court should not give AEDPA deference to the state appellate court's ruling." Miranda v. Bennett, 322 F.3d 171, 177-78 (2d Cir.

---

39/      (...continued)
York Court of Appeals addressed [petitioner's] argument beyond a brief statement that the argument was without merit. In the absence of any expressed reasoning behind this conclusion, we turn directly to the facts of the case to determine whether Strickland was applied unreasonably."); Dallio v. Spitzer, 343 F.3d at 559-60; Parsad v. Greiner, 337 F.3d at 180-81; Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003); Eze v. Senkowski, 321 F.3d at 121; Ryan v. Miller, 303 F.3d at 245; Aeid v. Bennett, 296 F.3d 58, 62 (2d Cir.), cert. denied, 537 U.S. 1093, 123 S. Ct. 694 (2002); Norde v. Keane, 294 F.3d 401, 410 (2d Cir. 2002); Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir. 2001).

The Second Circuit "recognize[d] that a state court's explanation of the reasoning underlying its decision would ease our burden in applying the 'unreasonable application' or 'contrary to' tests." Sellan v. Kuhlman, 261 F.3d at 312. Where the state court does not explain its reasoning, the Second Circuit articulated the analytic steps to be followed by a federal habeas court:

> We adopt the Fifth Circuit's succinct articulation of the analytic steps that a federal habeas court should follow in determining whether a federal claim has been adjudicated "on the merits" by a state court. As the Fifth Circuit has explained, "[W]e determine whether a state court's disposition of a petitioner's claim is on the merits by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." Mercadel v. Cain, 179 F.3d 271, 274 (5th Cir. 1999).

Sellan v. Kuhlman, 261 F.3d at 314; accord, e.g., Cotto v. Herbert, 331 F.3d at 230; Eze v. Senkowski, 321 F.3d at 121-22; Norde v. Keane, 294 F.3d at 410; Aparicio v. Artuz, 269 F.3d at 93; see also Dallio v. Spitzer, 343 F.3d at 560.

2003) (citations omitted).[40/]  Of course, "[i]f there is no [state court] adjudication on the merits, then the pre-AEDPA, <u>de novo</u> standard of review applies." <u>Cotto</u> v. <u>Herbert</u>, 331 F.3d at 230.

Finally, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); <u>accord</u>, <u>e.g.</u>, <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246-47; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 220. "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'" <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181 (quoting § 2254(e)(1)); <u>accord</u>, <u>e.g.</u>, <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246-47.

## III.  THE FIRST DEPARTMENT'S DETERMINATION THAT THE <u>CRAWFORD</u> CONFRONTATION CLAUSE ERROR WAS HARMLESS WAS NOT AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW

The First Department held that Justice Snyder's admission of the seven plea allocutions was harmless error:

> Although the court improperly admitted the plea allocutions of various participants in defendants' fraudulent enterprise, we find the error to be harmless.

---

[40/]  The Second Circuit in <u>Miranda</u> v. <u>Bennett</u> continued: "Generally, when the Appellate Division opinion states that a group of contentions is either without merit 'or' procedurally barred, the decision does not disclose which claim in the group has been rejected on which ground. If the record makes it clear, however, that a given claim had been properly preserved for appellate review, we will conclude that it fell into the 'without merit' part of the disjunct even if it was not expressly discussed by the Appellate Division." <u>Id</u>. at 178.

<u>Crawford</u> v. <u>Washington</u>, 541 U.S. 36, 124 S. Ct. 1354, 1372, 158 L.Ed.2d 177 includes plea allocutions within the category of "testimonial" hearsay statements covered by the Confrontation Clause. Since defendants specifically objected under the Confrontation Clause, we apply the standard for constitutional error and find the error to be harmless beyond a reasonable doubt. Despite the number of allocutions admitted at trial, none of them directly linked any of defendants to any specific crime, and none was critical proof of any crime against any defendant. Moreover, the allocutions represented a minuscule portion of the overwhelming evidence against these defendants, which included testimony from 10 other codefendants, numerous defrauded customers, voluminous documentation and expert testimony.

<u>People</u> v. <u>A.S. Goldmen, Inc.</u>, 9 A.D.3d 283, 284, 779 N.Y.S.2d 489, 491 (1st Dep't 2004)

(citations omitted). The sole issue before this Court relates to the harmless error issue, not the

<u>Crawford</u> violation itself, which is conceded. (Dkt. No. 6: State Br. at 42-46.)[41/]

---

[41/] The Confrontation Clause of the Sixth Amendment affords the accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Sixth Amendment's Confrontation Clause is applicable in state criminal trials via the Fourteenth Amendment. E.g.,<u>Crawford</u> v. <u>Washington</u>, 541 U.S. 36, 42, 124 S. Ct. 1354, 1359 (2004); <u>Douglas</u> v. <u>Alabama</u>, 380 U.S. 415, 418, 85 S. Ct. 1074, 1076 (1965); <u>Pointer</u> v. <u>Texas</u>, 380 U.S. 400, 404, 85 S. Ct. 1065, 1068 (1965); <u>Ellis</u> v. <u>Phillips</u>, 04 Civ. 7988, 2005 WL 1637826 at *21 & n.38 (S.D.N.Y. July 13, 2005) (Peck, M.J.) (& cases cited therein). The primary purpose of the Confrontation Clause is to prevent out-of-court statements from being used against a criminal defendant in lieu of in-court testimony subject to the scrutiny of cross-examination. E.g., <u>Douglas</u> v. <u>Alabama</u>, 380 U.S. at 418-19, 85 S. Ct. at 1076-77; <u>see</u>, <u>e.g.</u>, <u>Crawford</u> v. <u>Washington</u>, 541 U.S. at 50-59, 124 S. Ct. at 1363-69.

According to the Supreme Court in <u>Crawford</u>, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." <u>Crawford</u> v. <u>Washington</u>, 541 U.S. at 68-69, 124 S. Ct. at 1374. Plea allocutions are "plainly testimonial" statements, <u>id.</u> at 64, 124 S. Ct. at 1371; <u>see</u> <u>United States</u> v. <u>McClain</u>, 377 F.3d 219, 221-22 (2d Cir. 2004), and thus the admission of a co-conspirator's plea allocution who does not testify at trial is a violation of a defendant's confrontation clause rights, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Reifler</u>, 446 F.3d 65, 86 (2d Cir. 2006); <u>United States</u> v. <u>Pearson</u>, 165 Fed. Appx. 129, 131 (2d Cir. 2006); <u>United States</u> v. <u>Zhou</u>, 428 F.3d 361, 374 n.12 (2d Cir. 2005); <u>People</u> v. <u>Hardy</u>, 4 N.Y.3d 192, 194,
(continued...)

## A.    **Legal Standard**

It is black letter law, undisputed by the parties here, that Confrontation Clause violations are subject to harmless error analysis. E.g., United States v. Santos, 449 F.3d 93, 99 (2d Cir. 2006); United States v. Reifler, 446 F.3d 65, 86 (2d Cir. 2006); United States v. Snype, 441 F.3d 119, 128 (2d Cir. 2006); United States v. Pearson, 165 Fed. Appx. at 131; United States v. Al-Sadawi, 432 F.3d 419, 426 (2d Cir. 2005); Howard v. Walker, 406 F.3d 114, 123, 133-34 (2d Cir. 2005); Gutierrez v. McGinnis, 389 F.3d 300, 308 (2d Cir. 2004); Brown v. Keane, 355 F.3d 82, 91 (2d Cir. 2004); Hopkins v. Burge, 05 Civ. 8230, 2006 WL 519782 at *10 (S.D.N.Y. Mar. 3, 2006) (Peck, M.J.); Ellis v. Phillips, 04 Civ. 7988, 2005 WL 1637826 at *24 & n.45 (S.D.N.Y. July 13, 2005) (Peck, M.J.) ("It is settled law that 'violations of the confrontation clause may, in an appropriate case, be declared harmless' error.") (& cases cited therein).[42]

----

[41]    (...continued)
198, 791 N.Y.S.2d 513, 515, 517 (2005).

[42]    See, e.g., Lilly v. Virginia, 527 U.S. 116, 139-40, 119 S. Ct. 1887, 1901 (1999) (remanding case to state court "to consider in the first instance whether this Sixth Amendment [Confrontation Clause] error was harmless beyond a reasonable doubt."); Coy v. Iowa, 487 U.S. 1012, 1021, 108 S. Ct. 2798, 2803 (1988) (holding that denial of face-to-face confrontation is subject to harmless error review); Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986) (harmless error applies to Confrontation Clause issue); United States v. Bermudez, 138 Fed. Appx. 339, 342 (2d Cir.) (Confrontation Clause "violation 'does not necessitate a new trial as long as the government can show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"), cert. denied, 126 S. Ct. 597 (2005); United States v. Kiltinivichious, 132 Fed. Appx. 901, 902-03 (2d Cir. 2005) (admission of co-defendants' plea allocutions was harmless error); United States v. Foster, 127 Fed. Appx. 537, 539 (2d Cir.) ("'It is well established that violations of the Confrontation Clause, if preserved for appellate review, are subject to
(continued...)

The parties here also agree as to the legal analysis to be applied on AEDPA review of a state court's harmless error determination. (Dkt. No. 1: Marchiano Br. at 27-30; Dkt. No. 6: State Br. at 43-46.) After the Supreme Court's decision in Mitchell v. Esparza, 540 U.S. 12, 17-18, 124 S. Ct. 7, 12 (2003), the Second Circuit in Gutierrez v. McGinnis held "that when a state court explicitly conducts harmless error review of a constitutional error, a habeas court must evaluate whether the state unreasonably applied Chapman" v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967). Gutierrez v. McGinnis, 389 F.3d at 306.[43/] Under the Chapman standard, a "constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Mitchell v. Esparza, 540 U.S. at 17-18, 124 S. Ct. at 12 (internal quotations omitted); accord, e.g., United States v. Santos, 449 F.3d at 99; Gutierrez v. McGinnis, 389 F.3d at 306.

To determine whether a Confrontation Clause violation is harmless error, federal courts examine "many factors, including 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the witness on material points, the extent of cross-examination

---

[42/]     (...continued)
harmless error review, however, and Crawford does not suggest otherwise.'") (quoting United States v. McClain, 377 F.3d 219, 221-22 (2d Cir. 2004)), cert. denied, 126 S. Ct. 208 (2005); United States v. Tropeano, 252 F.3d 653, 659 (2d Cir. 2001) ("[H]armless error analysis applies to evidentiary errors and to violations of the Confrontation Clause.").

[43/]     Accord, e.g., Hopkins v. Burge, 2006 WL 519782 at *10; Johnson v. Fischer, 05 Civ. 2870, 2006 WL 176999 at *4 (S.D.N.Y. Jan. 23, 2006); Brinson v. Walker, 407 F. Supp. 2d 456, 480-81 (W.D.N.Y. 2006); Ellis v. Phillips, 2005 WL 1637826 at *24 n.45.

otherwise permitted, and, of course, the overall strength of the prosecution's case.'"  Gutierrez v.

McGinnis, 389 F.3d at 308 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431,

1438 (1986)); see, e.g., United States v. Reifler, 446 F.3d at 86; United States v. Al-Sadawi, 432

F.3d at 426; Howard v. Walker, 406 F.3d at 133-34; Zappulla v. New York, 391 F.3d 462, 468 (2d

Cir. 2004), cert. denied, 126 S. Ct. 472 (2005); Brown v. Keane, 355 F.3d 82, 92 (2d Cir. 2004) ("In

making a determination of harmless error, the court looks to the record as a whole, considering the

overall strength of the prosecution's case, the importance of the improperly admitted evidence, and

whether the evidence was emphasized at trial.").[44]

## B.    The First Department Did Not Unreasonably Apply Clearly Established Federal Law

Petitioners claim that the First Department unreasonably applied the harmless error

review standard enunciated in Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967).

(See Marchiano Br. at 28-29.)  According to petitioners, the plea allocutions admitted at trial

provided the "lynchpin of the prosecutor's case" (id. at 34), diminished the prosecution's burden of

proof (id. at 37-39) and implicated petitioners as those guilty of the crimes allocuted to by the co-

conspirators (id. at 39).

---

[44]    See also, e.g., Blount v. Artuz, No. 98-2923, 189 F.3d 460 (table), 1999 WL 710251 at *2
(2d Cir. Sept. 2, 1999); Latine v. Mann, 25 F.3d 1162, 1167-68 (2d Cir. 1994), cert. denied,
514 U.S. 1006, 115 S. Ct. 1319 (1995); Henry v. Speckard, 22 F.3d 1209, 1216 (2d Cir.),
cert. denied, 513 U.S. 1029, 115 S. Ct. 606 (1994); Tinsley v. Kuhlmann, 973 F.2d 163, 166
(2d Cir. 1992), cert. denied, 506 U.S. 1081, 113 S. Ct. 1050 (1993); Hopkins v. Burge, 2006
WL 519782 at *11; Johnson v. Fischer, 2006 WL 176999 at *3; Brinson v. Walker, 407 F.
Supp. 2d at 481; Ellis v. Phillips, 2005 WL 1637826 at *24-25.

1. **The Jury is Presumed to Follow the Court's Limiting Instructions**

Justice Snyder thrice issued limiting instructions regarding the purpose for which the allocutions had been admitted – once before and once immediately after the allocutions were admitted, and again during the final charge to the jury. (<u>See</u> pages 30-31, 39-40 above.) Each time, Justice Snyder explained that the jury could only consider the allocutions as evidence of "participation of the subject acts by the persons who made the statements." (<u>See</u> pages 30, 39, 40 above.) Justice Snyder instructed that the allocutions were admitted to show "whether or not a crime of enterprise or conspiracy existed. And the scope of any criminal enterprise or conspiracy and whether certain criminal acts were committed as part of a pattern of criminal activity carried on by criminal enterprise." (<u>See</u> pages 30, 39, 40 above.) Justice Snyder further instructed that the jury was not to use the statements as evidence to identify any of the defendants on trial. (<u>See</u> pages 30, 39, 40 above.)

The jury is presumed to have followed the court's instructions. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Santos</u>, 449 F.3d 93,100 (2d Cir. 2006) ("The <u>Crawford</u> inquiry only involves this first element [- the existence of a conspiracy to rob -] because . . . the district court instructed the jury to consider [co-defendant's] post-arrest statement for the sole purpose of establishing the existence of a conspiracy to rob. We presume that the jury followed the instruction not to consider [co-defendant's] post-arrest statement when considering whether the government established the second element - that [the other defendants] <u>participated in</u> the conspiracy. There are no circumstances in this case that counsel us to deviate from this presumption.") (citations omitted); <u>United States</u> v.

Snype, 441 F.3d 119, 129-30 (2d Cir. 2006) (Crawford error harmless because of, inter alia, the trial court's limiting instructions); United States v. McClain, 377 F.3d 219, 223 (2d Cir. 2004) (jury presumed to follow limiting instructions; Crawford error harmless); Kamara v. United States, 04 Civ. 5340, 2005 WL 1337396 at *3 (S.D.N.Y. June 6, 2005) (same); see also, e.g., United States v. Reifler, 446 F.3d 65, 86, 90 (2d Cir. 2006) (admitting co-conspirators' plea allocutions was harmless error where, inter alia, the court instructed the jury that it could only consider the statements as evidence of whether a conspiracy existed and of the role the allocuting co-conspirator played in that conspiracy, but that the jury would have to rely on other evidence to consider the role, if any, that any of the defendants on trial played in the conspiracy); United States v. Bermudez, 138 Fed. Appx. 339, 342 (2d Cir.) ("Given that the plea allocutions of the co-conspirators were admitted only to prove the existence of the . . . conspiracy, and taking into account the substantial evidence of the conspiracy introduced during trial, we find the admission of the statements to be harmless error."), cert. denied, 125 S. Ct. 597 (2005); see generally Rosario v. Walsh, 05 Civ. 2684, 2006 WL 1431410 at *23 & n.45 (S.D.N.Y. May 25, 2006) (Peck, M.J.) ("The jury is presumed to obey a court's curative instruction.") (citing cases).

Thus, the Court presumes that, as instructed, the jury considered the allocutions only to determine whether a conspiracy or criminal enterprise existed.[45/]

---

[45/]     Petitioners argue that the significance of the allocutions to the jury's guilty verdict is evidenced, inter alia, by the fact that during deliberations the jury requested a copy of Winkler's allocution, and John and Christopher Delcioppo's statement. (Deliberations: Tr. 13185-86.) (See Marchiano Br. at 31, 35.) Petitioners do not cite any case law to support
                                                                              (continued...)

## 2.    The Evidence of Petitioners' Guilt Was Overwhelming

The ten cooperating witnesses who testified against petitioners at trial specifically named  Salvatore and Anthony Marchiano as key players in the criminal enterprise of ASG. Contrary to petitioners' contention (Marchiano Br. at 35), several of the cooperating witnesses had been high-ranking ASG employees.  For example, head trader Stacy Meyers testified to Anthony's hands-on role during the IPOs and aftermarket trading.  (See pages 4, 11-13, 17, 22 n.14, 25-26, 27 above.)  Meyers testified that she answered to Anthony, and she described specific instances where she bought and sold securities at prices and volume set by Anthony.  (See pages 11-12, 17, 22 n.14 above.)  Erika Whitman, second to Winkler in the compliance department, also testified about

---

45/    (...continued)
their argument on this point and this Court does not intend to do the job of petitioners' counsel.  However, since the New York Court of Appeals recently addressed this issue in People v. Hardy, 4 N.Y.3d 192, 791 N.Y.S.2d 513 (2005), the Court discusses that case here. The Hardy court found the introduction of co-defendant's plea allocution was not harmless error because of the People's "heavy reliance" on the plea allocution, the weak evidence at trial and the jury's reliance on the allocution, despite the court's limiting instruction, as evidenced by its "repeated requests that [the allocution] be read back along with other testimony."  People v. Hardy, 4 N.Y.3d at 199, 791 N.Y.S.2d at 518.  The instant case is distinguishable from People v. Hardy in that all other factors of the harmless error analysis favor a finding that the error was harmless.  The prosecution also points out that the jury in this case submitted many notes requesting many exhibits and that, if the Court is to engage in speculation as to what the jury relied on in reaching its verdict, the Court should note that the jury acquitted ASG, Anthony, Sal and Trento of various counts to which Winkler and others had allocuted.  (See State Br. at 59, 62-63.)

In any event, this Court is not deciding whether the Crawford error was harmless but rather whether the First Department's harmless error determination was unreasonable.  In light of all the factors discussed in Point III, the Court cannot say that the First Department's decision was an unreasonable application of the Chapman harmless error standard.

Anthony's role in the IPO schemes where securities were placed in nominee and problem accounts and taken out at below market-price at the direction of Anthony (and Winkler). (See pages 11, 15, 21 above.) Brokers also testified about Anthony's role in the enterprise. For example, broker Michael Lamarti, who worked in ASG's Florida office with Anthony, outlined how pervasive Anthony was in carrying out the ASG enterprise, from decisions about the IPOs to pressuring brokers to sell house stocks to customers through lies and deception. (See pages 12, 21-22 above.)[46]

As to Salvatore Marchiano, brokers including senior broker Stephen Kaplan testified about Sal's role at ASG, specifically that Sal was in charge of the brokers, conducted sales meetings in which he motivated the brokers to sell house stocks using lies and empty promises, enforced ASG's "no net sales" policy and manipulated NASDAQ computers to run-up stock prices. (See pages 13, 16, 20, 23-24, 26 above.)[47]

The trial testimony from brokers, specifically Shawn Smith who sat in Trento's office, focused on Charles Trento's participation in the IPO schemes and the dishonest sales practices he engaged in and taught to others. (See pages 23-24, 26-27 above.) Joseph Imbrenda and Charles

---

[46] In addition to the evidence summarized above in the "Facts" section, other ASG brokers testified that Anthony was directly involved in furthering ASG's enterprise operations. (Caracciolo: Tr. 4239-47; Cilmi: Tr. 8760-61, 8840-41, 8847-50, 8857-59, 8863-66; Lamarti: Tr. 9435-38, 9453.)

[47] In addition to the evidence summarized above in the "Facts" section, other ASG brokers testified that Sal was directly involved in the ASG scheme. (Kaplan: Tr. 1197; Caracciolo: Tr. 3751-54, 3765-71, 3785-95; Pipia: Tr. 8014-21. )

Pipia also testified about Trento's participation in the ASG criminal enterprise.  (See pages 15-16, 17-18, 26, 27, 29 n.17 above.)

The prosecution also presented documentary evidence, testimony from regulators, testimony from customers who had been victims of the ASG enterprise, and tape recorded telephone conversations between ASG employees and between ASG employees and customers.

The overwhelming evidence introduced at trial against petitioners supports the conclusion that admission of the plea allocutions was harmless error.  See, e.g., United States v. Reifler, 446 F.3d 65, 89-90 (2d Cir. 2006); United States v. Lewis, 144 Fed. Appx. 131, 133 (2d Cir. 2005) (affirming conviction, concluding that introduction of portions of co-conspirator's plea allocution for the purpose of showing the existence of the conspiracy was harmless error where, inter alia, evidence of the existence of the conspiracy and defendant's guilt was overwhelming and came from extensive testimony including that of another co-conspirator subject to cross-examination at trial, physical evidence and taped conversations); United States v. Santiago, 126 Fed. Appx. 21, 23 (2d Cir. 2005) (admission of co-defendants' plea allocutions was harmless error where defendants' "guilt was supported by an overwhelming amount of evidence" including eyewitness and victim testimony, physical evidence, surveillance videos and recorded conversations).[48/]

---

[48/]    See also, e.g., Muyet v. United States, 03 Civ. 4247, 2004 WL 2997866 at *10 (S.D.N.Y. Dec. 27, 2004) (denying § 2255 motion; admission of co-defendants' guilty pleas was harmless error where the evidence at trial was overwhelming and the court gave a limiting instruction); People v. Muhammad, 17 A.D.3d 139, 139, 791 N.Y.S.2d 828, 828-29 (1st Dep't) ("The introduction of nontestifying codefendant's plea allocution violated Crawford. . . . This evidence was clearly received for its truth with regard to whether or not

(continued...)

a robbery occurred . . . However, the error was harmless beyond a reasonable doubt. . . .
Without reference to the inadmissible plea allocution, there was overwhelming evidence
compelling the conclusion that the incident in question was a robbery and not an altercation
as claimed by defendant."), appeal denied, 5 N.Y.3d 792, 801 N.Y.S.2d 813 (2005).

The Marchiano petitioners point to United States v. Becker, 01 Cr. 156, 2006 WL 156677
at *3 (S.D.N.Y. Jan. 17, 2006), as a factually similar case in which the district court found
the admission of 11 plea allocutions was not harmless beyond a reasonable doubt and
vacated the defendant's conviction. (See Dkt. No. 10: 1/31/06 Pollok Letter at 3.) It is true
that the fraudulent techniques used at the investment firm in Becker–that of the brokers lying
about their own experience, their commissions, lying so that customers held onto house
stocks and avoiding customers calling to sell stocks – are similar to those used at ASG. See
United States v. Becker, 2006 WL 156677 at *1. The defendant in Becker was a broker at
his firm. The evidence introduced against him consisted of the testimony of two cooperating
witnesses as well as former customer testimony and tape recordings of his
misrepresentations. Id. at *1-2. Additionally, the prosecution in Becker was permitted to
admit plea allocutions of 11 other brokers for the purpose of showing that a conspiracy
existed and to provide testimony about the overt acts in furtherance of the conspiracy
committed by the allocuting brokers. Id. at *3. The trial court in Becker held that, in spite
of the trial judge's limiting instructions, the admission of the plea allocutions was not
harmless because the "admission of the eleven allocutions was important to the government's
case. Through these allocutions the Government proved to the jury that not just a few
individuals were engaged in defrauding the customers but that the defrauding of
customers . . . was a widespread practice . . . increasing the likelihood that Becker was a
member of the conspiracy. . . ." Id. at *3.

In Becker there were two cooperating witnesses who testified against the defendant
and eleven plea allocutions admitted; in contrast, here ten cooperating witnesses testified
against the defendants and seven plea allocutions were admitted. Additionally, here the
petitioners were principals (the Marchianos) or high-level employees (Trento) of ASG, who
were shown at trial to have been involved in the every-day operations of the firm. In Becker,
on the other hand, the defendant was a low-level broker among 100 other brokers. See id.
at *2. While there is no bright line rule as to the "correct" ratio of live testimony to plea
allocutions, the difference in the ratios in Becker and in the case sub judice, combined with
the fact that the defendant in Becker was a low-level employee as opposed to one of the key
figures in the firm as the petitioners were here, render the facts of Becker sufficiently
(continued...)

While petitioners argue that the redacted plea allocutions which referred to acting with "others" served to identify the petitioners (Marchiano Br. at 39), it was standard practice (prior to <u>Crawford</u>) to make such redactions. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Donovan</u>, 55 Fed. Appx. 16, 21 (2d Cir.) (pre-<u>Crawford</u> case holding admission of co-conspirators' plea allocutions was not error and that "there were several plea allocutions admitted at trial, so there was no implication that the 'others' were the defendants on trial."), <u>cert. denied</u>, 538 U.S. 1047, 123 S. Ct. 2110 (2003); <u>see also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Tropeano</u>, 252 F.3d 653, 659 (2d Cir. 2001) (pre-<u>Crawford</u> case where plea allocution of co-defendant in which he stated he acted "with others" was proper.); <u>United States</u> v. <u>Vergara</u>, No. 98-1351, 173 F.3d 847 (table), 1999 WL 278631 at *1 (2d Cir. May 4, 1999) (pre-<u>Crawford</u> case holding no hearsay violation where "[t]he codefendants stated [in their plea allocutions] that they had conspired with 'others,' and they did not identify [defendants] as coconspirators or otherwise mention them."), <u>cert. denied</u>, 528 U.S. 909, 120 S. Ct. 255 (1999). Moreover, Winkler's allocution never indicated who the "others" were, and in light of the extensive testimony about the brokers' misconduct, Winkler's reference to "others" did not point to the Marchianos or Trento. (<u>See</u> State Br. a 57.) <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Reifler</u>, 446 F.3d at 84-85, 90; <u>United States</u> v. <u>Lewis</u>, 144 Fed. Appx. at 133; <u>United States</u> v. <u>Sherry</u>, 107 Fed. Appx. 253, 257

---

[48]/     (...continued)
different such that it is not dispositive here. Most importantly, however, <u>Becker</u> involved a federal prosecution to which the deferential AEDPA review standard described in Point II above does not apply.

(2d Cir. 2004) ("[T]he admission of [co-defendant's] plea, in which he admitted to 'agree[ing] with several other people,' as opposed to a more innocuous 'one or more other persons,' was harmless error."), vacated on other grounds, 544 U.S. 917, 125 S. Ct. 1677 (2005); Hopkins v. Burge, 05 Civ. 8230, 2006 WL 519782 at *11 (S.D.N.Y. Mar. 3, 2006) (Peck, M.J.) (habeas petition denied where co-defendant's redacted plea allocution did not identify petitioner by name, but rather as "A" and "B."); Kamara v. United States, 04 Civ. 5340, 2005 WL 1337396 at *1 (S.D.N.Y. June 6, 2005).

### 3. The Plea Allocutions Were Cumulative of Admissible Evidence That Was Independently Corroborated at Trial

The plea allocutions were read into evidence at the end of the prosecution's case which had spanned five to six months of live testimony covering about 12,000 transcript pages up to that point. Most of the trial testimony came from ten cooperating witnesses who outlined in detail ASG's operations and petitioners' roles in the IPOs and retail brokerage scheme. By the time the plea allocutions were read into the record, the jury had repeatedly heard about the mechanics of the IPO schemes, that the brokers were encouraged to use nominee accounts and to lie to customers and regulators, etc. (See pages 7-30 above.) The seven plea allocutions were cumulative of the evidence that had already been presented – even petitioners point out that "the plea allocutions identified 27 allegedly defrauded customers, many of whom were witnesses at trial." (Marchiano Br. at 34.)

Petitioners focus on Winkler's allocution as the most harmful due to Winkler's important position at ASG. (Marchiano Br. at 35-37.) While Winkler's allocution was more detailed and extensive than the other allocutions (see pages 34-38 above), as noted above, the cooperating witnesses had testified at length at trial about Winkler's pervasive role in the ASG criminal

enterprise. (See pages 7-30 above.) In other words, even before Winkler's allocution was presented, the jury had overwhelming evidence concerning Winkler's role in the ASG criminal enterprise and petitioners' link to the scheme. The acts outlined in Winkler's allocution were cumulative of admissible evidence that had been presented at trial. In the prosecution's words, "every word [Winkler] said was old news" to the jurors. (State Br. at 54.)

Where, as here, allocutions are merely cumulative, that favors a finding of harmless error. See United States v. Reifler, 446 F.3d 65, 88 (2d Cir. 2006) ("[A]lthough the plea allocution statements bore on two essential elements of the conspiracy charges . . . they were plainly cumulative."); United States v. Fruchter, 137 Fed. Appx. 390, 392 (2d Cir.) (holding introduction of allocution was harmless error because "[t]he substance of the allocution was cumulative of other evidence that had been presented at trial and was fully corroborated."), cert. denied, 126 S. Ct. 840 (2005); United States v. Hawkins, 125 Fed. Appx. 364, 367 (2d Cir. 2005) (admission of co-defendant's allocution was harmless error where the allocution was "cumulative with other evidence in the record," including the testimony of a testifying cooperating witness and recorded telephone calls.); United States v. Londono-Tabarez, 121 Fed. Appx. 882, 883 (2d Cir.) (admitting portions of two co-conspirators' plea allocutions was harmless error "since this evidence was directed at establishing the existence of the conspiracy, for which there was ample other evidence, and not [defendant's] participation in the conspiracy . . . , the plea allocutions were entirely cumulative."), cert. denied, 544 U.S. 1008, 125 S. Ct. 1962 (2005).

### 4. The Prosecution's References to the Plea Allocutions During Summation Were Brief and Minor in Relation to the Whole Summation

The prosecutor's summation spanned almost two hundred transcript pages. (Summation: Tr. 12602-786.) The prosecutor's mention of the plea allocutions, in comparison to the whole of her summation, was fleeting. (See Summation: Tr. 12748-49, 12751, 12760-61.) However, of concern is not the length of time that the prosecutor discussed the guilty pleas, but rather, the effect it could have had on the jury's verdict.

The first mention of the allocutions came when the prosecutor was discussing the Stadium Capital private placement which included evidence that ASG omitted material facts from the private placement prospectus. (Summation: Tr. 12744-48.) At the end of this discussion, the prosecutor said: "Also there is evidence from John [Abey] and [Vincent] Lia's statement [i.e., plea allocutions] they participated in the scheme and doing the things I just mentioned." (Summation: Tr. 12748.) The fraudulent scheme surrounding the Stadium Capital private placement was charged against Anthony in the third count of the indictment; Anthony was alleged to have acted together with Winkler, Abey, Lia and Christopher and John Delcioppo – all of whose allocutions were read into evidence at trial – to violate the Martin Act by engaging in the misrepresentations and omissions the prosecutor explained in this portion of her summation. (See Jt. Appx. Vol. I at A.179-80: Indictment.) The jury found Anthony not guilty of this count (Verdict: Tr. 13408) and thus mention of Abey and Lia's allocutions during summation did not contribute to Marchiano's conviction.

Petitioners point to a second instance where the allocutors' names were mentioned. (Dkt. No. 10: 1/31/06 Pollok Letter at 3.) After going through the schemes used for other IPOs and

the misrepresentations made to customers on the retail side of the scheme, the prosecutor explained the verdict sheet the jury would be receiving and grouped the charges against the various defendants for the jury. (Summation: Tr. 12741-52.) While discussing the Martin Act charges against Anthony, the prosecutor told the jury: "[T]hese are charges that are being submitted to you under the theory of accomplice liability. Each of the counts relates to a different investor. You heard testimony from either the investor or broker or cooperator or documentary evidence of Martin Act takings with respect to these individuals, Anthony Marchiano as the owner president of the firm is charged as an accomplice in that." (Summation: Tr. 12745-46.) After summarizing the groupings of charges against the defendants, the prosecutor made additional comments about the Stadium Capital scheme and evidence related to it. (Summation: Tr. 12746-50.) The prosecutor began speaking about Trento's and Anthony's larceny charges and seemed to switch gears to the Martin Act charges against Anthony, apparently discussing the Millennium Sports/Skylands Park scheme, including lying to customers and failing to disclose ASG's purchase of class D warrants, as charged in count two of the indictment (Jt. Appx. Vol. I A. 176-78: Indictment):

> As to Mr. Marchiano, the theory is also the same with the Martin Act takings that he was acting as an accomplice to one of the four Florida brokers, [Abey], Lia and the Delcioppo brothers who stole people's money by getting them to purchase Millennium stock.

> The investor snapshots may be helpful to you when you are deliberating and I invite you to look at them.

> These again if you will, if you find that Anthony Marchiano was an accomplice to [Abey], Lia or the Delcioppos, all the other elements are satisfied either through the witness or through the factual statement in evidence.

(Summation: Tr. 12751.)

The prosecution spent a considerable amount of time, however, discussing the Millennium/Skylands Park deal without mentioning the plea allocutions. (Summation: Tr. 12672-89.) Specifically, the prosecutor outlined the evidence of Anthony's involvement in ASG, including the way he ran the Florida office, mentioning the testimony of Lamarti, Meyers and other testifying cooperating witnesses, the regulators' testimony, documentary evidence – including, inter alia, the firm blotter, a letter from Anthony to Winkler, and a printout of all the Millennium/Sklyands Park transactions that took place during the period in question – and tape recordings, some of which were of discussions between customers and one of the co-conspirators whose plea allocution was admitted. (Id.)

Petitioners point to the prosecutor's third mention of the allocutions which arose during discussion of the enterprise corruption count, particularly the pattern acts. (Summation: Tr. 12757-62; see 1/31/06 Pollok Letter at 3.) In this discussion, the prosecutor told the jurors that the prosecution established ten IPO schemes to defraud, and the jury could find any three of them to be a pattern of criminal activity, but that the jury "can also look to the activity of the other people who established these [pattern] acts, and you can look to their activity to see a pattern of criminal activity. You heard from [testifying] cooperators admit to defrauding many people through the fraudulent sale of stock in many of these IPO's and you also heard Winkler, Principato, Lia, [Abey], Randazzo and the Declioppo brothers admit to the other crimes." (Summation: Tr. 12760-61.) However, since each petitioner was found to have committed at least three pattern acts which were not committed

solely with those whose guilty plea allocutions were admitted into evidence (see Jt. Appx. Vol. I at A. 22-175: Indictment; Verdict: Tr. 13397-408, 13421-24, 13429-37), the First Department's conclusion that the allocutions did not contribute to the jury's enterprise corruption verdict was not an unreasonable application of the Chapman harmless error standard.

The brief references to the allocutions in summation did not overly emphasize them and were made within the context of other evidence. Taken as a whole, the prosecutor's summation did not rely on the importance of the guilty plea allocutions, there were only a few mentions within the lengthy closing argument. This supports the other factors in finding the Crawford violation to be harmless error. See United States v. Al-Sadawi, 432 F.3d 419, 426 (2d Cir. 2005) ("While the government adverted to the allocution in closing arguments, the reference was brief and was subsumed in discussions of the contents of the [independent] evidence."); Gutierrez v. McGinnis, 389 F.3d 300, 309 (2d Cir. 2004) ("[T]he prosecutor highlighted the 911 tape as only one of several important pieces of evidence that the prosecutor stressed during his lengthy summation. Given the overall strength of the prosecution's case, the Appellate Division's application of clearly established Supreme Court precedent governing harmless error review of Confrontation Clause errors . . . was not objectively unreasonable.").[49]

---

[49] See also United States v. Damti, 109 Fed. Appx. 454, 456 (2d Cir. 2004) (admission of co-defendant's redacted confession which referred to an unnamed "individual" who owned the moving businesses at issue, was harmless error even though prosecutor's summation linked the defendant to the co-defendant's redacted confession because "by the time this lapse occurred there was an abundance of evidence before the jury that [the defendant] was, in fact, the owner of the allegedly fraudulent moving businesses."); Haymon v. New York, 332 F.
(continued...)

* * * * *

The overwhelming evidence at trial, Justice Snyder's repeated limiting instructions, the fact that the prosecution did not stress the allocutions in summation and that the detailed acts described in the allocutions, especially Winkler's, were cumulative of admissible evidence corroborated at trial, leads this Court to conclude that the First Department's finding of harmless error was not an unreasonable application of Chapman. See, e.g., United States v. Reifler, 446 F.3d 65, 90 (23 Cir. 2006) ("In sum, given the discerning nature of the verdicts, the brevity of the government's mention of the plea allocutions, the purely cumulative character of the statements, and the strength of the government's case against [defendants], we consider that the Crawford error was, beyond a reasonable doubt, harmless."); United States v. Snype, 441 F.3d 119, 130 (2d Cir. 2006) ("In sum, although we find that the admission of White's plea allocution was error under Crawford, because we have no reason to conclude that the jury failed to follow the district court's instruction limiting consideration of that evidence to the element of conspiracy, and because the admissible evidence of conspiracy was plainly overwhelming, we conclude that this Crawford error was harmless beyond a reasonable doubt."); United States v. Pearson, 165 Fed. Appx. 129, 131 (2d Cir. 2006) ("First, the plea allocutions did not identify [defendant] as a member of the conspiracy. Second, the government presented overwhelming evidence aside from the plea allocutions to

---

49/     (...continued)
         Supp. 2d 550, 559 (W.D.N.Y. 2004) (habeas petition denied where introduction of co-
         defendant's confession to police interrogators was harmless error because, inter alia, "the
         prosecutor did not emphasize the co-defendant's statements to the jury in his summation.").

establish that [defendant] was involved in a . . . conspiracy.  Thus, we conclude that the [Crawford]

error did not contribute to the verdict obtained against [defendant]."); United States v. Al-Sadawi,

432 F.3d at 426 ("Each of these factors leads us to conclude that the error in the admission of

Soliman's allocution was harmless. . . . [T]he government's case was strong.  The statements from

Soliman's plea allocution were essentially cumulative of the properly admitted . . . evidence that

supplied powerful evidence of Al-Sadawi's guilt.  Moreover, the introduction of the allocution was

the subject of an appropriate limiting instruction.  While the government adverted to the allocution

in closing arguments, the reference was brief . . . Viewing the record in its entirety, we conclude that

the admission of the allocution does not erode our confidence that the properly admitted evidence

established Al-Sadawi's guilt beyond a reasonable doubt."); United States v. McClain, 377 F.3d 219,

222-23 (2d Cir. 2004) ("The evidence of [defendants'] guilt was overwhelming . . . There was ample

evidence that [defendants] were guilty of the substantive offenses for which they were charged.

Moreover, the jury was instructed that it could consider the plea allocutions only as evidence that

the conspiracy existed . . . With respect to the existence of the conspiracy, the plea allocutions were

cumulative . . . The admission of the plea allocutions was therefore harmless beyond a reasonable

doubt."); see also, e.g., Haymon v. New York, 332 F. Supp. 2d at 559; Hopkins v. Burge, 05 Civ.

8230, 2006 WL 519782 at *11-12 (S.D.N.Y. Mar. 3, 2006) (Peck, M.J.) (habeas denied where First

Department's conclusion that admission of co-defendant's plea allocution was harmless error was not

an unreasonable application of Chapman.).

The Court stresses that the issue is not whether this Court would find the error to be harmless, but rather, under the deferential AEDPA standard, whether the First Department's harmless error conclusion was an unreasonable application of <u>Chapman</u>. It was not. Petitioner's Confrontation Clause habeas claim should be DENIED, but a certificate of appealability should issue as to this claim.

**III. PETITIONERS' CLAIM THAT THE TRIAL JUDGE WAS BIASED AND IMPROPERLY QUESTIONED WITNESSES SHOULD BE DENIED**

    **A.**     <u>**Legal Standard**</u>

"The role of the Trial Judge is neither that of automaton nor advocate." <u>People</u> v. <u>Yut Wai Tom</u>, 53 N.Y.2d 44, 56, 439 N.Y.S.2d 896, 903 (1981). It is well-settled under New York law that a trial judge "is entitled to question witnesses to clarify testimony and to facilitate the progress of the trial." <u>People</u> v. <u>Yut Wai Tom</u>, 53 N.Y.2d at 55, 439 N.Y.S.2d at 902; <u>accord</u>, <u>e.g.</u>, <u>People</u> v. <u>Retamozzo</u>, 25 A.D.3d 73, 86, 802 N.Y.S.2d 426, 435-36 (1st Dep't 2005); <u>People</u> v. <u>Brown</u>, 262 A.D.2d 570, 573, 694 N.Y.S.2d 666, 669 (2d Dep't 1999), <u>aff'd</u>, 95 N.Y.2d 776, 710 N.Y.S. 2d 837 (2000); <u>see</u> <u>People</u> v. <u>DeJesus</u>, 42 N.Y.2d 519, 523, 399 N.Y.S.2d 196, 199 (1977) ("[A]s part of the responsibility of insuring a fair trial, [the trial judge] may seize the affirmative, when proper and necessary, to clarify perplexing issues, to develop significant factual information, to enforce propriety, orderliness, decorum and expedition in trial."). To this end, the trial judge may determine it necessary and appropriate to question a witness to "'elicit relevant and important facts . . . [and] . . . interrogate a witness after a cross-examination that appears to be misleading to the jury.'" <u>People</u> v. <u>Yut Wai Tom</u>, 53 N.Y.2d at 57, 439 N.Y.S.2d at 903; <u>accord</u>, <u>e.g.</u>, <u>Gayle</u> v. <u>Scully</u>, 779 F.2d 802,

813 (2d Cir. 1985), cert. denied, 479 U.S. 838, 107 S. Ct. 139 (1986); Perez v. Hollins, 02 Civ. 6120, 2004 WL 307271 at *10 (S.D.N.Y. Feb. 5, 2004) ("[T]he trial judge 'must[] be more than a mere moderator or umpire in a contest between two parties in an arena before him. He should take part where necessary to clarify testimony and assist the jury in understanding the evidence.'").  However, "[a] Trial Judge's examination of witnesses carries with it so many risks of unfairness that it should be a rare instance when the court rather than counsel examines a witness." People v. Yut Wai Tom, 53 N.Y.2d at 57, 439 N.Y.S.2d at 903-04.

In the federal habeas corpus context, while "prejudicial intervention by a trial judge could so fundamentally impair the fairness of a criminal trial as to violate the Due Process Clause," Daye v. Attorney General, 712 F.2d 1566, 1570 (2d Cir. 1983), cert. denied, 464 U.S. 1048, 104 S. Ct. 723 (1984), "a federal [habeas] court will not lightly intervene when such a claim [of judicial bias] is asserted," Gayle v. Scully, 779 F.2d at 806.  The "facet of federalism" dictates that "federal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts and lack such authority with respect to state courts.  The only commands that federal courts can enforce in state courts are those of the Constitution." Daye v. Attorney General, 712 F.2d at 1571; accord, e.g., Gayle v. Scully, 779 F.2d at 813.

In this Circuit, the habeas petitioner faces a high burden to show a constitutional deprivation when the interference of the state trial judge is at issue:

> A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits.

Daye v. Attorney General, 712 F.2d at 1572; accord, e.g., Francolino v. Kuhlman, 365 F.3d 137, 142-43 (2d Cir.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Gayle v. Scully, 779 F.2d at 806; Johnson v. Scully, 727 F.2d 222, 226 (2d Cir. 1984); Paccione v. New York, 353 F. Supp. 2d 358, 368 (E.D.N.Y. 2005); Reid v. Phillips, 04 Civ. 1338, 2004 WL 1920218 at *4 (S.D.N.Y. Aug. 26, 2004) ("A criminal defendant faces a high hurdle to establish a judge's partiality based on comments made at trial.").

While the Second Circuit's standard for determining when a state trial judge's conduct becomes unconstitutional is "'somewhat ill-defined,'" Gayle v. Scully, 779 F.2d at 806 (quoting Johnson v. Scully, 727 F.2d at 226), a habeas court is guided by the concerns raised by a trial judge's interference which, first,

> "creates a risk that the jury will be deflected from a conscientious discharge of their responsibility to find the facts, apply the law, and reach a fair verdict.  The jurors may believe that they should shade their judgment to accommodate the judge's view of the defendant's guilt, perhaps deferring to his view in a close case. Second, even if the jurors are not swayed from an independent discharge of their solemn responsibilities, the judge's [action] creates a risk that the trial will not be perceived by the defendant or the public as a fair adjudication of guilt or innocence, presided over by a neutral magistrate obliged to deal evenhandedly between the contending forces of the prosecution and the defense."

Gayle v. Scully, 779 F.2d at 806 (quoting Daye v. Attorney General, 712 F.2d at 1571-72); see, e.g., United States v. Amiel, 95 F.3d 135, 146 (2d Cir. 1996) ("The court's role is not to determine 'whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid.'  The test is whether the jury was so impressed with the judge's partiality to the prosecution that it became a factor in determining the defendant's guilt, or whether

'it appear[ed] clear to the jury that the court believe[d] the accused is guilty.") (citations omitted);

Perez v. Hollins, 2004 WL 307271 at *11 ("[J]udicial intervention is prejudicial only to the extent

'that the jurors have been impressed with the trial judge's partiality to one side to the point that this

became a factor in the determination of the jury.'"); Copeland v. Walker, 258 F. Supp. 2d 105, 135-

36 (E.D.N.Y. 2003); Gumbs v. Kelly, 97 Civ. 8755, 2000 WL 1172350 at *11 (S.D.N.Y. Aug. 18,

2000) (Peck, M.J.).

      A habeas court looks not only at the number of instances of interference by the trial

judge but also at the significance of each intervention to determine whether the judge's questioning

evinced an unconstitutional partiality which prejudiced the petitioners.  Daye v. Attorney General,

712 F.2d at 1572; see, e.g., Brown v. McKinney, 358 F. Supp. 161, 173 (E.D.N.Y. 2005)

("[N]either in quantity nor significance did the [state trial] judge's questions approach the level of

problematic judicial questioning that has been upheld in this Circuit."); Copeland v. Walker, 258 F.

Supp. 2d at 136; Francolino v. Kuhlman, 224 F. Supp. 2d 615, 638-39, 641-42 (S.D.N.Y. 2002),

aff'd, 365 F.3d 137 (2d Cir.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004).

      Finally, addressing claims of bias based on remarks made by federal trial judges, the

Supreme Court has held:

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or
> even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias
> or partiality challenge. They may do so if they reveal an opinion that derives from an
> extrajudicial source; and they will do so if they reveal such a high degree of
> favoritism or antagonism as to make fair judgment impossible. . . . Not establishing
> bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance,
> and even anger, that are within the bounds of what imperfect men and women, even
> after having been confirmed as federal judges, sometimes display. A judge's ordinary

efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration-remain immune.

Liteky v. United States, 510 U.S. 540, 555-56, 114 S. Ct. 1147, 1157 (1994); accord, e.g., Reid v. Phillips, 2004 WL 1920218 at *4; Copeland v. Walker, 258 F. Supp. 2d at 134.

Thus, the federal courts look to whether the judge's conduct "'was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.'" United States v. Amiel, 95 F.3d at 146; accord, e.g., Martinez v. Kelly, 01 Civ. 11570, 2005 WL 1863854 at *6 (S.D.N.Y. Aug. 4, 2005); McLaurin v. Walsh, 03 Civ. 6984, 2005 WL 1337550 at *6 (S.D.N.Y. June 3, 2005); Gumbs v. Kelly, 2000 WL 1172350 at *11 ("The Second Circuit has repeatedly held that a trial court's hostility towards defense counsel will lead to reversal only if the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.") (internal quotations omitted; citing cases).

Here, due to the six-month length of the trial and the resulting over 13,000 page transcript, this Court adopts the approach taken by the late Judge Schwartz who, when faced with a 14,000 page transcript from an eight month trial presided over by Justice Snyder, remarked that "[g]iven the extraordinary length of the trial and resulting transcript, conducting a complete analysis of every page of the record would be a Herculean task." Francolino v. Kuhlman, 224 F. Supp. 2d at 638.[50] Instead, "the Court reviews the instances singled out and highlighted by [petitioners] in

---

[50] The normal course is to review the record as a whole to determine whether alleged instances of misconduct deprived a habeas petitioner of a fair trial. See, e.g., Martinez v. Kelly, 2005 WL 1863854 at *6 ("[W]hen analyzing the prejudicial effect of a trial judge's comments, the (continued...)

[their petition and briefs], on the well-founded assumption that the examples [they] cite[] are the most 'flagrant' or 'clear-cut' examples of Justice Snyder's alleged bias." <u>Francolino</u> v. <u>Kuhlman</u>, 224 F. Supp. 2d at 638-39. Moreover, this Court gave the parties notice that the Court would not be reviewing the transcript in full and provided the parties the opportunity to supplement the fact citations in their briefs. (<u>See</u> Dkt. No. 8: 1/10/06 Peck Order; Dkt. No. 10: 1/31/06 Pollok Letter; Dkt. No. 11: 2/6/06 ADA Dwyer Letter.)

**B.     The Trial Judge's Comments and Questions Before and During Trial Did Not Contravene Petitioners' Due Process Rights**

**1.     <u>Justice Snyder's Comments in Her Book, Publised After the Trial</u>**

Petitioners contend that Justice Snyder harbored an over-arching bias against them, grounded in her general pro-prosecution stance. (Dkt. No. 1: Marchiano Br. at 49-52.) Petitioners point to Justice Snyder's book, <u>25 to Life: The Truth, the Whole Truth, and Nothing But the Truth</u>, published after the trial in this case, as evidence of her bias against the petitioners. (Marchiano Br. at 49-52.) In her book, Justice Snyder mentions the ASG case, stating: it was "the most boring case [she] ever tried, and it lasted seven painful months. Winkler was blamed for everything by his co-defendants, since he was not there – a not unusual course of events. However, I am constrained from discussing the case further, as it is on appeal." Leslie Crocker Snyder, <u>25 to Life: The Truth, the Whole Truth, and Nothing But the Truth</u> 298-99 (Warner Books 2002). She also discussed

---

<u>50/</u>     (...continued)
       reviewing court must not judge such comments in isolation but must instead make 'an examination of the entire record, in order to determine whether the defendant received a fair trial.'").

Winkler's plot against her and how she felt being a crime victim for the first time. (Id. at 292-97.) Finally, petitioners quote from a passage at the end of her book where Justice Snyder observed generally that there is a "serious disparity in levels of courtroom experience between the prosecutors and the defense attorneys. It is a matter of concern in complex cases and is particularly visible in white-collar cases." (Id. at 323.) According to petitioners, this "passage helps explain how and the extent to which Judge Snyder crossed the line from judge to advocate." (Marchiano Br. at 49.)

First, by pointing out the latter quoted passage, petitioners essentially ask the Court to declare Justice Snyder biased against virtually every "experienced" defense attorney and therefore unable to have presided as a neutral judge. Reference to the trial as "boring" (which I suspect it was compared to the gang drug and murder trials Justice Snyder presided over) in a book published after the fact, and reference to defense attorneys generally being more experienced in the courtroom than prosecutors, do not demonstrate a pre-determined bias against the petitioners. Cf. People v. Gil, 251 A.D.2d 121, 122, 674 N.Y.S.2d 651, 652 (1st Dep't) ("We see nothing in the highly-publicized scheduling conflict between defense counsel's appearances in the instant case and the O.J. Simpson trial, or its aftermath including its mention in a book written by the Trial Justice, that would entitle this defendant to a new trial."), appeal denied, 92 N.Y.2d 981, 683 N.Y.S.2d 762 (1998); cf. also Low v. Nunan, 154 F.2d 261, 264 (2d Cir. 1946) ("Such displays of impatience should usually be restrained in the presence of a jury. But, in the absence of a jury, they are not to be taken as signs of improper bias. We know that, when on the bench, we sometimes manifest, orally or otherwise, symptoms of boredom, but are nevertheless able to decide in favor of the party whose lawyer has

taxed our patience, if his case is meritorious.").  Such remarks written about defense attorneys in general do not display the type of "deep-seated favoritism or antagonism" contemplated by the Supreme Court in Liteky that would "make fair judgment impossible."  Liteky v. United States, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994).[51/]

Moreover, petitioners imply that Justice Snyder attempted to "level the playing field" by assisting the prosecution team so that it would not be overwhelmed by the more able defense attorneys.  (Marchiano Br. at 49.)  However, while the transcript is littered with Justice Snyder's comments that the defense attorneys are experienced attorneys, there is no indication in the trial record (or at least none pointed to in petitioners' habeas briefs) that she considered this prosecution team disadvantaged by inexperience.

Petitioners do not claim that Justice Snyder's publication of her book was in and of itself improper, but rather that it provides this Court with an insight into Justice Snyder's attitude

---

[51/]    The Supreme Court gave an example of what would qualify as improper "favoritism or antagonism":

> An example . . . is the statement that was alleged to have been made by the District Judge in Berger v. United States, 255 U.S. 22, 41 S. Ct. 230, 65 L. Ed. 481 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty."

Liteky v. United States, 510 U.S. at 555, 114 S. Ct. at 1157.  Moreover, in federal recusal motions, where the courts consider judicial bias pursuant to 28 U.S.C. § 455, "courts have consistently held that to require recusal, judicial bias must be against a party, not the party's counsel."  United States v. Helmsley, 760 F. Supp. 338, 344 (S.D.N.Y. 1991) (Walker, C.J.), aff'd, 963 F.2d 1522 (2d Cir. 1992).

toward defense attorneys in general and her predisposition against criminal defendants. (Marchiano Br. at 49.) Obviously, a book published after the trial was not a matter that occurred in the jury's presence. Rather than trying to psychoanalyze from a book the "why" of Justice Snyder's courtroom conduct, the Court turns to an examination of <u>what</u> that conduct was.

### 2. Justice Snyder's Comments at Pre-Trial Hearings

Petitioners argue that Justice Snyder was biased against them as evidenced by her remarks during pretrial proceedings, which allegedly revealed her belief that ASG had mob connections. (Marchiano Br. at 50.) Petitioners point to several comments Justice Snyder made at an October 28, 1999 pretrial hearing:

> There are plenty of people who are hitmen out there connected to this case, and I'm using a hyperbolae and exaggerating slightly, but not necessarily by much.

(Jt. Appx. Vol. I at A. 353: 10/28/99 Conf. Tr. at 11; <u>see</u> Marchiano Br. at 50.)

> [A]s I said there is other evidence in this case supporting the fact that this is a mob connected case and [the fact that a former ASG employee was murdered] bears it out further.

(Jt. Appx. Vol. I at A. 357: 10/28/99 Conf. Tr. at 15; <u>see</u> Marchiano Br. at 50.)

> I take what the media says with a great deal of skepticism, but from what the media is saying and from every indication otherwise, this case has serious mob ties. . . . [ASG] seems to have been mob connected and mob run in a general sense.

(Jt. Appx. Vol. I at A. 352: 10/28/99 Conf. Tr. at 10; <u>see</u> Marchiano Br. at 50.)

Additionally, petitioners point to comments made by Justice Snyder at an October 29, 1999 conference where Justice Snyder "continued to state that this was a 'mob' case" (Marchiano Br. at 50) but then later in the hearing remarked:

> Apparently, there is a reason to be concerned that in general lurking beneath the [surface] of a white collar case, is the mob, quote unquote, and violence since two people have been executed. Whether directly connected to this case, indirectly or not, of course I have no proof, but it does appear that there is some mob connection, at least as to one, and I'm deeply disturbed.

(Jt. Appx. Vol. I at A. 386: 10/29/99 Conf. Tr. at 22; see Marchiano Br. at 50.)

Taken in context, these comments by Justice Snyder did not exhibit bias against the petitioners. The prosecution had submitted an affidavit in support of an ex parte motion for a protective order because of connections between ASG and organized crime. (See State Br. at 70.) The October 28 and 29, 1999 hearings were held after Justice Snyder had granted the prosecution's motion. (Jt. Appx. Vol. I at A. 346: 10/28/99 Conf. Tr. at 4.) A defense attorney had attached the name and resume of a possible government confidential informant to his papers in opposition to the protective order motion, which he disseminated not only to the parties involved (including 30 attorneys) but to the press. (Id. at A. 344-47: 10/28/99 Conf. Tr. at 2-5.) At the October 28th hearing, Justice Snyder expressed her "outrage" that the defense attorney had released the personal information of a possible government confidential informant to the press. (Id. at A. 350-58: 10/28/99 Conf. Tr. at 8-16.) Moreover, the same day as the October 28th hearing, the news media reported that two men had been shot execution style, one of whom was a former ASG employee. (Id. at A. 347-52: 10/28/99 Conf. Tr. at 5-10.)

During these pretrial hearings, Justice Snyder referred to possible mob connections to the case, in light of the homicides reported that day and the general spin the media was putting on them. Her reference to "other evidence" supporting the fact that there may be mob connections in the case could have been to the prosecution's ex parte submissions or could have been to her experience with Winkler; the record does not indicate on what information the she based her comments. However, Justice Snyder also expressed that "[e]veryone has made statements about this being a mob case. I don't know whether that will ever be proven or is relevant." (Id. at A. 369: 10/29/99 Conf. Tr. at 5.) Additionally, Justice Snyder made the comment quoted above that there was no proof of mob connections. (Id. at A. 386: Conf. Tr. 10/29/99 at 22.)

Within the context surrounding these hearings, Justice Snyder's comments did not exhibit bias against petitioners. See generally Liteky v. United States, 510 U.S. 540, 555-56, 114 S. Ct. 1147, 1157 (1994) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."); McMahon v. Hodges, 382 F.3d 284, 290 (2d Cir. 2004) (denying habeas where state trial judge who had presided over petitioner's co-defendant's trial correctly decided not to recuse himself from petitioner's trial even though "the trial judge had undoubtedly formed opinions about [petitioner's] likely guilt during the course of [co-defendant's] trial at which the judge presided."). Moreover, comments made at pretrial hearings where, of course, no jury was present, could not prejudice petitioners at trial. (See cases cited at pages 101-02 below.)

As another example of the judge's "bias and predisposition" (Marchiano Br. at 51),
petitioners point to comments Justice Snyder made at former co-defendant Michael Cilmi's guilty
plea in April 2000:

> I am saying this to you [Michael Cilmi] totally sua sponte, anyone threatens you in
> anyway or anything should come up that involves, we are taking this plea in open
> Court, we don't usually, but any kind of threat to your safety, I have no idea whether
> that is a possibility, I would like you to report that to me because I will tell you that
> I note there are certain people who are frequently in the courtroom.
>
> I just saw one of them a minute ago. Whenever certain Defendants are here,
> in my view they must be functioning as spies for other people in the case.

(Jt. Appx. Vol. I at A. 428-29: 4/17/00 Plea Tr. at 28-29.)  Petitioners argue that the suggestion that

defendants and/or defense counsel who monitor proceedings related to a complex criminal case were

spies showed bias or "at the very minimum, gives an appearance of partiality." (Marchiano Br. at

51.)  Whether unfounded or not, the judge's expression of concern for a cooperating defendant's

safety does not show bias or prejudice when instances of violence had already been connected with

the case.  Such comments at a pretrial hearing do not rise to the level of partiality that would deprive

petitioners of their constitutional right to a fair trial.  See, e.g., Garcia v. Teitler, 443 F.3d 202, 211

(2d Cir. 2006) (District Court's remarks during an evidentiary hearing, which were critical of

defendant's performance as an attorney, did "not approach the type or severity of antagonism that

would support a finding that Teitler was deprived of a fair hearing."); Katowski v. Greiner, 212 F.

Supp. 2d 78, 85 (E.D.N.Y. 2002) (judicial misconduct claim held procedurally barred, but in any

event meritless where "the record reveals some impatient comments by the trial judge, these occurred

during pretrial proceedings" and the "minor" trial comments did not deprive petitioner of a fair trial.);

see also, e.g., United States v. Pugliese, 805 F.2d 1117, 1119, 1125 (2d Cir. 1986) (trial judge's

challenged statement – "I have a great deal of resentment for people like these [defendants] who are

foreigners and come here and are involved in crime . . ." – was not a basis for recusal because it was

"a product of [his] observations and information derived from the pretrial proceedings."), cert.

denied, 489 U.S. 1067, 109 S. Ct. 1344 (1989); United States v. Bernstein, 533 F.2d 775, 785 (2d

Cir.) ("The rule of law, without belaboring the point, is that what a judge learns in his judicial

capacity whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of

pretrial proceedings, or both is a proper basis for judicial observations, and the use of such

information is not the kind of matter that results in disqualification.  Rules against 'bias' and

'partiality' can never mean to require the total absence of preconception, predispositions and other

mental habits. . . ."), cert. denied, 429 U.S. 998, 97 S. Ct. 523 (1976).

### 3.  Justice Snyder's Ruling on Defense Subpoenas and Limiting Cross Examinations of Victims[52]

Petitioners argue that Justice Snyder "effectively quashed" their subpoenas duces

tecum of the customer-witnesses' financial records due to her bias against criminal defendants and

consequently "refused to allow meaningful cross-examination of many [of the] customer-witnesses."

(Marchiano Br. at 52-53.)

The First Department ruled that Justice Snyder did not quash "the numerous

subpoenas duces tecum directed at the brokerage firms which then held the accounts of the corporate

---

[52]    The Court will follow the order of petitioners' brief, as opposed to the chronology of the trial, in discussing petitioners' claims as to Justice Snyder's alleged bias.

defendant's victimized customers. On the contrary, the court correctly reserved decision on the particular subpoenas, pending an offer of proof by defendants regarding the relevance of the information sought as to each particular witness." People v. A.S. Goldmen, Inc., 9 A.D.3d 283, 285, 779 N.Y.S.2d 489, 491 (1st Dep't 2004).

At oral argument on the subpoenas, Justice Snyder recognized that the customers' past investments with other brokerage firms could become relevant on the issue of credibility, the reliance element for the larceny counts and/or the materiality of omissions for the Martin Act counts. (See Jt. Appx. Vol. II at A. 594-95, 604-05: 1/3/01 Hearing Tr. 27-28, 37-38.) In order to avoid a "fishing expedition," Justice Snyder required an offer of proof from defense counsel at the end of the prosecution's direct examination of the pertinent customer-witnesses to determine whether the financial records would be relevant on cross-examination. (See A. 607: 1/3/01 Hearing Tr. 40; Trial Tr. 195-211.) Justice Snyder conducted extensive oral argument on this issue and made clear her intention to allow defense counsel access to the material necessary for "relevant appropriate cross-examination" about the customers' investment habits should the need arise. (Tr. 210.) The colloquies with counsel show that Justice Snyder was not predisposed or biased against the defense on this issue. Generally, Justice Snyder struggled to reach a balance between preventing the defense from engaging in a fishing expedition and allowing proper material for impeachment of the witnesses' credibility.

Petitioners point to Justice Snyder's use of the "rape victim" analogy as proof that her "experiences as a sex crimes prosecutor and as a victim-witness" prejudiced her against petitioners

as criminal defendants. (Marchiano Br. at 53.) Justice Snyder used the rape-victim analogy in the context of determining the scope of the defense's cross-examination of the customers: Justice Snyder made it clear that she did not want cross-examination to turn into a trial of the customers where they would be faulted for being ignorant or naive investors. (See, e.g., Jt. Appx. Vol. II at A. 602-03: 1/3/01 Hearing Tr. 35-36.) Justice Snyder used the rape-victim analogy to illustrate her point that she did not intend to allow the defense to "blame the victim" since the customers' investment experience, or lack thereof, was not an element of the indicted crimes. (Id.) Justice Snyder did not import the standard governing rape prosecutions into this criminal case, as petitioners contend, and she admitted on the record that the rape-victim analogy "may or may not be a good one." (Id.) Moreover, in each instance that she used the rape-victim language, there was no jury present. (See id.; see also Tr. 612-22, 2169.)

Once examination of the customers began, Justice Snyder continued to struggle with the proper scope of the defense's cross-examination. Justice Snyder spent a considerable amount of time on the record determining the appropriate form of the prosecution's questions to prove the materiality of omissions under the Martin Act. The debate between counsel focused on whether the mere fact of an omission was enough to prove materiality or whether it was necessary to inquire whether the customer/investor had heard or read or been effected by the omission. (E.g., Tr. 467-78, 2136-44, 2149-50, 8678-87.) At the first side-bars on this issue, Justice Snyder discussed with counsel how the prosecution could ask a witness whether they were told "X" and when the witness answered "no," because it was an omission, how the prosecution could bring out that such an

omission was material. (Tr. 462-68.)  The form of the prosecution's question could conceivably open the door for the defense to inquire into the witnesses' investment practices in general, for impeachment.  For example, during direct examination of customer Bruno Loia, the prosecution asked:  "Would either of those two alleged stated facts effected your decision to purchase Millennium Sports?" (Loia: Tr. 470.)  When defense counsel objected, Justice Snyder rephrased the question in line with her comments at the sidebar:  "would you have considered those matters if you had known about them considering they are true?"  (Loia: Tr. 470.)  On cross-examination, Justice Snyder did not allow defense counsel to inquire into what bases Loia relied on in purchasing stock in general (including investments with firms other than ASG), but rather only allowed questioning about the basis for Loia's decision to purchase Millennium stock.  (Loia: Tr. 524-26.)

       This was consistent with Justice Snyder's indication of the scope of cross-examination she would allow:[53]  Questions on cross-examination about what a customer did with another brokerage firm could only be relevant for purposes of impeaching the witness' credibility and Justice Snyder would consider the propriety of such a line of questioning after an offer of proof by defense counsel for the specific witness and if the defense had a good faith basis to question the witness'

---

[53]    As the trial progressed, Justice Snyder became clearer on the range of permissible inquiry surrounding the material omission issue.  (Tr. 2136-55.)  Finally, the prosecution decided it planned to ask the "did it matter to you question" and recognized that the defense would be entitled to cross-examination as to the credibility of whether that omitted information did matter to the witness, and Justice Snyder reiterated that she would determine the scope of cross-examination on a witness by witness basis by having the defense give an offer of proof at the end of witnesses' direct examination.  (Tr. 2152-55.)

credibility then Justice Snyder would allow it. (Tr. 2169-70; see Tr. 2163-68.)[54/] The fact that

Justice Snyder took over the questioning on this point does not, as petitioners argue, show bias here,

since Justice Snyder through her questions was limiting cross-examination consistent with her prior

rulings on this issue. (See Marchiano Br. at 54; Loia: Tr. 525-26.)[55/] "Judicial rulings alone almost

never constitute a valid basis for a bias or partiality motion." Liteky v. United States, 510 U.S. 540,

555, 114 S. Ct. 1147, 1157 (1994); accord, e.g., Armatullo v. Taylor, 04 Civ. 5357, 2005 WL

2386093 at *20 (S.D.N.Y. Sept. 28, 2005); Francolino v. Kuhlman, 224 F. Supp. 2d at 641 (citing

cases); Malik v. Khoenan, 94 Civ. 8084, 1996 WL 137478 at *3 (S.D.N.Y. Mar. 26, 1996)

(Petitioner could not "base a claim of judicial bias on adverse (or even incorrect) rulings, without

evidence of 'such a high degree of favoritism or antagonism as to make fair judgment impossible.'").

During cross-examination of former ASG customer Cecil Fisher, defense counsel

focused on what Fisher had known about the Sklyands Park/Millennium company; that he had

received the annual reports and prospectus, that he knew the company had gone through bankruptcy

---

[54/] When Justice Snyder made this ruling at one of the numerous sidebars on the issue, defense counsel replied "That's fair." (Tr. 2169-70.)

[55/] Justice Snyder's comment to defense counsel to "sit down" that petitioners take issue with (Marchiano Br. at 54), taken in context, was not a showing of bias but rather was part of Justice Snyder's admonition not to make speaking objections in front of the jury, while adding that defense counsel would have the later opportunity to make a record outside of the jury's presence. (Loia: Tr. 526.) "Not establishing bias or partiality . . . are expressions of impatience. . . . A judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune." Liteky v. United States, 510 U.S. 540, 555-56, 114 S. Ct. 1147, 1157 (1994); accord, e.g., Francolino v. Kuhlman, 224 F. Supp. 2d 615, 644 (S.D.N.Y. 2002), aff'd, 365 F.3d 137 (2d Cir.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004).

and was told by John Declioppo that Millennium was coming out of bankruptcy, and that the prospectus as well as John Delcioppo informed him that the purchase of the stock involved a high degree of risk. (Fisher: Tr. 1010-15.) Justice Snyder issued an instruction, <u>sua sponte</u>, during this questioning about what Fisher knew about Millennium:

> Well, the problem with this line of questioning, Mr. Driscoll [defense counsel], is that I have to remind the jury, the focus is going to be, <u>the defense has an absolute right to raise these issues</u>. However, your issue is ultimately going to be in large measure, whether each defendant considered separately, had a specific intent, for example, an intent to defraud, which is a separate issue than whether or not a witness was told about the risk of the stock. <u>So, while some of this cross is relevant, I have to focus you on the fact it is not each witness who is on trial here</u>. It is you considering the evidence in terms of whether the People can prove to you beyond a reasonable doubt as to each defendant, considered separately, whether, for example, there was an intent to defraud.
>
> Now, I will discuss that a lot further in my final charge to you, but it appears necessary to focus on the issue in view of the cross-examinations that we heard.

(Tr. 1015-16, emphasis added.) The defense objected to this instruction, to which Justice Snyder responded:

> It is a major issue in the trial, that is why I'm reminding the jury. <u>I'm allowing you to cross examination that this witness had information, that is a totally separate issue or it may be a totally separate issue than whether a defendant had an interest to defraud</u>.
>
> . . .
>
> [Defense counsel] may have a certain amount of leeway. <u>I'm allowing you to show various things that were known. I'm also pointing out to the jury what the relevant issues are</u>. That is my job. <u>It is a very complicated legal case</u>.

(Tr. 1016-17, emphasis added.) Defense counsel continued with his line of questioning, exploring what information customer Fisher had about Skylands Park/Millennium. (Fisher: Tr. 1017-60.)

Justice Snyder, as the presiding trial judge, had the right to instruct the jury on the law, and while the form or timing may be objectionable to petitioners, the statements themselves were not improper.  See, e.g., Francolino v. Kuhlman, 224 F. Supp. 2d at 645 ("Justice Snyder was within her rights as judge to instruct the jury on the law [during trial].  It is unquestionably the province of the presiding judge to make determinations of relevance.  In this case, while the form of Justice Snyder's comments leaves something to be desired, the statement itself was not improper."); cf. United States v. Drew, 894 F.2d 965, 971 (2d Cir.) ("[B]eyond the requirement that the charges correctly state the law, instructions to the jury are wholly within the province of the trial judge because the jurors' understanding of the instructions 'is certainly more evident in the living scene than in a cold record.'"), cert. denied, 494 U.S. 1089, 110 S. Ct. 1830 (1990).

Through several more sidebars throughout the cross-examination, Justice Snyder expressed her concern that the cross was going into irrelevant matters, but that the defense was entitled to continue the line of questioning since the prosecution had opened the door by asking Fisher "would you have bought the stock if you had known X" and "[w]ould you have bought the stock if you had known Y." (Fisher: Tr. 1029-30, 1039-45; see Tr. 1065-66.)  Further, Justice Snyder agreed with the defense that they had a right to impeach Fisher's credibility and allowed defense counsel to ask questions which would go toward credibility, overruling many objections by the prosecution along the way.  (Fisher: Tr. 1045-59, 1060-64.)[56/]

---

[56/]    At the end of cross-examination of Fisher, after the jury was excused, Justice Snyder spoke to counsel again on the issue of permissible questioning of customer witnesses:

(continued...)

Justice Snyder consistently limited questions on cross which inquired into a customer's investment history with firms other than ASG. (Trueblood: Tr. 608-12, 638-39; Monaghan: Tr. 1876, 1895, 1861, 1897; <u>see</u> Marchiano Br. at 56-59.) As one final example, during cross-examination of another former ASG customer Paul Trueblood, the defense asked Trueblood if he was "aware that Winfield Capital then went to ten and twenty and ultimately to sixty-five per share." A: "I have no idea." Q: "Did you ever follow it, look into it?" A: "No." Q: "Not at all?" A: "I've had quite enough." Q: "So, in fact, are you aware if you had held the Winfield Capital stock --." (Trueblood: Tr. 638.) At that point the prosecution objected and Justice Snyder sustained with the following comment:

> It is not the intelligence, wisdom, smartness or stupidity of the investor that's at issue here unless that in some way mitigates the evidence the People may have which, of course, they have to prove by proof beyond a reasonable doubt as to the defendant's intent as to whether the defendants were running a criminal enterprise, each defendant considered separately and the legal issues in this case.

---

[56]/ (...continued)
> This is going painfully and miserably. . . . It is going painfully and miserably on my part too. Why? Because it could have been a lot cleaner were it not for a lot of the questions the People asked on direct. I tried to craft an instruction to the jury. I'm not sure it is an actually balanced instruction. I will give them another instruction. Obviously, some of this is relevant on credibility. . . . You [the prosecutor] have opened up the issue of reliance, in my view even though I don't think it is legally relevant . . . I don't know what suggestions can be made, but until you put on a new witness and curtail your direct appropriately, there is a problem. . . . The People I feel put me in a position I have to allow more of it than I would normally allow.

(Tr. 1060-61.) When the jury returned, Justice Snyder told them that her instruction had not adequately explained the issue and that she would be giving them a more balanced, clear and correct instruction once she had worked out the "very difficult areas of the law." (Tr. 1067.)

> I mean you're very effectively showing this witness doesn't mean to have anything to do with any of his investments. But what relevance that has is unclear to me. Nevertheless, continue.

(Tr. 638-39.) This instruction was consistent with what the judge had told counsel she would do if the defense started to "blame the victim" (see, e.g., Tr. 613), which that line of questioning appeared to do. The judge's commentaary would have been better left unsaid, but it did not rise to the level of bias under the Daye standard.

Therefore, while Justice Snyder should have left her editorial commentary out of her instructions, she was consistent with her rulings, and she held multiple sidebars and conferences wherein both sides had an opportunity to be heard to resolve the complex legal issues for which she was, admittedly, struggling to find a balance. This conduct, individually and taken as a whole, does not evince bias. Under the deferential AEDPA review standard, this Court does not find the First Department's ruling to be an unreasonable application of federal law.

### 4. Justice Snyder's Interference With the Defense's Cross-Examination With Questions Suited for Re-Direct

Petitioners claim that Justice Snyder's interjection into the defense's cross-examination with questions suitable for re-direct and the judge's "derogatory" comments directed at defense counsel was motivated by bias which vitiated their right to a fair trial. (Marchiano Br. at 60-86.) This Court has reviewed each example cited by petitioners. Before discussing the individual instances, this Court makes the general observation that while some of Justice Snyder's questions posed during cross-examination were proper clarifying questions, several of the series of questions were inappropriate interference with the defense's cross-examination and Justice Snyder should have

allowed the prosecution the opportunity to ask those questions on re-direct. The cross-examination of each witness was lengthy, however, and Justice Snyder reasonably could have felt that waiting until redirect would cause jury confusion. Several of Justice Snyder's comments on the record were derogatory toward defense counsel, and while she did instruct the jury several times that any "arguments" between the court and counsel should not be taken into account by the jury, she should have refrained from making the comments. However, while Justice Snyder's questions or comments at times were improper, this Court is not reviewing these comments de novo under the Daye standard (which already poses a high burden for petitioners), but rather is reviewing the First Department's decision under the deferential AEDPA standard. While Justice Snyder's questions and comments at times give this Court pause, the First Department was not unreasonable in concluding that Justice Snyder's conduct did not deprive petitioners of a fair trial.

During cross examination of broker Vincent Caracciolo, defense counsel for Sal Marchiano, Mr. Maffeo, was asking Caracciolo whether he had seen the prospectuses that ASG sent out, the following occurred:

> Q:    You have seen prospectuses for these stocks?
>
> A:    Yes.
>
> Q:    You have seen [the prospectuses] over the entire five plus years you worked at the firm?
>
> [ADA] MAHONEY:  Objection?
>
> A:    Yes.
>
> Q:    The prospectuses you saw listed the various risks associated with the stocks?

THE COURT: Are you telling this jury prospectuses were issued in timely lie [sic] fashion for each of the IPO's?

A:     Is that what I am being asked?

THE COURT: I am asking you that.

A:     Yes they were.

THE COURT: Do you find [defense counsel's] questions that much easier to understand than [ADA] Mahoney's?

[Defense Counsel] HOFFMAN: Objection.

THE COURT: Overruled[.]

A:     I don't.

THE COURT: I withdraw my question. Proceed.

Q:     You have seen these prospectuses; have you not?

A:     Yes.

Q:     These prospectuses had a list of various risks associated with the stocks?

THE COURT: Again I am going to sustain [ADA] Mahoney's objection. You know why.

[Defense Counsel]MAFFEO: I do?

THE COURT: Yes you do Mr. Maffeo. You indicated on direct you had been involved in wrongdoing in this practice, you had lied about it before the SEC; right?

A:     Yes.

THE COURT: What was the wrongdoing?

A:     As to what?

THE COURT: As to what you are being asked about.

A: Mr. Maffeo I believe is asking me whether or not I saw prospectuses and I did. I think the issue at hand –.

THE COURT: I am talking about the broader question. The series of questions you were being asked.

[Defense Counsel]MAFFEO: Most respectfully I object. The question is whether he has seen prospectuses, whether the prospectuses listed the various risks.

THE COURT: The objection had to do with the timing of the prospectus. Whether he –.

[Defense Counsel]MAFFEO: I didn't ask a question about timing.

THE COURT: Come to sidebar with the Reporter please.

(Caracciolo: Tr. 3905-07.) At sidebar, Justice Snyder told defense counsel that his questions were "deceptive" because he was "lumping together all these prospectuses as if [ASG] issued prospectuses in a timely fashion" (Tr. 3908), which had not been Caracciolo's testimony on direct. (Caracciolo: Tr. 3909, 3910-11, 3914.) Justice Snyder also expressed her impression that Caracciolo was a hostile witness to the prosecution because he had "a lot of trouble" answering the prosecution's questions but was not having trouble with the defense's questions. (Caracciolo: Tr. 3908–09, 3912-14, 3916.) The sidebar colloquy continued:

MR. MAFFEO: Judge, I am offended by the fact the Court is first of all misconstruing my questions. I didn't ask one –.

THE COURT: I don't think I am misconstruing them.

MR. MAFFEO: I didn't ask one question about the timing.

THE COURT: That is the whole point. That is exactly –.

MR. MAFFEO: That is what redirect is all about.

THE COURT: Cross-examination can be vigorous. It has to be fair. I have noted in the past, I am telling you again, I think a lot of your questions are unfair.
. . .

What I am objecting to, the reason I called you to sidebar, you notice I have been trying not to, is that the question in itself is highly deceptive because what it seems you are saying, you didn't ask the timing.

That is the whole point. Your question implies this firm sent out prospectuses for everything, every offering.

It implies it was done properly. You have a witness who wants to answer anything you say the way you want it.

This is offensive. You are building on untruths.

(Caracciolo: Tr. 3909-11.) The arguing between Justice Snyder and Mr. Maffeo continued, with Justice Snyder reiterating that Mr. Maffeo's questions were misleading and deceptive and that the witness wanted to help Sal Marchiano. (Tr. 3911-17.)[57] The sidebar colloquy, of course, was outside the jury's presence.

Petitioners contend that Justice Snyder's observations about Caracciolo's hostility were unfounded and that Justice Snyder unfairly "excoriated" defense counsel. (Marchiano Br. at 64-65.) A trial judge is within her discretion to limit cross-examination that she determines is misleading (see cases cited at page 90 above), and Justice Snyder made clear that she found these

---

[57] When Anthony's defense counsel Mr. Hoffman brought up the issue of Justice Snyder's intervention before he began his cross-examination of the witness, Justice Snyder said, in part referring to Mr. Maffeo's questioning and in part making a general statement: "If anyone persists in bad faith questioning, their cross examination will end." (Tr. 4032.)

questions misleading.  While limiting Mr. Maffeo's questioning and leaving her questions to the

prosecution on re-direct might have been more appropriate, this instance of alleged interference did

not amount to a constitutional violation.  Moreover, Justice Snyder's comments to defense counsel

were made at sidebar, out of the jury's presence.[58]

---

[58]      Petitioners point to another instance, when Justice Snyder asked questions during defense
counsel's cross-examination of former broker Stephen Kaplan that were better left for the
prosecution on re-direct.  Defense counsel asked Kaplan:  "[W]hen you would recommend
a buy or that the stock be purchased by a customer did you do that because you believed in
the company?"  A:  "For the most part."  (Kaplan: Tr. 1316.)  After sustaining an objection
to a different question, Justice Snyder asked Kaplan:

> THE COURT:   . . . I want to go back to something.  What do you mean –
> Mr. Abercrombie [defense counsel] asked you a question whether you were selling
> some of these stocks because you believed in the company, you weren't selling them
> to make money[?]

> THE WITNESS:  Well, the reason I hesitated when he asked the question was, I'm
> speaking for myself, I feel a different level of enthusiasm, but –

> THE COURT:  If you were told to sell something would you try to sell it even if you
> didn't have any particular faith in it, didn't you[?]

> THE WITNESS:  Not that often.  I can't say it never happened, but at the time I was
> at A.S. Goldmen with my partner we tended to focus in on two or three situations that
> we liked more than others.  We built up pretty big positions in them.  We were
> enthusiastic about those specific situations.

> THE COURT:  Didn't you have other situations that you had to sell[?]

> THE WITNESS:  Yes, we just did much less of that.

> THE COURT:  You didn't push those that hard?

> THE WITNESS:  Yes.

(continued...)

(...continued)
>THE COURT: The ultimate objective was to make money?

>THE WITNESS: Yes.

(Kaplan: Tr. 1317-18.) Defense counsel resumed his cross-examination during which he brought out that Kaplan did not consider himself to have been a good broker because he "didn't make people money" even though that was his goal as a broker. (Kaplan: Tr. 1318-19.)

The cross-examination of Kaplan was lengthy, over 500 transcript pages (see Kapaln: Tr. 1216-770), and while volume does not supercede substance, looking at the situation as a whole, this interjection does not show bias nor amount to a constitutional violation.

Petitioners also point to Justice Snyder's interference with the cross-examination of broker-cooperating witness Joseph Imbrenda as another example of judicial bias. (Marchiano Br. at 66-68.) The line of questioning centered around a diary of the illegal conduct Imbrenda had engaged in at ASG, which he created at the direction of an attorney, to be used to refresh his recollection while testifying. (Imbrenda: Tr. 3035-42.) Justice Snyder sustained objections to Mr. Maffeo's asking Imbrenda to confirm that there was no mention in the diary of his direct testimony that Sal Marchiano had threatened physical beatings. (Imbrenda: Tr. 3039.) Justice Snyder's ruling was in line with her ruling in a previous side-bar concerning a related issue–that Mr. Maffeo could not ask Imbrenda to confirm that, during his testimony before the New Jersey Securities Bureau, he was not asked any questions about Sal Marchiano, because Justice Snyder considered that question irrelevant and without probative value. (Tr. 2994-96.) Justice Snyder said Mr. Maffeo could go into any inconsistencies in Imbrenda's testimony as well as inquire into the focus of the regulatory inquiry, but he could not ask: "'Isn't it a fact that Salvatore Marchiano's name never appears?'" (Tr. 2997.) Justice Snyder found that question misleading. (Id.) Thus, during the line of questioning surrounding Imbrenda's notebook, Justice Snyder sustained the prosecutor's objections, explaining: "That relates to the conversation at sidebar in which we discussed this issue in a different form." (Tr. 3039.) When Mr. Maffeo continued along the same line, Justice Snyder continued to sustain objections and, even though Mr. Maffeo said he "believe[d] that [his question was] consistent with the Court's ruling at sidebar" (Tr. 3039), Justice Snyder expressed exasperation with Mr. Maffeo: "In about three minutes you're going to sit down because you ignore my rulings and you're asking a lot of misrepresented questions. I do not want to go to sidebar again. Now move on." (Tr. 3040.) Justice Snyder then interrupted the

(continued...)

Another instance pointed out by petitioners (Marchiano Br. at 71-73) occurred during Mr. Maffeo's cross-examination of the prosecution's handwriting expert, where Justice Snyder several times told Mr. Maffeo to move on or sit down (e.g., Schatz: Tr. 9299, 9305-06). While Justice Snyder could have been more polite, she was exercising the trial judge's prerogative (indeed, duty) to move along a case that already filled over 9,000 pages of trial transcript. (See cases cited at pages 90, 93 above.) More troubling was Justice Snyder's questions on re-direct immediately following the conclusion of Mr. Maffeo's cross-examination:

> THE COURT: I just want to clarify something here. You have answered all of Mr. Maffeo's questions. To what degree of scientific certainty do you base your conclusion here?
>
> WITNESS: It is my opinion that this was not written by this particular author.

---

58/ (...continued)
cross-examination to ask Imbrenda to clarify the purpose for which he had created the diary. (Imbrenda: Tr. 3040-41.)

While Mr. Maffeo did not agree with the judge's limitation of his cross-examination, her ruling on the issue can not be said to be erroneous given the wide discretion of a trial judge. Even if the ruling was erroneous, it did not so limit the cross-examination as to prevent a meaningful cross-examination to occur. Moreover, the court's "excoriation" of counsel appear to have been expressions of impatience, which do not amount to unconstitutional partiality. See Liteky v. United States, 510 U.S. 540, 555-56, 114 S. Ct. 1147, 1157 (1994).

At a later sidebar, the issue was questioning about Imbrenda's knowledge about Sal Marchiano's heart procedure. (Tr. 3046-48.) Petitioners claim Justice Snyder improperly limited cross-examination because she would not allow Mr. Maffeo to ask the question the way he wanted to. (Marchiano Br. at 67-68.) The issue of the heart surgery was a small one and Mr. Maffeo was still allowed to question Imbrenda about his role in the "in-crowd," which was the point of the question about the heart surgery. (Imbrenda: Tr. 3051-52.)

THE COURT:  299 was not written by the person who wrote 301?

WITNESS:  That's correct.

THE COURT:  Do you have any doubt about that in your professional opinion?

WITNESS:  No, I do not.

[ADA] SALIT:  No further questions.

(Schatz: Tr. 9308-09.)  These questions were effective re-direct examination which should have been left to the prosecution to ask (or not ask).  Couched as "clarifying" questions, this was the type of conduct that could lead a jury to view the judge as favoring the prosecution.[59/]  However, the issue before us is not whether Justice Snyder acted correctly, but whether her conduct entitles petitioners to habeas relief.  The First Department ruled that Justice's Snyder's questions in this and other regards were not erroneous, biased or prejudicial, and this Court does not find that conclusion to be an unreasonable application of clearly established federal law.  See, e.g., Gayle v. Scully, 779 F.2d

---

[59/]  The other instances where Justice Snyder interrupted cross-examination with questions that should have been left for re-direct but were asked under the framework of "clarifications" also were better left unsaid but, given their contexts, were not grounds for habeas relief and in some instances were, indeed, clarifying.  (Meyers: Tr. 5957-63, 5972-77; Lamarti: Tr. 9818-20; see Marchiano Br. at 68-70, 73-74.)

The remaining instances pointed out by petitioners were comments made due to impatience and frustration at defense counsel.  (Marchiano Br. at 70-71.)  Viewed in context, Justice Snyder's impatience was understandable and while, again, more tactful comments would have been desirable, no constitutional violation resulted.  (See Panza: Tr. 7431-33, 7448-49.)  See, e.g., McClaurin v. Walsh, 03 Civ. 6984, 2005 WL 1337550 at *8 (S.D.N.Y. June 3, 2005) ("[W]hile the judge could have used less hyperbolic or stern words than 'completely off the wall' to describe the line of questioning for which he had sustained an objection, it was reasonable for the Appellate Division to conclude that such a statement did not deprive petitioner of a fair trial.").

802, 806 (2d Cir. 1985) ("It is clear that a judge does not deny a defendant due process of law by merely intervening in a trial to question witnesses, <u>cert. denied</u>, 479 U.S. 838, 107 S. Ct. 139 (1986). Further, it is abundantly clear that only infrequently does intervention by a trial judge rise to the level of a due process violation."); <u>Francolino</u> v. <u>Kuhlman</u>, 224 F. Supp. 2d 615, 651 (S.D.N.Y. 2002), <u>aff'd</u>, 365 F.3d 137 (2d Cir.), <u>cert. denied</u>, 543 U.S. 872, 125 S. Ct. 110 (2004).

**5.** **Justice Snyder's Questions During The Prosecution's Direct Examinations**

Petitioners assert that Justice Snyder's role in the prosecution's case in chief made her a "formidable ally" to the prosecution team to petitioners' constitutional detriment. (Marchiano Br. at 76-86.) Several of petitioners' examples where Justice Snyder intervened in the prosecution's direct examination (Marchiano Br. at 76-82) were permissible clarifications and thus will not be further discussed. (See Kaplan: Tr. 1192-94; Imbrenda: Tr. 2853-57; Panza: Tr. 7293-94.)

During direct examination, broker-cooperating witnesses Christopher Panza testified that he did not remember when he got involved in the Imatec private placement and the document the prosecution provided him did not refresh his recollection. (Panza: Tr. 7289.) Justice Snyder commented:

> THE COURT: I mean you worked there for almost five years. I don't understand your failure to recollect. Did you look at any of these documents?
>
> A: I remember that the private placement was before the offering. I don't remember how long before the offering.
>
> THE COURT: Well, that's a beginning. Why don't you try to think about your answer. You worked there. You prepared to be a witness, and, you know, think a

little harder and come up with some answer if you recall. It is a little hard for me to believe that you don't recall some of this and I'm getting very tired of it. Go on.

(Tr. 7289-90.) When Anthony's counsel later, out of the jury's presence, moved for a mistrial based on the judge's comment, on the ground that the witness could construe the judge's admonition as a direction to conjure an answer even if he did not remember the answer (Tr. 7322-23), Justice Snyder responded:

> . . . I don't remember saying, "You have to come up with some answer." If I did, then I certainly the words I used did not convey my meaning.
>
> . . .
>
> However, everything else conveyed my meaning. I believe this witness does remember better than the baloney we're hearing with half the cooperators here, who are probably afraid of the people at the defense table, and I don't have to put up with it. I'm not going to put up with that crap in my courtroom, and they're going to know it.
>
> . . .
>
> In any event, I guess your motions for mistrial, if that's what they are, are denied.
>
> . . .
>
> And I will make clear to the witness and the jury, however, that I'm not looking for an answer if he doesn't have one.

(7323-24.) As promised, when the jury returned, Justice Snyder instructed Panza and the jurors that Panza should not answer unless he actually remembered something and she did not mean to imply otherwise. (Tr. 7326.) The instruction rectified any misconception the jury or witness might have had.

None of these comments or questions, taken individually or as a whole, demonstrate partiality or bias, nor constitute a ground for habeas relief, especially under the deferential AEDPA review standard.

**6.**      **Justice Snyder's Comments During Opening Statements**

During the opening statement of counsel for then co-defendant Christopher Delcioppo, the prosecution objected to and Justice Snyder commented on the defense attorney's reference to his client as "Chris." (Opening: Tr. 255-57.) At sidebar, the prosecutor alluded to a pre-trial ruling dealing with how to refer to the defendant. (Tr. 257-58.) Justice Snyder told defense counsel to at least refer to the defendant as "Chris Delcioppo." (Tr. 258.)

Later in the same attorney's opening, in response to the prosecution's objection, Justice Snyder remarked that the jury would have to "wait and see" what the evidence will show and that the opening was "becoming an argument." (Tr. 262-63.) Justice Snyder called defense counsel up to an off-the-record sidebar at one point for a proffer of the direction in which the opening was headed and at another point during the opening explained to the jury that some of what they were hearing from the attorneys was argument and issues of law about which she would be instructing them. (Tr. 263, 264-66.) While it may be the general practice for trial courts to minimize interruptions during opening and closing statements, Justice Snyder was under no obligation to, and indeed should not, allow an opening to continue unfettered that contained argument, legal "instruction" or otherwise was inappropriate.

During the opening by John Delcioppo's defense attorney, Justice Snyder sustained an objection to defense counsel's statement that the securities industry is "heavily regulated" (Opening: Tr. 286), and instructed the jury:

> One of the problems with all these openings, you haven't heard any law really except the most general principles. Whether or not is it regulated may or may not be a factor for you to consider in terms of evaluating the charges against the defendant. It is certainly no legal defense to say to any charge, these were regulated.
>
> . . .
>
> One of the things you'll learn is there's certain principles in the law of conspiracy. Someone is proved to be a co-conspirator but the appropriate degree of proof, for example, that person is responsible as a member of the conspiracy for everything that went before him and everything that went after him. There's certain concepts referred to in the openings which may or may not have any legal relevance whatsoever. This is why the openings, I would have hoped, would be brief and to the point and then after you hear the evidence you hear the arguments in summation and then you hear the law from me which may or may not make some of these arguments relevant or irrelevant and then you'll apply the law to the facts. . . .

(Tr. 286-87.) Justice Snyder was within her province to instruct the jury as to the law, and while the timing and phrasing of the instruction may have left something to be desired, the instruction was not improper. See, e.g., Francolino v. Kuhlman, 224 F. Supp. 2d 615, 644, aff'd, 365 F.3d 137 (2d Cir.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004).[60] Moreover, these instances related to other then-defendants' openings, and not to the openings of counsel for petitioners.

---

[60] Petitioners also point out Justice Snyder's comments during Mr. Maffeo's opening statement. (Marchiano Br. at 82-83.) Most of Justice Snyder's comments while sustaining objections were better left unsaid and her comment concerning Mr. Maffeo's statement that Sal Marchiano had not pled guilty, taken in context, was better left unsaid, but it did not "effectively nullify[] the presumption of innocence." (See Marchiano Br. at 83.)

### 7. Justice Snyder's Derogatory Comments Aimed at Defense Counsel

Petitioners' final category of assertions of judicial bias center around Justice Snyder's on the record comments to defense counsel. (Marchiano Br. at 84-86.)

During defense counsel Mr. Hoffman's cross-examination of Imbrenda using prior inconsistent statements, Justice Snyder, after sustaining an objection, commented in front of the jury: "Mr. Hoffman, you are a very good lawyer so you know you are not asking proper questions and I'm going to have to give a little lecture to the jury soon if you continue." (Tr. 3124.) When the prosecution objected a few moments later to Mr. Hoffman's use of grand jury testimony as an allegedly prior inconsistent statement, Justice Snyder said at <u>sidebar</u>:

> Mr. Hoffman, first of all, I don't even want to comment. I really think a lot of your questions, you know that they are improper. You need support here? Probably the two of you are doing a record of knowingly improper, or certainly improperly phrased questions. Let me not get into that right now.
>
> The whole purpose of reading someone's Grand Jury testimony obviously would be either you show it to refresh his memory or you read him some inconsistency. In fact, what you just read was at least fifty percent consistent with exactly what he said.
>
> This is the kind of – I hate to use this word – but I can only say that I think you and Mr. Maffeo are so sneaky that I'm using that term deliberately. I think you are deliberately sneaky and misleading. You are both nice guys and good lawyers and I don't understand why you have to practice this way. This is my opinion and I am getting increasingly upset about it.

(Tr. 3127-28.) The Grand Jury testimony Mr. Hoffman was using was mostly consistent with what the witness had just testified to; any inconsistency was of the splitting hairs variety. (Imbrenda: Tr. 3125-26.) While the judge's comments to or about defense counsel may have been harsh, they were

made out of the jury's presence, and thus could not have prejudiced petitioners in front of the jury, nor is there any evidence that the purpose or effect was to browbeat defense counsel into being less vigorous advocates. E.g., Martinez v. Kelly, 01 Civ. 11570, 2005 WL 1863854 at *7 (S.D.N.Y. Aug. 4, 2005) ("[T]he prejudicial effect of the trial court's allegedly biased statements and conduct on Petitioner was significantly mitigated by," inter alia, the fact that "many of the trial court's purportedly hostile remarks about defense counsel were made outside the presence of the jury."); Reid v. Phillips, 04 Civ. 1338, 2004 WL 1920218 at *4 (S.D.N.Y. Aug. 26, 2004) ("The remarks cited by petitioner, most of which were outside the presence of the jury and therefore could not have influenced the verdict. . . ."); Gumbs v. Kelly, 97 Civ. 8755, 2000 WL 1172350 at *13 (S.D.N.Y. Aug. 18, 2000) (Peck, M.J.) ("Even if these comments had been particularly egregious – and they were not – the jury was shielded from them and they could therefore not have affected the fairness of the trial."); see, e.g., Shah v. Pan Am. World Servs., Inc., 148 F.3d 84, 101 (2d Cir. 1998) ("[T]he remarks [made by the trial judge rebuking counsel for plaintiff] are indicative not of judicial bias, but rather of the judge's legitimate concern over the attorney's performance at trial. Because the remarks were made outside of the jury's presence and did not otherwise impede the fairness of the proceedings, they did not influence or prejudice the trial in any way."), cert. denied, 525 U.S. 1142, 119 S. Ct. 1033 (1999).

Later, when Mr. Hoffman was attempting to bring out another prior inconsistency, Justice Snyder said in open court: "The jury heard the semantic quibbling that went on here. If you consider that an inconsistency you will accept it as an [in]consistency. That is up to you. That is

enough. Move on."  (Tr. 3141.)  See DeLeon v. Duncan, 99 Civ. 9086, 2001 WL 1029400 at *12 (S.D.N.Y. Sept. 5, 2001)("While it is true that the relationship between Judge Snyder and [co-defendant's attorney] often appears uncivilized, it is also true that [petitioner] has not demonstrated that the judge's conduct so influenced the jury as to deny him a fair trial.  There is no evidence the judge directed her comments to the defendants themselves. . . ."), report & rec. adopted, 2002 WL 1997892 (S.D.N.Y. Aug. 28, 2002).

Finally, petitioners point to Justice Snyder's comments, out of the jury's presence, warning defense counsel that she would not allow them to use Winkler as the "fall guy" in an "empty chair defense."  (Marchiano Br. at 86; Kaplan: Tr. 1520-21.)

Petitioners contend that Justice Snyder's comments and treatment of defense counsel throughout the trial demonstrated that she "clearly believed that cross-examination was inherently tantamount to 'misleading the jury' and, because of that belief, took every opportunity to forestall appropriate and effective cross-examination."  (Marchiano Br. at 85.)  The First Department disagreed, and so does this Court.

* * * * *

Justice Snyder repeatedly advised the jury that she asked questions to clarify testimony (Tr. 1330; Tr. 5976-77; Charge: Tr. 12805-06), and that if she criticized counsel in any way, that should not influence the jurors (Prelim. Instructions: Tr. 15-16; Tr. 3072-73, 3992-95, 9028, 10512, 11473; Charge: Tr. 12808-09).  In her final jury instructions, Justice Snyder clearly reminded the jurors that she had no opinion on the case and they were the exclusive finders of fact:

But what occurs to me to emphasize is that if I ever said anything during the course of the case or asked any questions, that has no particular significance and is no different than anyone asking a question.

If at times I felt things were confusing and I asked questions, that's part of the function of a judge to make things clearer, not that I usually always succeed. But when I asked a question it was for that purpose and has no particular weight or emphasis or meaning because I asked it. Just as I have no opinion as to what you should do in this case. It's not my function to have an opinion. And if I were to have one, I couldn't communicate it to you in any event because I don't decide the facts. I don't determine anyone's guilt or lack of guilt, you do.

So the lawyers' opinions or my opinion are totally irrelevant. And I don't believe that I've ever expressed an opinion to you. I think the lawyers tried to in their summations, that's their job.

But you, and you alone, tell us what the facts are in this case. And I want you to remember that I have no power to tell you what witness was truthful or untruthful or partially truthful or partially untruthful.

I have no power to tell you what are the important facts or unimportant facts. Those are all matters in your own exclusive power as judges of the facts.

(Charge: Tr. 12805-06.)

Justice Snyder further reminded the jury in her charge that all the lawyers were excellent, and if she was argumentative or there were arguments with counsel, the jury should not draw any negative inferences from that:

Now, let me just say one thing. As we all know, during the course of this trial, at times there was colloquy and even argument between the lawyers or some of the lawyers particularly and myself. That happens in every case. I would not want you to draw any negative inference or any unfavorable inference against any of the lawyers because that occurred. I happen to be argumentative, lawyers by nature are argumentative, and this happens in every trial. In fact, we are very fortunate that we have excellent lawyers here, and I like all of them, and we do get along other than in front of you upon occasion. So, please, draw no negative inference against the lawyers for either side or against any of the defendants because of any colloquy or

argument that may have occurred. Each lawyer on both sides did an excellent job, and that's the nature of the beast. Criminal trials are adversarial, and they seem to bring out arguments in all of us. Put it in perspective. Also, whether you like or dislike an attorney, obviously, is irrelevant. This is not a personality contest; therefore, that should never factor in any way in your evaluation of the evidence in the case.

(Charge: Tr. 12808-09.)

As discussed above, the jury is presumed to follow the trial court's instructions. (See cases cited at pages 75-76 above.) While such instructions, of course, cannot remedy every instance of sufficiently prejudicial intervention by a trial judge that fundamentally impairs the fairness of the criminal trial, such instructions help to mitigate any prejudice to petitioners that may have occurred. See, e.g., Paccione v. New York, 353 F. Supp. 2d 358, 369 (E.D.N.Y. 2005) (The trial judge's instruction in her final charge that the jury "must not infer from any of [her] rulings, or anything [she] may have said during the trial that [she] hold[s] any personal views for or against these defendants. Further, you must not draw any inference or conclusion from . . . any relations or remarks that [she has] made that [she] mean[s] to indicate any opinion as to the facts or as to what your verdict should be," contributed to the district court's finding on habeas review that petitioner was not denied a fair trial due to any judicial misconduct.); Martinez v. Kelly, 2005 WL 1863854 at *6-7 ("[T]he prejudicial effect of a trial court's comments 'can be cured by the court's cautionary instruction' to the jury . . . [T]he trial court repeatedly instructed the jury that neither [co-defendant's attorney's] behavior nor the court's exchanges with defense counsel should be held against any of the defendants," mitigated the trial court's comments.); Perez v. Hollins, 02 Civ. 6120, 2004 WL 307271 at *11 (S.D.N.Y. Feb. 5, 2004) (the trial judge's instructions to the jury "minimized any . . .

prejudice."); <u>Francolino</u> v. <u>Kuhlman</u>, 224 F. Supp. 2d 615, 654 n.49 (S.D.N.Y. 2002) (Justice Snyder's curative instruction "made it clear to the jury that the apparent friction in the courtroom was not necessarily improper," where the instruction told the jury that "[s]ometimes we all get a little heated.  The main thing is that both sides have to have a fair opportunity to present their arguments in accordance with the law."), <u>aff'd</u>, 365 F.3d 137 (2d Cir.), <u>cert. denied</u>, 543 U.S. 872, 125 S. Ct. 110 (2004); <u>DeLeon</u> v. <u>Duncan</u>, 2001 WL 1029400 at *12 ("Judge Snyder instructed the jury to ignore her colloquy with counsel," which was one of the mitigating factors which led the habeas to conclude that the state court was not unreasonable to have found no constitutional deprivation.); <u>Gumbs</u> v. <u>Kelly</u>, 2000 WL 1172350 at *13 (The effect of any derogatory comments by Justice Snyder toward defense counsel was mitigated by her repeated instructions to the jury that it should "ignore" the acrimonious colloquy between counsel and the court and that the comments made should not be "'held against the defendant or the People.'").  In this case, Justice Snyder's instructions to the jury, especially in the final charge, are an important factor, along with the other factors discussed above, in finding no prejudice (and no unreasonable application of federal law).

       As this Court noted at the beginning of its discussion of this issue, certainly some of Justice Snyder's comments/questions were better left unsaid or were made at inopportune moments, but most were not improper and none (singly or collectively) rose to a level warranting habeas relief. Certainly, none cause this Court to conclude that the First Department's denial of this claim was an unreasonable application of federal law.  Petitioners' judicial bias habeas claim should be denied.

## IV.   PETITIONER TRENTO'S ADDITIONAL CLAIMS SHOULD BE DENIED

Petitioner Trento was represented by counsel at the time he filed his very cursory habeas petition. (05 Civ. 5496, Dkt. No. 1: Trento Pet.; see also page 60 n.26 above.) Trento's new counsel did not supplement, or seek leave to supplement, Trento's original petition.

### A.   Trento's Claim That the Evidence Was Insufficient to Support His Enterprise Corruption Conviction Should Be Denied

#### 1.   Legal Principles Governing Sufficiency of the Evidence Habeas Claims[61]

"'[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" Jackson v. Virginia, 443 U.S. 307, 315, 99 S. Ct. 2781, 2787 (1979) (quoting In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970)). However, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S.

---

[61]   For additional decisions authored by this Judge discussing the sufficiency of the evidence standard in habeas cases in language substantially similar to this section of this Report & Recommendation, see, e.g., Rosario v. Walsh, 05 Civ. 2684, 2006 WL 1431410 at *19-20 (S.D.N.Y. May 25, 2006) (Peck, M.J.); Nelson v. Sears, 05 Civ. 10341, 2006 WL 775123 at *9-10 (S.D.N.Y. Mar. 28, 2006) (Peck, M.J.); Olivo v. Thorton, 05 Civ. 3237, 2005 WL 3292542 at *14 (S.D.N.Y. Dec. 6, 2005) (Peck, M.J.), report & rec. adopted, 2006 WL 1636742 (S.D.N.Y. June 12, 2006) (Castel, D.J.); Roman v. Filion, 04 Civ. 8022, 2005 WL 1383167 at *31-33 (S.D.N.Y. June 10, 2005) (Peck, M.J.); Castro v. Fisher, 04 Civ. 0346, 2004 WL 1637920 at *23-25 (S.D.N.Y. July 23, 2004) (Peck, M.J.) (citing my prior decisions), report & rec. adopted, 2004 WL 2525876 (S.D.N.Y. Nov. 8, 2004) (Cote, D.J.); Besser v. Walsh, 02 Civ. 6775, 2003 WL 22093477 at *10-13 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.) (citing my prior decisions), report & rec. adopted, 2003 WL 22846044 (Dec. 2, 2003) (Kaplan, D.J.); Hediam v. Miller, 02 Civ. 1419, 2002 WL 31867722 at *11-14 (S.D.N.Y. Dec. 23, 2002) (Peck, M.J.) (citing my prior decisions).

at 317, 99 S. Ct. at 2788. Accordingly, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 – if the settled procedural prerequisites for such a claim have otherwise been satisfied – the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. at 324, 99 S. Ct. at 2791-92.[62/]

> The petitioner bears a very heavy burden:
>
> [T]he standard for appellate review of an insufficiency claim placed a "very heavy burden" on the appellant. Our inquiry is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt. In making this determination, we must view the evidence in the light most favorable to the government, and construe all permissible inferences in its favor.

United States v. Carson, 702 F.2d 351, 361 (2d Cir.) (citations omitted), cert. denied, 462 U.S. 1108, 103 S. Ct. 2456, 2457 (1983).[63/]

---

[62/]    Accord, e.g., Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000); Einaugler v. Supreme Court, 109 F.3d 836, 839 (2d Cir. 1997).

[63/]    Accord, e.g., Fama v. Comm'r of Corr. Servs., 235 F.3d at 811 ("petitioner bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficiency of the evidence"); United States v. Middlemiss, 217 F.3d 112, 117 (2d Cir. 2000); United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) ("a defendant shoulders a 'heavy burden' in challenging the sufficiency of evidence supporting a conviction"); United States v. Kinney, 211 F.3d 13, 16 (2d Cir. 2000), cert. denied, 531 U.S. 1079, 121 S. Ct. 778 (2001); United States v. Bicaksiz, 194 F.3d 390, 398 (2d Cir. 1999) (The defendant "bears a 'very heavy burden' in challenging the sufficiency of the evidence that led to his conviction. In considering any such challenge, we view all proof in the light most favorable to the government and draw all reasonable inferences in the government's favor.") (citations omitted), cert. denied, 528 U.S. 1161, 120 S. Ct. 1175 (2000); United States v. Russo, 74 F.3d 1383, 1395 (2d Cir.), cert. denied, 519 U.S. 927, 117 S. Ct. 293 (1996); United States
(continued...)

The habeas court's review of the jury's findings is limited:

> [T]his inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

Jackson v. Virginia, 443 U.S. at 318-19, 99 S. Ct. at 2789 (citations omitted).[64/]

The Jackson v. Virginia "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson v. Virginia, 443 U.S. at 324 n.16, 99 S. Ct. at 2792 n.16; accord, e.g., Green v. Abrams, 984 F.2d 41, 44-45 (2d Cir. 1993) ("In considering a petition for a writ of habeas corpus based on insufficient evidence to support a criminal conviction in the state courts, a federal court must look to state law to determine the elements of the crime.").

---

[63/] (...continued)
v. Rosa, 11 F.3d 315, 337 (2d Cir. 1993) ("[T]he defendant who makes a sufficiency challenge bears a heavy burden."), cert. denied, 511 U.S. 1042, 1096, 114 S. Ct. 1565, 1864 (1994); United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993) (burden on defendant claiming insufficiency is "very heavy" and all inferences must be drawn in the government's favor).

[64/] Accord, e.g., United States v. Middlemiss, 217 F.3d at 117; United States v. Kinney, 211 F.3d at 16; United States v. Russo, 74 F.3d at 1395 (quoting United States v. Martinez, 54 F.3d 1040, 1042-43 (2d Cir.), cert. denied, 516 U.S. 1001, 116 S. Ct. 545 (1995)); Mallette v. Scully, 752 F.2d 26, 31 (2d Cir. 1984).

## 2.    Application of the Standard to Trento's Claim

The First Department held that Trento's "challenges to the sufficiency and weight of the evidence against him are unavailing.  To the extent required, accomplice testimony was fully corroborated, especially by the testimony of the People's financial investigator."  People v. A.S. Goldmen, Inc., 9 A.D.3d 283, 286, 779 N.Y.S.2d 489, 492 (1st Dep't 2004).

Trento claims the evidence at trial was legally insufficient because "the only criminal activity of which [he] was convicted involved allegations of use of nominee accounts.  The prosecution's theory was that these accounts were used to flip stock back to the criminal enterprise at a reduced price.  There was no proof that [Trento] used the accounts for such a purpose or that he otherwise advanced the enterprise."  (05 Civ. 5496, Trento Pet. ¶ 12(A).)  These two sentences constitute the entirety of Trento's claim in his habeas petition, despite being represented by counsel.  In the interests of justice, this Court has reviewed Trento's First Department brief in which he argues this point in more depth:  Trento there challenged his conviction for enterprise corruption on the ground that since Trento's nominees did not "flip" their stock back to ASG within the same short time period as most other nominees, the proof did not support the inference "that Trento engaged in conduct with the intent of participating in the affairs of the enterprise or furthered the enterprise's interests."  (05 Civ. 5496, Dkt. No. 10: Ginsberg Aff. Ex. A: Trento 1st Dep't Br. at 6-7.)

Trento was convicted of enterprise corruption under Penal Law § 460.20, which provides:

1.  A person is guilty of enterprise corruption when, having knowledge of the
existence of a criminal enterprise and the nature of its activities, and being employed
by or associated with such enterprise, he:

(a) intentionally conducts or participates in the affairs of an enterprise by
participating in a pattern of criminal activity . . .

2.  For purposes of this section, a person participates in a pattern of criminal activity
when, with intent to participate in or advance the affairs of the criminal enterprise,
he engages in conduct constituting . . . at least three of the criminal acts included in
the pattern . . . .

Penal Law § 460.20.

To support a charge of enterprise corruption, evidence must show that the defendant

intended to further the affairs of the enterprise through a pattern of criminal acts that are "either:

(i) related to one another through a common scheme or plan or (ii) were committed, solicited,

requested, importuned or intentionally aided by persons acting with the mental culpability required

for the commission thereof and associated with or in the criminal enterprise."  Penal Law

§§ 460.10(4)(c), 460.20.  See, e.g., Besser v. Walsh, 02 Civ. 6775, 2003 WL 22093477 at *20

(S.D.N.Y. Sept. 10, 2003) (Peck, M.J.) (citing N.Y. authority), report & rec. adopted, 2003 WL

22846044 (Dec. 2, 2003) (Kaplan, D.J.); People v. Cantarella, 160 Misc. 2d 8, 20-21, 606 N.Y.S.2d

942, 950-51 (Sup. Ct. N.Y. Co. 1993) (evidence that a defendant was told about the distribution of

profits from his criminal activity to members of his criminal enterprise was sufficient to prove his

intent to further the enterprise.).[65]

---

[65]    Cf., e.g., Barone v. Williams, No. CV-96-5898, 1997 WL 785611 at *5 (E.D.N.Y. Dec. 8,
        1997) (defendant's "relationship to a 'Criminal Enterprise'" sufficiently proven by evidence
                                                                              (continued...)

Here, the evidence shows that Trento, as a senior broker, was an active participant in ASG's money-making schemes, who, among other things, trained underlings such as Shawn Smith in the art of deceiving clients and using nominee accounts to generate profits. (<u>See</u> pages 16, 23-24, 26-27 above.) Trento was deeply implicated in the ASG criminal enterprise through the testimony of accomplices Shawn Smith, Joseph Imbrenda and Charles Pipia. (<u>See</u> pages 15-16, 17-18, 23-24, 26-27, 29 n.17 above.) Further, there was sufficient corroboration of this accomplice testimony for the jury to have found Trento guilty of enterprise corruption: several customers testified about Trento's involvement (<u>e.g.</u>, Fisher: Tr. 323-33, 336-38); Heinz Dieken, the husband of Trento's nominee testified (Dieken: Tr. 2427-76); and additional evidence about the IPO schemes was submitted through financial investigators and documentary evidence. (<u>See generally</u> pages 7-30 above.) The jury reasonably could have concluded from all the evidence that "some independent evidence tended to connect [Trento] to the offense of enterprise corruption." <u>See</u> <u>People</u> v. <u>Besser</u>, 96 N.Y.2d 136, 141, 726 N.Y.S.2d 48, 49 (2001) (holding that testimony of accomplices does not need to be "corroborated for each pattern act" but is sufficiently corroborated by some independent evidence tending to connect the defendant to the enterprise corruption charge.) Therefore, Trento's contention that the failure to show Trento's nominees flipped their stocks within the same timeframe as the others is unavailing since the evidence against Trento rested on other proof as well.

---

65/      (...continued)
that he had an "intimate association" with members of the Bonnano crime family during his management of the corrupt enterprise Union News and that he co-owned Union News with a "made" member of the crime family).

## B. Trento's Claim That Justice Snyder Erred By Declining to Dismiss Three Jurors Who Reported A Fourth Juror's Misconduct Should Be Denied

Trento's petition claims, in conclusory fashion, that Justice Snyder's denial of the defense's "request to excuse three jurors who reported 'misconduct' of a fourth juror, who was replaced by an alternate" was a denial of Trento's right to an impartial jury where "at least one [juror] indicated a possibility of bias, [though] the juror gave assurances to the court of impartiality." (05 Civ. 5496, Dkt. No. 1: Trento Pet. ¶ 12(D).) Again, Trento was represented by two different attorneys during the filing and pendency of his habeas petition but the petition cited to no facts from the record nor case law to support his claim.

Trento's claim is meritless. Pursuant to C.P.L. § 270.35, a trial court may not discharge a sworn juror unless that juror is "grossly unqualified." A juror is "grossly unqualified" only "'when it becomes obvious that [the] particular juror possesses a state of mind which would prevent the rendering of an impartial verdict.'" People v. Rodriguez, 71 N.Y.2d 214, 219, 524 N.Y.S.2d 422, 425 (1988) (quoting People v. Buford, 69 N.Y.2d 290, 298, 514 N.Y.S.2d 191, 195 (1987)); accord, e.g., Thomas v. Fischer, 03 Civ. 5388, 2004 WL 725636 at *7 (S.D.N.Y. Apr. 5, 2004). The New York Court of Appeals has set forth the procedure the trial court should follow to determine whether a juror must be discharged:

> In reaching its conclusion, the trial court must question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant. Counsel should be permitted to participate if they desire. In a probing and tactful inquiry, the court should evaluate the nature of what the juror has seen, heard, or has acquired knowledge of, and assess its importance and its bearing on the case. . . . In concluding that a juror is grossly unqualified, the [trial] court may not speculate as to possible partiality of the juror based on her equivocal responses. Instead, it must

be convinced that the juror's knowledge will prevent her from rendering an impartial verdict.

People v. Buford, 69 N.Y.2d at 299, 514 N.Y.S.2d at 196; accord, e.g., Booker v. Girdich, 262 F. Supp. 2d 264, 268 (S.D.N.Y. 2003); People v. Rodriguez, 71 N.Y.2d at 219-20, 524 N.Y.S.2d at 425. "'This statutory test places a greater burden upon the moving party than if the juror was challenged for cause'" before the jury was impaneled. People v. Buford, 69 N.Y.2d at 298, 514 N.Y.S.2d at 195.

Further, the Second Circuit requires that "[o]n § 2254 review, the state trial court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial." Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 813 (2d Cir. 2000); accord, e.g., Thomas v. Fischer, 2004 WL 725636 at *8; Booker v. Girdich, 262 F. Supp. 2d at 268. Further, "the Supreme Court has made it clear that 'the trial court's findings of impartiality [may] be overturned only for "manifest error."'" Knapp v. Leonardo, 46 F.3d 170, 176 (2d Cir.) (quoting Patton v. Yount, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 2889 (1984)), cert. denied, 515 U.S. 1136, 115 S. Ct. 2566 (1995); accord, e.g., Fama v. Comm'r of Corr. Servs., 235 F.3d at 813; Booker v. Girdich, 262 F. Supp. 2d at 268. Thus, "'[t]he trial judge must be given wide discretion to decide upon the appropriate course to take,' given his or her unique ability to personally observe the jurors in question." Thomas v. Fischer, 2004 WL 725636 at *7; see also, e.g., Booker v. Girdich, 262 F. Supp. 2d at 268; Diaz v. Mazzuca, 00 Civ. 4383, 2001 WL 170662 at *3 (S.D.N.Y. Feb. 21, 2001).

Even before the AEDPA's enactment, the Supreme Court explained that there are "good reasons to apply the statutory presumption of correctness to the trial court's resolution of these questions":

> There are good reasons to apply the statutory presumption of correctness to the trial court's resolution of these questions.  First, the determination has been made only after an often extended voir dire proceeding designed specifically to identify biased veniremen.  It is fair to assume that the method we have relied on since the beginning, usually identifies bias.  Second, the determination is essentially one of credibility, and therefore largely one of demeanor.  As we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to "special deference."  The respect paid such findings in a habeas proceeding certainly should be no less.

Patton v. Yount, 467 U.S. at 1038, 104 S. Ct. at 2892 (citations & footnote omitted).

Here, the record amply supports the finding that the three jurors who came forward unequivocally testified to their ability to remain impartial.  Justice Snyder inquired of each individual juror and conducted a thorough inquiry to ascertain whether they could remain impartial despite their exposure to the misconduct of the discharged fourth juror.  (See pages 47-54 above.)  In particular, Justice Snyder interviewed juror Mr. Davis twice to make sure his comments that he thought the defendants were "bad guys" would not cloud his ability to remain impartial during deliberations.  (See pages 47-51 above.)  Mr. Davis unequivocally assured Justice Snyder that he had not made up his mind as to defendants' guilt or innocence and his view that they were not "nice" did not vitiate the presumption of innocence.  (See pages 50-51 above.)  Moreover, his view that defendants were bad guys was not based on any extra-record information, but on the evidence heard by the jury so far.  Justice Snyder was within her discretion to determine the three jurors credible in their unequivocal assurances that they remained impartial.  See, e.g., Ramos v. Artuz, 107 Fed. Appx.

239, 240 (2d Cir. 2004) ("After receiving a report from an alternate juror that two jurors discussed the merits of the case after having been warned not to do so, the trial court questioned all jurors about the alleged comments and the impact of those comments on their ability to be impartial." The judge's conclusion that only the two jurors needed to be excused was a reasonable determination of the facts on the testimony given by the jurors.); Ingram v. Senkowski, No. 96-2818, 131 F.3d 131 (table), 1997 WL 738101 at *3 (2d Cir. Nov. 24, 1997) ("[T]he state court's inquiry was sufficient to discover the nature of the discussion between the jurors and its potential, if any, for prejudice . . . [T]he trial court, having observed the foreperson's demeanor, credited her testimony that she did not recall hearing any trial-related discussions . . . [did not] abuse its discretion when it refused to dismiss the foreperson from the jury."); Brown v. Menifee, No. 99 CV 1258, 2004 WL 1810341 at *11 (E.D.N.Y. Aug. 9, 2004) (The state trial court conducted a hearing to investigate the alleged juror misconduct and "consider[ed] the jurors' testimony regarding their ability to remain unbiased" which procedure "was in accord with the United States Supreme Court's standard for allegations of juror misconduct."); Thomas v. Fischer, 2004 WL 725636 at *7-8 (The trial court acted within its "'wide discretion'" in finding the jury was impartial given its "'unique ability to personally observe the jurors in question.'"); James v. Walker, No. 99-CV-6191, No. 03-MISC-0066, 2003 WL 22952861 at *8 (E.D.N.Y. Aug. 28, 2003) (Weinstein, D.J.) ("In assessing the credibility of a juror's response and the state of mind of the juror, the trial court has the obvious advantage of actually observing a juror-a factor unavailable to this [habeas] court. There is nothing in the record which indicates an abuse of discretion."), aff'd, 116 Fed. Appx. 295 (2d Cir. 2004); Jones v. Spitzer, 01 Civ.

9754, 2003 WL 1563780 at *24 (S.D.N.Y. Mar. 26, 2003) ("'[T]he trial judge's finding that each juror could render an unbiased verdict was upheld on direct appeal and there is no compelling contrary evidence. This Court must defer to that finding.'"), report & rec. adopted, 2005 WL 167605 (S.D.N.Y. Jan. 25, 2005).[66/]   There is no evidence that the First Department's decision was an unreasonable application of federal law.  Trento's juror misconduct habeas claim should be denied.

### C.   Trento's Claim That Justice Snyder Should Have Recused Herself Should Be Denied

Trento raises the claim, not joined by Anthony or Salvatore Marchiano, that Justice Snyder's denial of petitioners' recusal motion at trial was a demonstration of her bias resulting in the denial of a fair trial.  (05 Civ. 5496, Dkt. No. 1: Trento Pet. ¶12(C).)

Under New York law, "absent a legal disqualification under Judiciary Law § 14, a Trial Judge is the sole arbiter of whether recusal is warranted by the appearance of partiality, and this discretionary decision is within the personal conscience of the court . . . [and] considerable deference should be accorded to his or her exercise of discretion." People v. Grier, 273 A.D.2d 403, 405, 709 N.Y.S.2d 607, 610 (2d Dep't 2000) (citing People v. Moreno, 70 N.Y.2d 403, 405-06, 521 N.Y.S.2d 663, 665 (1987).[67/]

---

[66/]   The State referred to Petitioners' Joint First Department Brief which cited to caselaw to support this claim.  (See Dkt. No. 6: State Br. at 132 n.23, 135 n.24.)  In the interest of justice, this Court reviewed the arguments petitioners made to the First Department.  (Pets. Joint 1st Dep't Br. at 115-33.)  None of the cases cited in his state brief compel this Court to reach a different conclusion.

[67/]   N.Y. Judiciary Law § 14 provides in pertinent part:

(continued...)

Justice Snyder was not statutorily required to recuse herself. Moreover, in denying petitioners' recusal motion at trial, she ruled that she had "searched [her] conscience" and concluded she would "have no problem being fair." (State Br. at 66, quoting 9/22/00 hearing transcript.)

Once Winkler's plot to kill Justice Snyder emerged, she severed Winkler from the case and recused herself from his trial. (<u>See</u> pages 39 n.20 above.) Trento argued in his joint brief to the First Department that Justice Snyder should have recused herself from his trial because Winkler's conspiracy against her biased her against the remaining defendants. (Pets. Jt. 1st Dep't Br. at 28.) The cases cited to in petitioners' First Department brief dealt with the issue of whether a judge should recuse herself when a defendant plotted against her, but did not address whether it was proper for a judge to preside over the case of any co-defendants who had not been involved in the murder plot. (<u>See</u> Pets. Jt. 1st Dep't Br. at 31, citing <u>United States</u> v. <u>Greenspan</u>, 26 F.3d 1001 (10th Cir. 1994); <u>United States</u> v. <u>Cerrella</u>, 529 F. Supp. 1373 (S.D. Fla. 1982).)

Given the wide discretion afforded trial judge's when considering recusal motions, this Court finds the First Department's conclusion that there was no Due Process violation by Justice Snyder's denial of Trento's recusal motion was not an unreasonable application of federal law. Accordingly, Trento's recusal haabeas claim should be denied.

---

67/     (...continued)
        A judge shall not sit as such in, or take any part in the decision of, an action, claim, matter, motion or proceeding to which he is a party, or in which he has been attorney or counsel, or in which he is interested, or if he is related by consanguinity or affinity to any party to the controversy within the sixth degree.

## **CONCLUSION**

For the reasons discussed above, petitioners' habeas petition should be denied in all respects, and a certificate of appealability should issue but only as to the <u>Crawford</u> harmless error claim.

## **FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. <u>See also</u> Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable P. Kevin Castel, 500 Pearl Street, Room 2260, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Castel (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas</u> v. <u>Arn</u>, 474 U.S. 140, 106 S. Ct. 466 (1985); <u>IUE AFL-CIO Pension Fund</u> v. <u>Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993), <u>cert. denied</u>, 513 U.S. 822, 115 S. Ct. 86 (1994); <u>Roldan</u> v. <u>Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Frank</u> v. <u>Johnson</u>, 968 F.2d 298, 300 (2d Cir.), <u>cert. denied</u>, 506 U.S. 1038, 113 S. Ct. 825 (1992); <u>Small</u> v. <u>Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989); <u>Wesolek</u> v. <u>Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988); <u>McCarthy</u>

v. <u>Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a),

6(e).

Dated:      New York, New York
            July 6, 2006

Respectfully submitted,

**Andrew J. Peck**
United States Magistrate Judge

Copies to:    Seth Ginsberg, Esq.
              John L. Pollok, Esq.
              J. Bruce Maffeo, Esq.
              Mark Dwyer, Esq.
              Judge P. Kevin Castel