UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
A.S. GOLDMEN, INC., ANTHONY          :
MARCHIANO and                        :
SALVATORE MARCHIANO,                 :
                                     :
                     Petitioners,    :          05 Civ. 4385 (PKC)(AJP)
                                     :
            -against-                :
                                     :
WARDEN WILLIAM PHILLIPS, Green Haven :
Correctional Facility and SUPERINTENDENT :
WILLIAM CONNOLLY, Edgecombe          :
Correctional Facility,               :
                                     :
                     Respondents.    :
-------------------------------------------------------------x
CHARLES TRENTO,                      :
                                     :
                     Petitioner,     :          05 Civ. 5496 (PKC)(AJP)
                                     :
            -against-                :
                                     :
CHAIRMAN ROBERT DENNISON,            :              MEMORANDUM
New York State Division of Parole,   :                  AND
                                     :                 ORDER
                     Respondent.     :
-------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

             Anthony Marchiano, Salvatore Marchiano, Charles Trento and A.S.

Goldmen, Inc. have petitioned for a writ of habeas corpus asserting that their New York State

convictions were obtained in violation of rights protected by the United States Constitution.  I

referred the petitions to Magistrate Judge Andrew J. Peck to hear and report.  The reference

required a review of issues arising in a difficult trial lasting over five months and about

12,000 pages of transcript.  In a 142-page Report and Recommendation ("R & R"), Judge

Peck recommended that the petitions be denied.  (Doc # 13)

At petitioners' request, I extended the time for filing objections to the R & R. (Doc # 14)  Timely objections were filed by Anthony Marchiano ("Anthony") and Salvatore Marchiano ("Sal").  (Doc #15)  No objections were filed by petitioners Charles Trento or A.S. Goldmen, Inc.  "[A] party generally waives judicial review of an issue when he or she fails to make timely objection to a magistrate judge's report, . . . [t]his rule . . . is a nonjurisdictional waiver provision, and its violation may be excused in the interests of justice."  DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citations omitted); see United States v. Male Juvenile (95-CR-1074), 121 F.3d 34, 39 (2d Cir. 1997).  "Even if neither party objects to the magistrate's recommendation, the district court is not bound by the recommendation of the magistrate."  DeLeon, 234 F.3d at 87 (citation and internal quotations omitted).  I have reviewed the R & R insofar as it addresses the claims of non-objecting petitioners Trento and A.S. Goldmen, Inc. and I find no reason, in the interests of justice, to excuse the failure to object.

Anthony and Sal object to the R & R asserting that, at the state trial, seven plea allocutions were admitted into evidence in violation of their constitutional right to confront their accusers.  The claim of constitutional error is premised upon Crawford v. United States, 541 U.S. 36 (2004), decided on March 8, 2004, after the trial was concluded.  The error was conceded in state appellate court but found to have been harmless.  The R & R concludes that the state appellate court did not unreasonably apply Chapman v. California, 386 U.S. 18 (1967), which is clearly-established law setting forth the standard for harmless-error review.  Petitioners also object to the R & R to the extent that it rejects their assertion that the state courts denied them due process of law because the trial judge was biased, unfairly limited cross-examination and improperly questioned witnesses.  I have engaged in a de novo review of so much of the R & R as is addressed in petitioners' objections.

To facilitate an examination of the trial record, I directed the respondents to file a witness-by-witness summary of each witness's testimony. (Prior submissions had organized the evidentiary presentation on a transaction-by-transaction basis.) I invited submissions addressing questions posed by the Court in an Order. (Doc # 17) Thereafter, I invited a further submission addressing the cooperators' testimony concerning their own guilty pleas. (Doc # 25) Subsequent to the issuance of the R & R, the Supreme Court decided Fry v. Pliler, __ U.S. __, 127 S.Ct. 2321 (2007). I will consider the impact of Fry on the R & R's discussion of the standard to be applied on habeas review of the state court's harmless-error analysis.

Crawford Errors on Federal Habeas Review of a State Conviction

In Crawford, the Supreme Court held that testimonial evidence is admissible only where (1) the witness is unavailable to testify and (2) the defendant has had a prior opportunity to cross-examine the witness. 541 U.S. at 59. Since Crawford, courts have consistently held that out-of-court statements, including plea allocutions, are testimonial in nature and subject to these requirements. See United States v. Becker, __ F.3d __, No. 06-1274-cr, 2007 WL 2669604, at *6 (2d Cir. Sept. 13, 2007); United States v. McClain, 377 F.3d 219, 221 (2d Cir. 2004); United States v. Lombardozzi, 491 F.3d 61, 76 (2d. Cir. 2007).

In Chapman v. California, the Court recognized that not all constitutional violations require automatic reversal. 386 U.S. at 22. The Court identified two types of errors—structural error and trial error. See Arizona v. Fulminante, 499 U.S. 279, 307–10 (1991). Structural errors—errors that affect the "entire conduct of the trial from beginning to end," such as judicial bias or the deprivation of the right to counsel—are cause for automatic reversal of a conviction. Id. at 309–10. On the other hand, trial errors—errors that arise "during the presentation of the case to the jury"—are subject to review for harmlessness. Id.

at 307–08.  While a finding of judicial bias qualifies for automatic reversal, the erroneous
admission of a plea allocution, in violation of Crawford, is a trial error subject to harmless-
error review.  See Neder v. United States, 527 U.S. 1, 18 (1999) ("[V]iolation of the right to
confront witnesses guaranteed by the Sixth Amendment . . . [is] subject to harmless-error
analysis.") (citation omitted).

      In Chapman, the Court outlined the standard of review for harmless error.  The
standard requires the reviewing court to consider whether the error was "harmless beyond a
reasonable doubt."  386 U.S. at 24.  This turns on whether wrongly-admitted evidence "might
have contributed to the conviction."  Id. at 23 (quoting Fahy v. Connecticut, 375 U.S. 85, 86-
87 (1963)).

      However, the Chapman standard applies only to direct review of constitutional
errors.  Brecht v. Abrahamson, 507 U.S. 619, 622–23 (1993).  In Brecht, the Court held that
on a habeas petition, the reviewing court should only grant relief where the constitutional trial
error caused "actual prejudice."  507 U.S. at 637.  To grant the petition, the court considering
the collateral attack must find that the error "had substantial and injurious effect or influence
in determining the jury's verdict."  Id. at 623 (quoting Kotteakos v. United States, 328 U.S.
750, 776 (1946)).  This standard advances "the considerations underlying habeas
jurisprudence," promotes "the nature and purpose of collateral review," and respects state
interests in finality and federalism.  Id. at 623, 635-38.

      Three years after the decision in Brecht, the Antiterrorism and Effective Death
Penalty Act of 1996 ("AEDPA") amended the federal habeas statute.  28 U.S.C. § 2254.
Under AEDPA, a federal court exercising habeas jurisdiction may only disturb a state court
adjudication if such adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A decision is contrary to clearly-established federal law if it "contradicts the governing law" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from" the Supreme Court.  Williams v. Taylor, 529 U.S. 362, 405–06 (2000).

Under AEDPA, an unreasonable application of federal law is more than an incorrect application, but the petitioner need not show that all reasonable jurists would agree that a state court determination is incorrect in order for it to be unreasonable.  Id. at 409–12. Instead, a federal court should review a state court's interpretation of federal law using a standard of objective reasonableness.  Id. at 409.  The "increment of incorrectness beyond error . . . need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence."  Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks and citation omitted).  Noting the difference between the AEDPA and Brecht standards, the Second Circuit interpreted the standard for habeas review of constitutional error in Gutierrez v. McGinnis, 389 F.3d 300 (2d Cir. 2004). Where a state court has evaluated a constitutional error for harmlessness under Chapman, the AEDPA standard of review should be used in the habeas context; that is, on collateral review, the court must determine "whether the state unreasonably applied Chapman."  Gutierrez, 389 F.3d at 306.  Consistent with the foregoing, Magistrate Judge Peck considered whether the state court's "harmless error conclusion [on the evidence admitted in violation of Crawford] was an unreasonable application of Chapman."  (R & R 90.)

Subsequent to the issuance of the R & R, the Supreme Court held that, on habeas review under 28 U.S.C. § 2254, a federal court must evaluate the significance of constitutional error in a state court criminal proceeding under Brecht's "substantial and injurious effect" standard, regardless of whether the state court reviewed for harmless error under Chapman.  Fry v. Pliler, 127 S. Ct. at 2328.  Noting that AEDPA further limited the availability of habeas relief, the Court emphasized that the Brecht standard embodies AEDPA's unreasonableness test.  Id. at 2327.  Therefore, if the reviewing court, in applying Brecht, finds that the constitutional trial error is not harmless because it had a "substantial and injurious effect or influence in determining the jury's verdict," then the state court unreasonably applied clearly-established federal law.  Under this approach, AEDPA is satisfied because an error that had a "substantial and injurious effect" on a trial's outcome reasonably could not have been found to be harmless, under any standard, by any reviewing court.  See Pearson v. Ercole, No. CV-06-5315, 2007 WL 2128350, at *6 (E.D.N.Y. July 25, 2007) ("[U]nder Fry, to determine whether the State Court's finding of harmless error . . . was objectively unreasonable, the Court must determine whether the erroneous admission . . . 'had a substantial and injurious effect or influence in determining the jury's verdict.'") (quoting Brecht, 507 U.S. at 631).  This court will apply the "substantial and injurious effect or influence" standard articulated in Brecht to determine whether the Crawford error was harmless.[1]

Harmless-error analysis under the "actual prejudice" standard requires a review of the entire record.  See Brecht, 507 U.S. at 638 (analyzing the constitutional error "in light of the record as a whole"); Calderon v. Coleman, 525 U.S. 141, 147 (1998) (holding that the

---

[1]  The portion of the petition alleging judicial bias, a structural error, does not turn on the Supreme Court's decision in Fry.  Magistrate Judge Peck's analysis of the claims of judicial bias is not altered by Fry.

Brecht standard requires the reviewing court to "find that the error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict"). In its review of the record, the court considers "the importance of the [] wrongly admitted testimony, and the overall strength of the prosecution's case." Wray v. Johnson, 202 F.3d 515, 526 (2d Cir. 2000) (citing Brecht, 507 U.S. at 639) (additional citations omitted). When evaluating the importance of the testimony, the court considers whether the wrongly-admitted evidence (1) influenced an issue crucial to the jury's determination; (2) was significantly referenced throughout the prosecution's arguments; and (3) "was cumulative of other properly admitted evidence." Wray, 202 F.3d at 526 (citing Brecht, 597 U.S. at 639; Chapman, 386 U.S. at 25–26) (additional citations omitted).

Based upon a review of the record and consideration of the R & R and the objections thereto, I conclude on de novo review that the improperly-admitted evidence did not have a substantial and injurious effect or influence on the jury. I have considered as part of the review the strength of the prosecution's case apart from the improperly-admitted evidence, the extent to which the evidence was exploited or referenced by the prosecution and the absence of any other indicia of effect or influence of the improper evidence on the jury. Without intending to supplant Magistrate Judge Peck's impressive review of the record, I will offer a few additional observations on the evidence and on a subsequent case from the Circuit.

Additional Considerations Relating to the Possible Impact Upon the Jury

Anthony and Sal defended in part on the argument that any criminal activity was orchestrated by Stuart Winkler, the firm's Chief Financial and Compliance Officer, and that it transpired without their guilty knowledge. In his opening statement to the jury, Sal's lawyer asserted that, "[y]ou will hear testimony from the witnesses that the prosecution calls that Stewart [sic] Winkler manipulated people, manipulated my client, had his own agenda,

his own interests, his own favorites, and that he lobbied and manipulated to edge out my

client from this firm.  (Tr. 230.)

       Winkler's plea allocution is described by petitioners as the "coup de grace,"

supplying the "crucial link" to Anthony and Sal.  (Objections 5.)  Petitioners note that the

allocution repeatedly referred to actions that Winkler "and others" took.  (Tr. 11996-2010.)  It

is the reference to "others," that petitioners find especially prejudicial.  But neither Anthony

nor Sal was mentioned by name and the number of participants in the enterprise was such that

a reference to "others" did not point to either Marchiano.  Anthony's lawyer in his opening

told the jury that "[t]he number of brokers that worked at various parts [sic] in time for

Goldmen were hundreds, almost approaching a thousand."  (Tr. 143; see also Tr. 152).  Apart

from Winkler's plea allocution, the evidence of Winkler's involvement in criminal activity

was overwhelming and elicited through the testimony of numerous witnesses offered for

cross-examination.  True, the nature of Winkler's criminal activity would have required high-

level planning and the assistance of others, but such assistance and planning could logically

have come from a variety of sources.  The plea allocution of Winkler—offered only after the

other testimony of his criminal involvement had been introduced—was largely cumulative of

the testimony of Winkler's involvement.

       The impact of the other plea allocutions was of considerably less significance.

Putting their best foot forward, petitioners describe the effect of the other allocutions as

follows:  "The other allocutions served to corroborate each other and the live testimony of the

witnesses, essentially undoing the impact of the cross-examination that was done."

(Objections 5.)  Again, these allocutions established that the individual who had pled guilty

had engaged in crimes; they did not point the finger at Anthony or Sal.  By making this

observation, I do not mean to imply that the absence of a direct link to petitioners disposes of

the issue; it does not.  But, the relatively large number of employees at A.S. Goldmen, Inc. is a relevant factor tending to undermine any inference that Anthony or Sal were the guilty "others" to whom reference was made in the allocutions.  Moreover, the jury was carefully instructed that the allocutions could only be considered on the existence and scope of the criminal enterprise and not to identify any defendant as a participant in the criminal enterprise.  (R & R 30-31; 39-40 (quoting the limiting instructions).)

       Wholly apart from the seven plea allocutions that were improperly received into evidence, the jury heard from cooperators, who were submitted for cross-examination and testified that they had pled guilty to participation in criminal activities while employed at A.S. Goldmen.[2]  Stephen Kaplan testified that he had pled guilty to "[p]articipating in a criminal enterprize [sic]," a class C felony.  (Tr. 1150-52.)  Kaplan had been a supervisor in a New Jersey office reporting at various times to Sal Marchiano and Stuart Winkler.  Stacy Meyers was a sales assistant hired by Anthony.  She became chief trader in the New York office and later in the New Jersey office.  She took instructions from Anthony on a frequent basis.  Meyers was originally represented by a lawyer paid for by Anthony.  Meyers testified at trial, subject to cross examination, that she had pled guilty to attempted enterprise corruption, a class C felony.  (Tr. 5403.)

       Erika Whitman worked for Winkler in the compliance department.  She testified at trial, subject to cross-examination, that she had pled guilty to a scheme to defraud in the first degree, a class E felony.  (Tr. 6719.)  She admitted to lying to customers, hiding documents from regulators and shredding documents.  (Tr. 6719.)  Christopher Panza worked as a broker at A.S. Goldmen for about four and a half years in New York and New Jersey.  He

---

[2] In total, there were ten cooperating testifiers who had pled guilty to crimes.  One, Louis Raneri, had pled guilty to perjury.  In addition to the ten, there were two additional insiders who testified but had immunity or were not charged.

testified at trial that he had been indicted for enterprise corruption, violation of the General

Business Law and falsifying records, but had pled guilty to a single count of attempted

enterprise corruption.  (Tr. 7245-46.)

Charles Pipia, who testified at trial, was a broker at A.S. Goldmen and attended

meetings with Anthony.  Pipia had pled guilty to attempted enterprise corruption.  (Tr. 7916-

17.)  Michael Cilmi, who testified at trial, had pled guilty to two counts of enterprise

corruption, one of which related to his activities at A.S. Goldmen  (Tr. 8715.)  Cilmi worked

in the New York and New Jersey offices of A.S. Goldmen.  Michael Lamarti, another trial

witness, worked in the New York, New Jersey and Florida offices of A.S. Goldman where, at

various times, he worked with Sal and Anthony.  Lamarti had pled guilty to attempted

criminal enterprise.  (Tr. 9422.)

Vincent Caracciolo was employed by A.S. Goldmen as a cold-caller and later

held a management role.  He was supervised, at various times, by Sal and Stuart Winkler.  He

testified, subject to cross-examination, that he had pled guilty to charges in connection with

his employment at A.S. Goldmen, specifically a scheme to defraud, a class E felony.  (Tr.

3697.)  Unlike the plea allocutions that were admitted in violation of Crawford, Caracciolo's

allocution, which was read in part to the jury, named Sal, Anthony and Winkler as having

approved of false and misleading statements to investors.  (Tr. 4161-64.)

The point of this recitation is that the evidence of guilty pleas by testifying

witnesses, which was properly admitted at trial, was not materially different in kind or quality

from the improperly-admitted plea allocutions.  The testifying witnesses went on at length

about the criminal activities in which they participated at the behest of, or with the approval

of, Sal and/or Anthony and acknowledged that they had pled guilty to, among other crimes,

attempting to participate or participating in a criminal enterprise.  The plea allocutions of the

non-testifying allocutors, who did not directly mention any of the defendants on trial, were largely cumulative of other evidence.

The impact of any guilty pleas, by those who testified and those who did not, was significantly blunted by the effective cross-examinations of skilled defense counsel.  In the course of cross-examinations of the testifying witnesses, jurors learned that a person who pleads guilty may face the prospect of more serious charges being filed against him which are avoided by the guilty plea.  (Tr. 3976-78; 4142-45.)  The jury learned that a person who has been indicted may later enter a plea arrangement where he pleads to less than all of the charges that he faces.  (Tr. 7243-46; 8318-19.)  He may plead to a lesser included offense. (Tr. 7407-08.)  A person who pleads guilty may negotiate for the imposition of a fine and/or forfeited sum that may be lower than the one that would have been imposed if he proceeded to trial.  (Tr. 3987-90; 4149-52; 7441-43.)  The jury also learned that in advance of a guilty plea a person may be given a written statement by the prosecution which he is expected to read as part of the plea allocution.  (Tr. 4159-61.)  While the Crawford error is incontrovertible, a good deal of what the defense would have been able to accomplish through cross-examination of the non-testifying allocutors was developed through the witnesses who did testify.  This further reduces the impact of the improperly-admitted allocutions.

The limiting instructions in this case were reasonably clear and are quoted at length in the R & R at 30, 39-40.  They were given before (R & R 30) and after the receipt of the allocutions (R & R 39) and in the final instructions (R & R 40).  The jury was told a plea allocution may only be considered as to the participation by the person who made the statement and for the purpose of showing whether a conspiracy or enterprise existed and its scope.  No mental gymnastics were required by the jury to understand and follow the instruction.

Subsequent to the R & R, the Second Circuit decided <u>United States v. Becker</u>, in which it affirmed a district court's grant of a habeas petition, pursuant to 28 U.S.C. § 2255, as to a defendant held on a federal criminal conviction for securities fraud, conspiracy to commit securities fraud, mail fraud and wire fraud.  No. 06-1274-cr, 2007 WL 2669604 (Sept. 13, 2007).[3] There is a superficial similarity between <u>Becker</u> and this case in that defendant worked in a securities brokerage firm and multiple (11) plea allocutions of co-workers were admitted into evidence, which, in view of <u>Crawford,</u> was error.  <u>Becker</u> at *1-*3.  The differences, apart from the deference owed to the state courts' review in this case, are significant.  The <u>Becker</u> defendant was 19 years old when he joined the firm and remained only a year or so; there was a significant issue of intent or "mental culpability."  Id. at *8; <u>see</u> <u>id.</u> at *11.  Plea allocutions of other young brokers significantly undermined that defense.  The Court's limiting instruction in <u>Becker</u> did not make plain that the plea allocutions could not be used on the issue of intent.  In <u>Becker</u>, there was the danger of the jury leaping to assume that if several twenty-something brokers admitted to engaging in fraud, then probably this twenty-something broker engaged in fraud.  That danger is not here, because Anthony and Sal—the "A" and "S" in A.S. Goldmen—were like no one else in the Goldmen organization.

Moreover, unlike the nine testifying cooperators in this case who had pled guilty to participation in the criminal enterprise, there were only two testifying cooperators in <u>Becker</u> who had pled guilty.  <u>Id.</u> at *10.  The credibility of the two cooperators in <u>Becker</u> was suspect.  <u>Id.</u> at *11.  One testified that he knew nothing about the defendant's sales practices but based his testimony upon what went on a "majority of the time."  <u>Id.</u>  The cooperators in the case at hand presented a credible narrative of a criminal enterprise riddled by lies to customers, gross breaches of trust and manipulation of stock prices to the detriment of customers.  True, some of the

---

[3] Magistrate Judge Peck addressed the district court's ruling in <u>Becker</u> in the R & R at 79-81 n. 48.

evidence of Anthony and Sal's awareness of the criminal activities was circumstantial, but the prosecution built a case, wholly apart from the improper allocutions, which pointed strongly to their knowing participation in the crimes.

Finally, the government "repeatedly highlighted the significance of the allocutions" in the summation to the jury in <u>Becker</u>.  <u>Id.</u> at *12.  In the present case, the references to the improper evidence were brief in the context of the considerable length of the summations and did not unduly emphasize that evidence.  (R & R 84-87.)

Judicial Bias, Limitations on Cross-Examinations
<u>And Other Attacks on the Fairness of the Trial</u>

I have reviewed de novo the claims of bias, improper limitations on cross-examination, improper interference with examinations and other denials of federal or constitutional rights.  I adopt the reasoning and conclusion of the R & R and reject the claims.

<u>Conclusion</u>

The R & R is adopted and the petition is DENIED.  The Clerk is directed to enter judgment in favor of the respondents.

In adopting the R & R, I adopt the Magistrate Judge's view that the petitioners have made a substantial showing of the denial of a constitutional right solely as to the state court's harmless error review on the <u>Crawford</u> issue and a certificate of appealability will issue limited to that single ground.  28 U.S.C. § 2253.  <u>See</u> <u>Lozada v. United States</u>, 107 F.3d 1011, 1016-17 (2d Cir. 1997), <u>abrogated on other grounds by</u> <u>United States v. Perez</u>, 129 F.3d 255, 259-60 (2d Cir. 1997).

-14-

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       October 15, 2007